**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br>    Plaintiff, <br><br>    v. <br><br> TURBO SOLUTIONS INC., f/k/a Alex Miller Financial Services Inc., d/b/a Alex Miller Credit Repair, and <br><br> ALEXANDER V. MILLER, in his individual and corporate capacity, <br><br>    Defendants. | Civil Action No.    4:22-mc-369 <br><br> **FILED UNDER SEAL** |

**COMPLAINT FOR CIVIL PENALTIES, PERMANENT INJUNCTION,**
**MONETARY RELIEF, AND OTHER RELIEF**

Plaintiff, the United States of America, acting upon notification and authorization to the

Attorney General by the Federal Trade Commission ("FTC"), pursuant to Section 16(a)(1) of the

FTC Act, 15 U.S.C. § 56(a)(1), for its Complaint alleges:

1.      This is an action arising under Sections 5(a), 5(m)(1)(A), 13(b), 16(a), and 19 of

the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), 56(a), and 57b, Section 410(b) of the Credit

Repair Organizations Act ("CROA"), 15 U.S.C. § 1679h(b), and Section 6(b) of the Telemarketing

and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6105(b), to

obtain civil penalties, permanent injunctive relief, monetary relief, and other relief for Defendants'

acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), CROA, 15 U.S.C.

§§ 1679-1679*l*, and the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, in

connection with Defendants' marketing and sale of credit repair services.

1

## NATURE OF THE CASE

2.      Since at least 2018, Defendants have operated an unlawful credit repair scam that has harmed vulnerable consumers nationwide. Through Internet websites, social media, and telemarketing, Defendants falsely claim that, for a fee ranging from several hundred dollars to more than $1,500, they can improve consumers' credit scores. Defendants attempt to improve the credit scores of their customers by filing false identity theft reports on the FTC's identitytheft.gov website and by other means, all of which are either ineffective or unlawful. In addition, Defendants have routinely solicited and accepted prohibited advanced fees for their credit repair services and fail to make required disclosures regarding those services.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the law of the United States. It also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1337(a) because it arises under an Act of Congress regulating interstate commerce, under 28 U.S.C. § 1345 because the United States is the Plaintiff, and under 28 U.S.C. § 1355 because the United States seeks a civil money penalty. At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

4.      The Court has personal jurisdiction over Defendants because Defendants reside in and have their principal place of business in this district and because the alleged acts giving rise to the claims occurred in this District and elsewhere in the United States.

5.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), and (c)(2), and 15 U.S.C. § 53(b).

## PARTIES

6.       Plaintiff is the United States of America.

7.       Defendant Turbo Solutions Inc. ("Turbo Solutions") is a Wyoming company with its principal place of business at 440 Louisiana Street, Suite 575, Houston, Texas. Turbo Solutions was administratively dissolved for tax delinquency on June 9, 2021.[1] Turbo Solutions has also used mailing addresses of 77 Sugar Creek Center Boulevard, Suite 611, Sugar Land, Texas and 7890 Kemper Circle, Beaumont, Texas. Turbo Solutions was formerly known as Alex Miller Financial Services Inc. and has done business as Alex Miller Credit Repair. At all times relevant to this Complaint, acting alone or in concert with others, Turbo Solutions has marketed and sold credit repair services to consumers throughout the United States. Turbo Solutions has employees in the United States and has employees or contractors in the Philippines. Turbo Solutions transacts or has transacted business in this District and throughout the United States.

8.       Defendant Alexander V. Miller is or was an owner, officer, director, or manager of Turbo Solutions. He is an authorized signatory on many of Defendants' bank accounts. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Alexander Miller resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

---

[1] Under Wyoming law, a corporation continues to exist as a corporation after administrative dissolution and may be named in a civil proceeding. *See* Wyo. Stat. Ann. § 17-16-1405(a), (b)(v).

**THE FTC ACT**

9.       Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts

or practices in or affecting commerce."

10.      Misrepresentations or deceptive omissions of material fact constitute deceptive acts

or practices prohibited by Section 5(a) of the FTC Act.

**THE CREDIT REPAIR ORGANIZATIONS ACT**

11.      The Credit Repair Organizations Act ("CROA") took effect on April 1, 1997.

CROA's purposes are (1) to ensure that prospective buyers of the services of credit repair

organizations receive the information necessary to make an informed decision regarding the

purchase of such services; and (2) to protect the public from unfair or deceptive advertising and

business practices by credit repair organizations. 15 U.S.C. § 1679(b).

12.      CROA defines a "credit repair organization" as "any person who uses any

instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that

they can or will sell, provide, or perform) any service, in return for the payment of money or other

valuable consideration, for the express or implied purpose of . . . improving any consumers' credit

record, credit history, or credit rating. . . ." 15 U.S.C. § 1679a(3).

13.      CROA prohibits all persons from making any statement, or counseling or advising

any consumer to make any statement, which is untrue or misleading with respect to any consumer's

credit worthiness, credit standing, or credit capacity to any consumer reporting agency. 15 U.S.C.

§ 1679b(a)(1)(A). CROA also bars all persons from making or using any untrue or misleading

representation of the services of the credit repair organization. 15 U.S.C. § 1679b(a)(3).

Furthermore, CROA prohibits all persons from engaging, directly or indirectly, in any act, practice,

or course of business that constitutes or results in the commission of, or an attempt to commit, a

fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization. 15 U.S.C. § 1679b(a)(4).

14.     CROA prohibits credit repair organizations from charging or receiving any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform before such service is fully performed. 15 U.S.C. § 1679b(b).

15.     Credit repair organizations must provide consumers with a written statement containing prescribed language concerning "Consumer Credit File Rights Under State and Federal Law" before any contract or agreement is executed. 15 U.S.C. § 1679c(a).

16.     Credit repair organizations must also include certain terms and conditions in any contract or agreement for services, including a conspicuous statement in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows: "You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right." 15 U.S.C. § 1679d(b)(4).

17.     CROA directs credit repair organizations to provide consumers with a "Notice of Cancellation" form, in duplicate, containing prescribed language concerning consumers' three-day right to cancel that consumers can use to cancel the contract. 15 U.S.C. § 1679e(b). Any consumer who enters into a contract with a credit repair organization shall be given a copy of the completed contract and all disclosures required under the Act and a copy of any other document the credit repair organization requires the consumer to sign. 15 U.S.C. § 1679e(c).

18.     A violation of CROA constitutes an unfair or deceptive act or practice in commerce in violation of Section 5(a) of the FTC Act (15 U.S.C. § 45(a)), 15 U.S.C. § 1679h(b)(1), and shall be treated as a violation of an FTC trade regulation rule. 15 U.S.C. § 1679h(b)(2). A violation of

CROA made with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), is subject to monetary civil penalties for each violation of CROA. *See* 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Public Law 114-74, sec. 701, 129 Stat. 599 (2015); *see also* 16 C.F.R. § 1.98(d).

19.    Each instance in which Defendants have failed to comply with CROA constitutes a separate violation of CROA for the purpose of assessing monetary civil penalties.

## THE TELEMARKETING SALES RULE

20.    In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108. The FTC adopted the original Telemarketing Sales Rule in 1995, extensively amended it in 2003, and amended certain sections thereafter. 16 C.F.R. Part 310.

21.    Under the TSR, a "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a consumer or donor. 16 C.F.R. § 310.2(ff). A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration. 16 C.F.R. § 310.2(dd).

22.    The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer. 16 C.F.R. § 310.3(a)(2)(iii).

23.    The TSR bars sellers and telemarketers from requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until: (a) the time frame in

6

which the seller has represented all of the goods or services will be provided to that person has expired; and (b) the seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved. 16 C.F.R. § 310.4(a)(2). The TSR also prohibits sellers and telemarketers from requesting or receiving payment of any fee or consideration in advance of obtaining a loan or other extension of credit when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan or other extension of credit for a person. 16 C.F.R. § 310.4(a)(4).

24.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). A violation of the TSR made with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), is subject to monetary civil penalties for each violation. *See* 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Public Law 114-74, sec. 701, 129 Stat. 599 (2015); *see also* 16 C.F.R. § 1.98(d).

## DEFENDANTS' UNLAWFUL BUSINESS ACTIVITES

### Defendants' Deceptive Website and Social Media Accounts

25.     To induce consumers to purchase their credit repair services, Defendants maintained an Internet website, alexmillercreditrepair.com, and continue to operate various social media accounts on which they market and make deceptive claims regarding their credit repair services. Defendants have claimed to be "a professional credit corrections company specializing

in restructuring and rebuilding your credit." Individual Defendant Alexander Miller has claimed to be a "Credit Repair Expert on Debt Validation."

26.     Defendants' marketing routinely claims that they improve consumers' credit scores through a two-step process: removing negative information from consumers' credit histories or credit reports and adding positive credit history. For the first step, Defendants have claimed to remove negative information that involves "advanced disputing" of information on consumers' credit reports. For the second step, Defendants have claimed that they can add "credit building products" to consumers' credit histories that will result in a positive payment history being added to the consumer's credit history or credit report.

27.     Defendants have claimed that this two-step process will significantly increase consumers' credit scores and their ability to gain access to mortgages, car loans, and eligibility for funding at lower interest rates.

28.     For example, Defendants' website alexmillercreditrepair.com featured an embedded video that claimed: "You're your credit," "700+ credit scores," "Larger loan amounts," and "Higher credit card limits." Defendants' website also displayed the following statements:

- Repair Your Credit Today!! Guaranteed Results in 40 days!

- Delete Negative Accounts

- We Delete Inaccurate and Negative Accounts

- We provide trade lines (Credit Boosters).

- "The 3 Round Burst"…is now known as the most effective way to get negative accounts deleted off credit reports.

- The 3 Round Burst consist [sic] of 3 master rounds of advanced disputing. Each round is 30-40 days. You will see massive deletion results at the end of each round.

- Will my score go up? Your score will increase according to how many positive accounts you have after we delete the negative accounts.

- Your scores will increase according to how many Positive Accounts you have after the Negative/Inaccurate accounts are deleted. If you don't have any Positive Accounts then we have Credit Building Products that will help to strengthen you credit scores.

- Alex Miller Credit Repair has helped over 10,000 clients repair their credit and purchase the cars, homes and businesses of their dreams!

29.     Defendants have made the following statements on their Instagram "feed:"

- 2 STEP PROCESS: Credit Repair is a 2 step process. Step 1 is to delete the negative accounts. Step 2: is for you to add credit building products/tradelines to BOOST your scores. If you don't do BOTH steps or try to skip a step it won't work. So you have to do both.

- Credit repair is a 2 STEP PROCESS. Step 1: The removal of at least 85% of your inaccurate negative accounts. Step [2]: is for you to replace the negative accounts that we helped to remove with some positive accounts which we call credit building products/tradelines which will help INCREASE your scores to help get you that approval                    that                    you                    need.

- My client [] did everything she was supposed to do and that's why it worked out for her to buy this house. 1. She was patient during Covid. 2. She purchased both credit building products/tradelines. . .

- While we clean your inaccurate negative accounts you MUST DO 2 THINGS to see HUGE INCREASES in your scores. 1. Purchase both credit building products/tradelines. . . .

- Student Loans = Deleted/Collections = Deleted/Charge offs = Deleted/Evictions = Deleted/Bankruptcies = Deleted/Repos = Deleted/Late Payments = Deleted/Hospital Bills = Deleted/Foreclosures = Deleted

30.     Defendants' website and Instagram account also promote their services using purported testimonials that display pictures of homes and automobiles with captions such as, "I fixed her credit! She bought this house."

**Defendants' Deceptive Telemarketing**

31.     Defendants' website and social media accounts invite consumers to call a telephone number for more information on their credit repair services. The Defendants' Instagram account also encourages consumers to text message Defendants their contact information.

32.     When consumers contact Defendants using the telephone number listed on Defendants' website or Instagram account, they speak with one of Defendants' telephone representatives. These representatives make many of the same representations included on Defendants' website and social media accounts. For example, Defendants' telephone representatives have claimed that Defendants can remove negative items from consumers' credit reports. They tell consumers that Defendants achieve their results by sending the major credit reporting agencies several rounds of letters that dispute the consumers' negative transactions.

33.     Defendants' telephone representatives also tell consumers that purchasing credit building products, such as store credit cards (that can only be used to purchase goods or services from a particular retailer), will improve consumers' credit scores.

34.     Defendants' telephone representatives have even claimed that as a result of Defendants' services, consumers' credit scores will improve by 200 points in 90 days.

**Defendants' Unlawful Enrollment Process**

35.     Before providing any of the promised credit repair services, Defendants' telephone representatives require consumers to make an upfront payment of up to $1,500, the amount typically quoted by sales representatives and listed on Defendants' Instagram feed. Occasionally, Defendants' telephone representatives have offered consumers a lower fee if the consumers agree to purchase credit repair services that day, or may allow the customer to make multiple payments.

36.      Defendants' telephone representatives require consumers to provide a credit or debit card number on the phone. They tell consumers that they must make at least a down payment immediately. Defendants charge consumers' credit or debit cards or debit payment from consumers' bank accounts soon after they receive the billing information, and well before the promised credit repair services have been provided or completed.

37.      Defendants' Instagram account makes clear that Defendants require payment before the work is performed. For example, one post reads "The #1 Reason why we have to stop or pause Credit repair. Our most recent attempt to bill your credit card failed. Please update your credit card information to restore access. Will set status to inactive due to no response." Another post reads "All you gotta do is 2 simple things. 1. Don't miss your monthly payments. 2. Keep your IdentityQ active. And you will see the same results as this client."

38.      Although Defendants' website indicated that consumers should complete and sign an online contract, Defendants have allowed consumers to enroll by sending Defendants a copy of their driver's license, social security number, and credit or debit card or bank account information. At least one consumer enrolled without signing a contract.

39.      Consumers who do sign a contract are generally not informed of all of their rights before they execute the contract. In some cases Defendants have not provided consumers with a written statement containing prescribed language concerning "Consumer Credit File Rights Under State and Federal Law." Defendants' contracts have also failed to display a conspicuous statement in bold face type next to the space reserved for the consumer's signature on the contract, which reads: "You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right." Defendants have further failed to provide

consumers with the aforementioned "Notice of Cancellation" form, in duplicate, that explains consumers' three-day right to cancel the contract. Defendants have also failed to provide many consumers with copies of the contracts they signed.

### Defendants Do Not Follow Through on Credit Repair Promises

40.     As detailed above, Defendants claim they can improve consumers' credit scores by removing negative items from their credit report and adding positive credit history. However, there is no legal way to remove accurate, non-obsolete negative items from a consumer's credit history. Defendants' strategy for removing negative items has included filing bogus identity theft reports and fabricating baseless credit disputes. Defendants purport to add "positive credit history" by instructing consumers to apply for store credit cards or to pay to be added to as an authorized user on a "trade line," *i.e.*, a line of credit. Defendants' services do little or nothing to increase consumers' credit scores.

41.     Purportedly to remove consumers' negative credit history, Defendants have submitted dispute letters to one or more credit reporting agencies challenging, without support, most or all of the negative information in consumers' credit reports. These unsupported challenges rarely if ever cause credit reporting agencies to delete or change any consumer's credit information.

42.     Defendants also have attempted to remove negative credit history by, unbeknownst to consumers, filing or causing to be filed on the FTC's identitytheft.gov website, fake identify theft reports asserting that the negative information on consumers' reports was the result of identity theft. In fact, none of the consumers on whose behalf Defendants filed, or caused to be filed, these identity theft reports were victims of identity theft, nor was the negative information on their credit reports caused by identity theft.

43.     Even if these identity theft reports had not been fake, simply filing an identity theft report will not automatically result in the removal of negative information from consumers' credit reports. Credit reporting agencies typically review identity theft reports submitted to them, and if those reports are determined to have been wrongfully filed, the credit reporting agency may decline to remove the requested negative information.

44.     Defendants' credit building products similarly fail to improve their credit as promised. The store credit cards and trade lines that Defendants recommend for this purpose do not have the positive impact on the consumer's credit score promised by Defendants.

45.     In summary, consumers who purchase Defendants' credit repair services do not obtain the promised improvements to their credit scores. In fact, at least one consumer reported that her credit score actually worsened after purchasing Defendants' credit repair services.

46.     Since at least 2018, Defendants have collected over $9 million from thousands of consumers through their unlawful credit repair scheme. The FTC has received dozens of consumer complaints about Defendants' scams.

47.     Based on the facts and violations of law alleged in this Complaint, the Government has reason to believe that Defendants are violating or are about to violate laws enforced by the FTC.

## COUNT I
### Violations of the FTC Act

48.     Paragraphs 1-47 are incorporated as if set forth herein.

49.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of credit repair services, Defendants have represented, directly or indirectly, expressly or by implication, that Defendants will significantly improve consumers'

credit scores by, among other things, a) removing negative information from consumers' credit reports or profiles; and/or b) selling credit building products, such as store credit cards.

50.     In fact, when Defendants have made the representations set forth above, such representations were false or misleading.

51.     Therefore, Defendants' false or misleading representations as set forth above constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II
### Fraudulent or Deceptive Credit Repair Practices

52.     Paragraphs 1-51 are incorporated as if set forth herein.

53.     Defendants are a "credit repair organization" under Section 403(3) of CROA, 15 U.S.C. § 1679a(3).

54.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of services to consumers by a credit repair organization, Defendants have engaged in practices prohibited by CROA. For example, Defendants have made statements, or counseled or advised consumers to make statements, which are untrue or misleading with respect to their credit worthiness, credit standing, or credit capacity to consumer reporting agencies, including by filing or causing to be filed identity theft reports even when consumers have not, in fact, been victims of identity theft.

55.     In addition, Defendants have made untrue or misleading representations to consumers, including that Defendants will significantly improve consumers' credit scores by, among other things: a) removing negative information from consumers' credit reports or profiles; and/or b) selling credit building products, such as store credit cards, that will appear on consumers' credit reports or profiles.

56.     Defendants also have engaged, directly or indirectly, in acts, practices, or course of business that constitute or result in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization, including by filing identity theft reports on behalf of consumers even when consumers have not, in fact, been victims of identity theft.

57.     Defendants have actual knowledge or knowledge fairly implied of the federal credit repair organization laws or analogous state laws that apply to and regulate credit repair organizations.

58.     Therefore, Defendants' acts or practices as set forth above violate Section 404(a) of CROA, 15 U.S.C. § 1679b(a).

## COUNT III
### Violation of Prohibition against Charging Advanced Fees for Credit Repair Services

59.     Paragraphs 1-58 are incorporated as if set forth herein.

60.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of services to consumers by a credit repair organization, Defendants have charged or received money or other valuable consideration for the performance of credit repair services that Defendants have agreed to perform before such services were fully performed.

61.     Therefore, Defendants' acts or practices as set forth above violate Section 404(b) of CROA, 15 U.S.C. § 1679b(b).

## COUNT IV
### Failure to Make Required Disclosures

62.     Paragraphs 1-61 are incorporated as if set forth herein.

63.     In connection with the sale of services to consumers by a credit repair organization, Defendants have failed to provide a written statement of "Consumer Credit File Rights Under State

and Federal Law," in the form and manner required by CROA, to consumers before any contract or agreement was executed.

64.     Therefore, Defendants' acts or practices as set forth above violate Section 405 of CROA, 15 U.S.C. § 1679c.

## COUNT V
### Failure to Include Required Terms and Conditions in Contracts

65.     Paragraphs 1-64 are incorporated as if set forth herein.

66.     In connection with the sale of services to consumers by a credit repair organization, Defendants have failed to include in their consumer contracts the following required terms and conditions: the specific conspicuous statement in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, regarding the consumers' right to cancel the contracts without penalty or obligation at any time before the third business day after the date on which consumers signed the contracts.

67.     Therefore, Defendants' acts or practices as set forth above violate Section 406 of CROA, 15 U.S.C. § 1679d.

## COUNT VI
### Failure to Provide Copy of Contract and Cancellation Form

68.     Paragraphs 1-67 are incorporated as if set forth herein.

69.     In connection with the sale of services to consumers by a credit repair organization, Defendants have failed to provide with their consumer contracts a form with the heading "Notice of Cancellation," in the form and manner required by CROA to consumers. Similarly, Defendants have failed to provide consumers who entered into a contract with Defendants a copy of the completed contract and all disclosures required under CROA and a copy of any other document Defendants required the consumers to sign.

70.     Therefore, Defendants' acts or practices as set forth above violate Section 407 of CROA, 15 U.S.C. § 1679e.

## COUNT VII
### Violations of Prohibition on Deceptive Telemarketing Practices

71.     Paragraphs 1-70 are incorporated as if set forth herein.

72.     Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing," as those terms are defined in the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).

73.     In numerous instances, in connection with the telemarketing of credit repair services, Defendants have misrepresented, directly or by implication, material aspects of the performance, efficacy, nature, or central characteristics of their credit repair services, including but not limited to, that Defendants will significantly improve consumers' credit scores by, among other things: a) removing negative information from consumers' credit reports or profiles; and/or b) selling credit building products, such as store credit cards, that will appear on consumers' credit reports or profiles.

74.     Defendants have actual knowledge or knowledge fairly implied of the TSR or analogous federal or state laws that regulate telemarketing.

75.     Therefore, Defendants' acts or practices as set forth above violate Section 310.3 of the TSR, 16 C.F.R. § 310.3.

## COUNT VIII
### Violation of Prohibition against Abusive Telemarketing Practices

76.     Paragraphs 1-75 are incorporated as if set forth herein.

77.     In connection with the telemarketing of credit repair services, Defendants have engaged in abusive telemarketing practices in violation of the TSR. Defendants have requested or received payment of a fee or consideration for credit repair services before: (a) the time frame in

which Defendants have represented all of the credit repair services will be provided to consumers has expired; and (b) Defendants have provided consumers with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved.

78.     In addition, Defendants have requested or received payment of a fee or consideration in advance of obtaining a loan or other extension of credit when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan or other extension of credit for a person.

79.     Defendants' acts or practices as set forth above violate Section 310.4 of the TSR, 16 C.F.R. § 310.4.

## CONSUMER INJURY

80.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, CROA, and the TSR. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court:

A.  Grant preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, an order freezing assets, and appointment of a receiver;

B.  Enter a permanent injunction to prevent future violations of the FTC Act, CROA, and the

     TSR by Defendants;

C.  Award monetary and other relief as provided by law;

D.  Award Plaintiff monetary civil penalties from Defendants for every violation of CROA

     and the TSR; and

E.  Award any other and additional relief as the Court may determine to be just and proper.

Dated: March 1, 2022                                Respectfully submitted,

**FOR FEDERAL TRADE**                               **FOR PLAINTIFF UNITED STATES OF**
**COMMISSION:**                                     **AMERICA:**

JAMES REILLY DOLAN                                  BRIAN M. BOYNTON
Acting General Counsel                              Principal Deputy Assistant Attorney General
                                                    Civil Division
MALINI MITHAL
Associate Director                                  ARUN G. RAO
Division of Financial Practices                     Deputy Assistant Attorney General

HEATHER ALLEN                                       GUSTAV W. EYLER
Assistant Director                                  Director
Division of Financial Practices                     Consumer Protection Branch

GREGORY A. ASHE                                     LISA K. HSIAO
Federal Trade Commission                            Assistant Director
600 Pennsylvania Avenue NW
Washington, DC 20580                                CLAUDE F. SCOTT
Telephone: 202-326-3719                             Senior Litigation Counsel
Facsimile: 202-326-3768
Email: gashe@ftc.gov                                STEPHEN C. TOSINI
                                                    Senior Trial Counsel

                                                    AMY P. KAPLAN
                                                    MARCUS P. SMITH
                                                    Trial Attorneys

                                                    JENNIFER B. LOWERY
                                                    United States Attorney

                                                    By:  *s/ Richard A. Kincheloe*
                                                    Richard Kincheloe

Assistant United States Attorney
United States Attorney's Office
Southern District of Texas
Texas Bar No. 24068107
S.D. Tex. ID No. 1132346
1000 Louisiana Street, Suite 2300
Houston, Texas 77002
Phone: (713) 567-9422
Fax: (713) 718-3303
Richard.Kincheloe@usdoj.gov