```
1                    IN THE UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF TEXAS
2                            HOUSTON DIVISION
   _____
3                                      )
   UNITED STATES OF AMERICA,           )
4            Plaintiff,                 )
                                       ) CIVIL ACTION NO.
5  VS.                                 ) 4:22-MC-369
                                       )
6  TURBO SOLUTIONS INC., f/k/a Alex    )
   Miller Financial Services Inc.,     )
7  d/b/a Alex Miller Credit Repair,    )
   and ALEXANDER V. MILLER, in his     ) 10:25 A.M.
8  individual and corporate capacity,)
            Defendants.                )
9  _____)


10
                        PERMANENT INJUNCTION HEARING
11                 BEFORE THE HONORABLE ANDREW S. HANEN
                      UNITED STATES DISTRICT JUDGE
12                           MARCH 18, 2022

13 APPEARANCES:

14 FOR PLAINTIFF:
   MR. MARCUS P. SMITH
15 MR. STEPHEN C. TOSINI
   United States Department of Justice
16 450 5th Street NW, Suite 6400-South
   Washington, DC  20001
17 (202)353-9712

18 FOR DEFENDANT:
   MR. ALEXANDER V. MILLER
19 Pro Se

20 ALSO PRESENT:
   MR. WILFRED MILLER
21
   COURT REPORTER:
22 Heather Alcaraz, FCRR, RMR
   Official Court Reporter
23 515 Rusk, Suite 8004
   Houston, Texas  77002
24 (713)250-5584

25 Proceedings recorded by mechanical stenography, transcript
   produced by computer.
```

10:25:26  1          *(Call to Order of the Court.)*

10:25:27  2                **THE COURT:**  Thank you.  Be seated.

10:25:32  3                Okay.  We're here today in United States versus Turbo

4     Solutions and Alexander Miller, which is 22-MC-369.

10:25:42  5                Who do I have here for the government?

10:25:45  6                **MR. SMITH:**  Morning, Your Honor.  Marcus Smith on

7     behalf of the plaintiff, United States.

10:25:51  8                **THE COURT:**  All right.

10:25:52  9                **MR. TOSINI:**  And good morning.  My name is Steve

10    Tosini, and I represent the United States as well.

10:25:56 11                **THE COURT:**  All right.  And Mr. Miller?

10:26:01 12                **DEFENDANT MILLER:**  Yes.  My name's Alex Miller.

10:26:03 13                **THE COURT:**  All right.  And are you here representing

14    yourself?

10:26:08 15                **DEFENDANT MILLER:**  No, sir.  I couldn't afford an

16    attorney, but I'm looking for an attorney right now.  I've been

17    talking to one, and he said that he'll take on my -- help me.

10:26:18 18                **THE COURT:**  Okay.  All right.  Let me -- let me just

19    see if I can short-circuit this.  Mr. Miller, the government is

20    claiming the way you operate your business violates the law --

10:26:43 21                **DEFENDANT MILLER:**  I don't want to fight, Your Honor.

10:26:44 22                **THE COURT:**  Pardon me?

10:26:46 23                **DEFENDANT MILLER:**  I don't want to fight the

24    government, Your Honor.

10:26:47 25                **THE COURT:**  And that's where I was going, and I don't

1   think they want to fight you, necessarily, as long as you're

2   complying with the law.  I don't think the government goes out

3   of their way to put private business out of business, but

4   they -- but they do have a duty to enforce the laws that's

5   written, and they do have a duty, when those laws are designed

6   to protect certain consumer groups, to protect those groups.

10:27:19  7           And -- and, Mr. Smith, you can weigh in to this if I

8   am putting something into your -- in your mouth that you

9   disagree with.

10:27:37  10          But what they are seeking and are asking me to do

11   today is enter an injunction that basically stops you from

12   violating the law, and I'm assuming, from what you just said,

13   that you're not intentionally violating the law anyway and don't

14   want to be violating the law.

10:28:04  15          **DEFENDANT MILLER:**  No, sir.

10:28:04  16          **THE COURT:**  And so I'm wondering if -- if maybe,

17   Mr. Smith, you could kind of detail short -- briefly here on the

18   record what it is the government thinks that Mr. Miller is doing

19   wrong or Turbo Solutions is doing wrong, and -- and we may have

20   an agreement here on the record by Mr. Miller that he'll quit

21   doing those things or -- if he -- if he was doing them, and if

22   he wasn't doing them, he'll make sure they don't happen in the

23   future either.

10:28:39  24          **MR. SMITH:**  So certainly, Your Honor.  The issue is

25   that the defendant's business is a fundamentally deceptive one

1  to consumers because the defendant is promising that he can

2  remove all negative information from a consumer's credit report

3  in exchange for a fee that's typically $1,500.  Those

4  representations aren't true, and we know that they're not true

5  because we have contacted representatives from Equifax, one of

6  the three national credit reporting agencies, representatives

7  from FICO, the company that has developed the most commonly used

8  credit -- credit score in the country, and we have submitted

9  declarations by these representatives which make it very clear

10  that it's not possible to remove accurate non-obsolete

11  information from a consumer's credit score.

10:29:35 12         We also know the defendant's representations are not

13  true because numerous consumers have said and submitted

14  declarations to that same effect, that they paid Mr. Miller's

15  fees and did not receive the credit repair that they paid for.

16  So there's an issue about the way Mr. Miller's marketing the

17  services that he claims to provide, but that's not the only

18  issue.

10:29:58 19         Credit repair is a tightly regulated industry.  Credit

20  repair organizations are required to provide written contracts.

21  They're required to provide a statement of consumer rights under

22  state and federal law.  They're required to provide a notice of

23  the right to cancel.  They're precluded from charging fees in

24  advance of providing services, and there's evidence that

25  Mr. Miller and his companies have violated all of these

1    restrictions.

10:30:26  2          So there's -- there are a variety of violations that

3    are going on here that violate different statutes, all of which

4    are at issue here.  And I would also note that these

5    are -- appear to be ongoing violations, that as recently --

6    we've documented as recently as last month, the defendant

7    continues to market his credit repair services; continues to

8    charge consumers fees range- -- excuse me -- ranging from $1,500

9    up to, I believe, $5,000 for the credit repair master class,

10   whatever that is.

10:31:02  11          So the issue is this ongoing marketing of this

12   business is defrauding consumers and continues to do so, but the

13   other issue, which the Court had not yet addressed, is that

14   there is an issue about consumer redress.  The defendant has

15   earned, by our calculation, over $9 million running this

16   business, and that was only through December of 2020, the last

17   financial statements that we have.

10:31:29  18          So it's quite possible that in the last 14 months,

19   that number has increased substantially.  So as we discuss a

20   potential resolution to this, one of the issues is going to be:

21   How are we going to make these consumers whole?  And the relief

22   that we are -- some of the relief that we are asking the Court

23   to enter today is intended to preserve whatever assets are

24   remaining so that when this case is over, the Court will be able

25   to provide effective relief to those consumers.

10:32:03  1          **THE COURT:**  Okay.  Did you -- go ahead, Mr. Miller.

10:32:11  2          **DEFENDANT MILLER:**  Inaccurate.  So, Your Honor, I have

3    a huge social media following, and my Instagram has what you

4    call BlueCheck verify.  It means that, like, my page is the

5    original social media page, and I have numerous people using my

6    images to steal people's money.

10:32:33  7          Do I do credit repair?  Yes, sir.  Have I helped

8    people?  Yes, sir.  Have I dropped the ball on a few customers?

9    Yes, sir.  Do I go back and fix it?  Yes, I do.

10:32:47 10          But my issue is scam artists -- my last -- most recent

11   post on my Instagram is seven Instagram scammers using my images

12   to steal from people.  Turbo Solutions, I quit credit repair,

13   man.

10:33:01 14          **THE COURT:**  You what?

10:33:03 15          **DEFENDANT MILLER:**  Turbo Solutions, the name of the

16   company, I want to quit credit repair.  I just want to get out

17   all of it altogether.  I know that once somebody -- the

18   government is after you, it's best to just stop.  Whether I'm

19   right or wrong, whether people are using my images to scam

20   people -- I just made a post on Facebook and Instagram last

21   night.  People find images; scam artists using my pictures.  I

22   don't care.

10:33:29 23          I just want to quit credit repair, period, altogether.

24   I can change my Instagram name.  I'm no longer marketing my

25   master class.  I don't want to teach people credit repair.  I

1    don't want to do none of it.

10:33:42  2         I got a halfway house and a drug treatment facility

3    that I'm working on because that's part of my past that I want

4    to move in to that and just start doing other stuff for my life.

10:33:54  5         THE COURT:  Well, are you willing to enter into an

6    agreement here on the record with the government that -- that

7    you will, both individually and as Turbo Solutions, stop

8    operating in the credit repair industry?

10:34:17  9         DEFENDANT MILLER:  Yes, sir.

10:34:18 10         THE COURT:  All right.  That takes care of part of the

11   problem.

10:34:21 12         MR. SMITH:  I would just also add:  I believe the

13   defendant has incorporated another entity, AMCR Win (phonetic)

14   LLC, just within the last month or two; that it's unclear

15   exactly what the purpose of that company is.  But any -- any

16   agreement about the defendant getting out of the credit repair

17   business has to include any entities in which he's involved.

10:34:45 18         THE COURT:  And you understand that?

10:34:46 19         DEFENDANT MILLER:  No, sir, I don't understand that

20   part.

10:34:48 21         THE COURT:  Well, let me -- what -- what Mr. Smith is

22   saying is he doesn't want Turbo Solutions to go out of the

23   credit repair business and then find out that you turned around

24   and -- and opened Miller Credit Solutions --

10:35:09 25         DEFENDANT MILLER:  No.  No.

10:35:09  1          **THE COURT:**  -- over here, and you're doing the same

2      thing but under a different name.

10:35:13  3          **DEFENDANT MILLER:**  No, sir.  I don't want to do that.

4      That's not what it is, sir.  No, sir.  I'm done

5      with -- Your Honor, I'm done with credit repair.  It's no more

6      Alex Miller Credit Repair.  I don't want to do it no more.  I'm

7      not going to do it.  I'm done, Your Honor.

10:35:26  8          **THE COURT:**  All right.  I'm trying to think what --

9      the best way to get this documented.

10:35:42  10         **MR. SMITH:**  We would be -- we can submit a proposed

11     injunction that covers this conduct.  And I'm happy to talk

12     either with Mr. Miller's attorney or -- or with him directly,

13     depending on whether he's represented, to try to work something

14     out to this effect and submit it to the Court in short order.

10:36:06  15         That shouldn't be a problem, but, again, often the

16     details -- there may be dispute about the details of that, the

17     wording of such an order, and, again, none of this addresses

18     the -- the consumer redress or civil penalties issue.

10:36:27  19         **THE COURT:**  How much -- and this may be something you

20     don't know, Mr. Smith.  I mean, do you have a feel for how many

21     consumers are trying to get return to their fees?

10:36:48  22         **MR. SMITH:**  It's hard to say.  I believe the FTC has

23     been in contact with, very roughly -- I can't commit to the

24     number, but I would say roughly a dozen consumers, but there are

25     hundreds of Better Business Bureau complaints about Alex Miller

1   Credit Repair, and it's -- and Mr. Miller has advertised that he

2   has had thousands of clients.  So it's unclear how many of those

3   are actively seeking refunds, but as far as whether or not the

4   law was violated with respect to those consumers, whether

5   there's any refunds or not is not relevant.

6        The issue is whether or not they were deceived into

7   paying for the services for which they paid, and the number of

8   consumers that were harmed as a result of Mr. Miller's marketing

9   could number in the thousands, you know, but we don't know, and

10  it's one of the issues we would like -- we were planning to

11  explore in discovery, if we get that far.

12       **THE COURT:**  Well, I'm trying to figure out -- I mean,

13  it's no secret what I'm trying to figure out.  I mean,

14  Mr. Miller says he's getting out of the business.  Whether

15  it -- it's him individually or under any kind of corporate name,

16  he's going to be out of the business.  That makes it easy, it

17  would seem like, for us to enter a -- an injunction and take

18  that aspect out of the case.

19       But I'm trying to figure out if there's a way -- it

20  seems a shame, given that Mr. Miller's getting out of the

21  business, to -- and I don't want to say "drag this case out"

22  because that sounds demeaning to both sides, but for him to take

23  money that he wouldn't otherwise have to spend, go hire an

24  attorney, and get involved in this, and for the government to

25  use taxpayer funds to pursue this, if there was a way, I don't

1   know, to set up a -- I don't know -- and I'm thinking off the

2   top of my head here, some kind of fund just to set aside kind of

3   an escrow, and if people complain and want a refund, and they

4   have a meritorious claim, they get a refund, and if they don't

5   have a meritorious claim, they don't get a refund.  And at the

6   end of it, let's say a year, anything that's left over gets

7   returned to Mr. Miller.

10:39:38   8        **MR. SMITH:**  And, Your Honor, what -- we had initially

9   submitted an order -- a proposed order appointing a receiver in

10  large part to do exactly that, to identify assets of

11  Mr. Miller's, to identify consumers who were harmed by

12  Mr. Miller's businesses, and to preserve those assets and

13  determine who would be entitled to a -- to compensation --

10:40:00   14        **THE COURT:**  I guess the thing that concerns me about

15  that, Mr. Smith, is, one, the cost because I think -- especially

16  if he's going out of business, I mean, there's not going to be a

17  large sum of money to pay that, and -- and, two, I mean,

18  if -- how is the receiver going to do that?  I mean, if -- if

19  somebody calls me up and says, "Hey, do you want your money

20  back," they're going to say yes.

10:40:31   21        **MR. SMITH:**  Well, it would be based -- again, it would

22  be based on documentation of who was a paying customer, and the

23  mere fact that they paid for services that could not have been

24  rendered -- because the notion that, for a fee, you can boost

25  your credit score is false.  And so any consumer who paid for

1   the services has been harmed and would be entitled to some

2   consumer redress, but we don't have a full list of Mr. Miller's

3   customers.  Only he has those documents, and so --

10:41:05   4        **THE COURT:**  No, I understand that, but, again, I'm

5   also understanding -- I mean, you know, if we handle this like a

6   class action where we mail something out to every possible

7   customer, they're all going to say they want their money back.

8   I mean, why wouldn't they?

10:41:23   9        **MR. SMITH:**  Well, they may all be entitled to their

10   money back, Your Honor.  That would be possible -- that would be

11   our position, and so the main issue would be identifying the

12   assets -- how much is there? -- and then identifying the --

13   the --

10:41:38   14        **THE COURT:**  Well, some of these people may actually

15   have been helped.

10:41:44   16        Let's take the first step at a time.

10:41:49   17        *(Sotto voce discussion between the Court and law clerk.)*

10:41:56   18        **THE COURT:**  Here's what I think we do first.  I just

19   asked Tanner to go get a copy of your proposed injunction.

20   Let's mark it up.  Let's -- Mr. Miller can look at it.

21   Let's -- let's nail down that this morning because that we can

22   get done, and that certainly, you know, puts an end to the

23   emergent aspect of this.

10:42:37   24        Mr. Smith, I'll let you mark it up; talk to

25   Mr. Miller.  Mr. Miller can make changes if -- you know, suggest

1 changes that he wants, and then we'll retype it, get it signed,

2 and we'll get it entered this morning.

10:42:56 3    Then, I think it would be -- once we get that done, it

4 may be beneficial for you and Mr. Miller to talk.  I mean, I

5 don't know what kind of assets Turbo Solutions has, but

6 let's -- and what kind of ongoing business -- maybe I should ask

7 you that, Mr. Miller.

10:43:23 8    What kind of ongoing business is Turbo Solutions

9 involved in?  Are they currently --

10:43:27 10   **DEFENDANT MILLER:**  Turbo Solutions, right now, is

11 paying taxes.  The business -- so I just got a divorce.  All of

12 this happened at the same time.  So the ex-wife took half of

13 everything.  Alex Miller's pretty much left with nothing.

10:43:39 14    I got eight computers; a little office I pay $2,500 a

15 month for.  I got some pens and papers.  I even had to sell the

16 house.  I gave her the house.

10:43:52 17    So Alex Miller, Turbo Solutions, we don't have nothing

18 anymore.  All of this happened at the same exact time.

10:43:58 19   **THE COURT:**  Well, maybe -- and if that's true, maybe

20 some of the aspect, Mr. Smith, of what you're trying to pursue

21 is trying to squeeze blood out of a turnip.  Now, you'd

22 obviously want proof of all that --

10:44:11 23   **MR. SMITH:**  Yes.

10:44:11 24   **THE COURT:**  -- you know, but if they've gone through a

25 divorce proceeding, that proof is probably sitting in the family

1  court.

10:44:17  2       Well, let's do this.  I'm -- I'm going to step off.

3  I'm going to have Tanner bring in your draft.  Let's doctor up

4  the draft.  I'll get it retyped.

10:44:28  5       Let's get the injunction in place because it sounds

6  like, Mr. Miller, you don't have a problem having Turbo

7  Solutions enjoined --

10:44:37  8       **DEFENDANT MILLER:**  Done.

10:44:38  9       **THE COURT:**  -- or yourself as far as credit

10  reformation --

10:44:42  11       **DEFENDANT MILLER:**  Yes, sir.

10:44:42  12       **THE COURT:**  -- and let's get that going.  And in the

13  meantime, let's see if we can think of a way that we can -- we

14  can do this.  I don't want to waste the taxpayers' money if

15  there's nothing there.  Obviously, if there's something there

16  and consumers have been harmed, maybe we -- you know, we want to

17  remedy that, but it doesn't do anybody good to just pound their

18  head against a wall.

10:45:09  19       So let's -- let's get the injunction language fixed,

20  and let's get that done, and I'll get that entered today, and

21  then let's -- so I'm going to ask you guys to hang around; look

22  at this language.  When you're done, give it to Rhonda.  We'll

23  get it typed up; I'll bring it back out; everybody will sign it;

24  I'll sign it; and then let's talk about -- in the meantime,

25  y'all be thinking about what's -- if there's a good way to

1    either remedy the consumer situation or for the government to be

2    assured that there's really no point in pursuing this further.

10:46:02  3         *(Sotto voce discussion between the Court and law clerk.)*

10:46:04  4         **THE COURT:**  This is styled "Temporary Restraining

5    Order."  Obviously, we'd want to change that to an injunction.

10:46:11  6         Why don't you hand that to Mr. Smith and let him --

7    I'm going to step off.  Y'all take about 15 or 20 minutes,

8    however long it takes to doctor that up to make it a permanent

9    injunction, and we'll retype it.  So don't worry about --

10:46:21 10        **MR. SMITH:**  Some the provisions -- oh, I see.  Yes,

11   this is great.  We will do that.  Thank you, Your Honor.

10:46:27 12        **THE COURT:**  All right.  Y'all talk about it, and then

13   let Rhonda know when you're ready, and I'll come back.

10:46:34 14        *(Recess taken from 10:46 a.m. to 12:17 p.m.)*

12:17:07 15        **THE COURT:**  All right.  Be seated.

12:17:13 16        I'm sorry that took as long as it did.  Some of your

17   notes were a little hard to --

12:17:17 18        **MR. SMITH:**  I understand.  I apologize for that.

12:17:19 19        **THE COURT:**  I was figuring that out.  We highlighted

20   various aspects of it just to make sure that we got it right.

12:17:34 21        **MR. SMITH:**  Yeah.

12:17:41 22        So shall I explain our thinking with respect to these

23   highlighted sections?

12:17:45 24        **THE COURT:**  Yeah.  Well, let's -- right now, let's

25   concentrate on the injunction part.

12:17:57  1          If the highlighted portions are right, I'm going to

2   get Tanner to go run un-highlighted, and then get everybody to

3   sign it.

12:18:06  4          **MR. SMITH:**  So, Judge -- and this is my fault for not

5   fully marking up the draft.  I would just point out that the

6   title of the document is still TRO and should be permanent

7   injunction.

12:18:18  8          **THE COURT:**  Yeah.  It should be permanent injunction

9   instead of --

12:18:20 10          **MR. SMITH:**  And then I've discussed this with

11  Mr. Miller, that in paragraph B on page 2, there are a couple of

12  references to "likelihood of success" that we would change to

13  "has succeeded" or "has shown" to reflect the fact that this is

14  no longer a temporary order.  So in the first line, it would

15  read, "The United States has shown that defendants, Turbo

16  Solutions Inc.," et cetera.

12:18:59 17          And then in the middle of the paragraph --

12:19:03 18          **THE COURT:**  Why don't we put, Tanner -- there's

19  another "likelihood of success."  Let's say "has shown, and the

20  defendants have not contested," and that way it represents an

21  agreement.

12:19:29 22          **MR. SMITH:**  I think I explained to Mr. Miller that the

23  -- on page 1, the highlighted section of the proposed order,

24  just -- appointing a receiver just reflects that we submitted

25  one.

12:19:40  1        **THE COURT:**  Yes, and I've looked at it.  That's all

       2   that that first page says.

12:19:50  3        **MR. SMITH:**  On page 3, I discussed with Mr. Miller

       4   that the -- the reference there is to a provision of the

       5   telemarketing sales rule that this language was originally meant

       6   to capture.

12:20:06  7        **THE COURT:**  And, Mr. Miller, if you want to see it, I

       8   brought you a copy.

12:20:09  9        **DEFENDANT MILLER:**  Yes, sir.

12:20:09 10        **THE COURT:**  Tanner, hand that to Mr. Miller.

12:20:11 11        To be honest with you, I had to look it up, too.

12:20:16 12        **MR. SMITH:**  It's not one anybody knows by heart.

12:20:37 13        **THE COURT:**  I mean, basically, the way -- the context

      14   the way those two things read at the bottom of 4 -- at the top

      15   of 4 and bottom of 3 is that you're -- what you're agreeing to

      16   is not violate the law.

12:20:48 17        **MR. SMITH:**  Yeah.  I do think, though, in paragraph C,

      18   that the citation does -- should be there because the -- the

      19   prohibitions enumerated in 1 through 6 are a bit broader than

      20   just that one provision of the sales rule.  This really goes to

      21   the false representations that are violations of the -- the CROA

      22   and of the FTC Act, as well as the telemarketing sales rule.

      23   And so I would want to delete that reference, and if I wrote it

      24   in, I apologize --

12:21:22 25        **THE COURT:**  On the top of 4?

12:21:23 1        **MR. SMITH:**  On the top of 4, yeah.  So that after,

2   "Otherwise" -- it would be "Otherwise," colon, and remove the

3   "in violation of."

12:21:31 4        **THE COURT:**  Yeah.  So I understand what you mean.  You

5   were actually referencing more than one act.

12:21:36 6        **MR. SMITH:**  Right.  That's right.

12:21:54 7        And then on page 5, we also discussed during the break

8   that this provision is really meant just to provide the

9   government with notice of other entities, other businesses the

10  defendant is operating just while this action is pending, not

11  for the rest of his natural life.  And so it requires him to

12  notify us what those businesses are while this action is pending

13  just so that we can verify that they are not in the credit

14  repair business.

12:22:21 15       And then once we reach a final resolution of the case,

16  he will no longer be under obligation to do that.

12:22:27 17       **THE COURT:**  I think we have "during the pendency of

18  the action."

12:22:31 19       **MR. SMITH:**  Yes, but that's why we added that.  That's

20  the reason we added that.

12:22:48 21       So with those edits, I don't believe the government

22  has anything else --

12:22:52 23       **THE COURT:**  All right.  Mr. Miller --

12:22:52 24       **MR. SMITH:**  -- on this piece --

12:22:53 25       **THE COURT:**  -- take a minute here, too, and let him

1   look at it.

12:22:57  2      *(Mr. Miller reviews document.)*

12:28:47  3      **THE COURT:**  Mr. Miller, did you ask me something?  I

4   didn't hear you.

12:28:47  5      **DEFENDANT MILLER:**  Yes, sir.  I had one question,

6   Your Honor.  At the bottom of the Telemarketing Act, part 4, it

7   reads:  (Reading) Requesting or receiving a payment of any fee

8   or consideration in advance or obtaining a loan or other

9   extension of credit when the seller or telemarketer has

10   guaranteed or represented a likelihood of success in obtaining

11   or arranging a loan or an -- or other extension for credit of a

12   person.

12:29:18 13      What I would like to do with my life now, besides the

14   halfway houses and treatment facilities, is -- I met a lady who

15   wants to help me to sell business loans, real estate loans and

16   things like that.  Would I be violating this act and be back in

17   court if I sell business loans?

12:29:38 18      **THE COURT:**  Tell me what page -- what page are you on

19   here?

12:29:42 20      **DEFENDANT MILLER:**  This would be page 1 of the

21   telemarketing law that you let me read.

12:29:47 22      **THE COURT:**  Oh, no.  I see what you -- no.  All

23   I'm -- this order solely refers to activities in the process of

24   credit repair.

12:30:01 25      **DEFENDANT MILLER:**  Yes, sir.  I totally understand

1    everything now, sir.

12:30:06    2           **THE COURT:**  All right.  Is it all right with you?

12:30:07    3           **DEFENDANT MILLER:**  Yes, sir.

12:30:08    4           **THE COURT:**  All right.  I'm going to hand you --

12:30:10    5           **MR. SMITH:**  I just want to clarify one thing.  So

6    this -- this regulation is specific to all telemarketing.  It's

7    specific to telemarketing, but not necessarily specific to

8    credit repair, and so when I discussed with Mr. Miller earlier,

9    I don't want to give him advice about what business will or will

10   not violate this particular regulation, but it's -- it does

11   apply to other business services that are marketed through

12   telemarketing.

12:30:40   13           **THE COURT:**  Well, I'm not -- I'm not giving you carte

14   blanche to violate this act --

12:30:48   15           **DEFENDANT MILLER:**  Yes, sir.

12:30:48   16           **THE COURT:**  -- on the one hand, but I am saying that

17   I'm limiting this order, though, to the tel- -- to the credit

18   repair industry.

12:30:57   19           **DEFENDANT MILLER:**  Okay.

12:30:58   20           **MR. SMITH:**  That -- that's our request.  I just want

21   to make sure that Mr. Miller understands that there may be risk

22   of violating this law, notwithstanding what we're saying here

23   today --

12:31:08   24           **THE COURT:**  Yeah.  In other words --

12:31:09   25           **MR. SMITH:**  -- when he conducts other business.

12:31:11  1          THE COURT:  What Mr. Smith is saying is you could

2  violate this law in other ways --

12:31:16  3          DEFENDANT MILLER:  Yes, sir.

12:31:16  4          THE COURT:  -- but as far as violating my order --

12:31:19  5          DEFENDANT MILLER:  Yes, sir.

12:31:19  6          THE COURT:  -- my order's limited to credit repair.

12:31:22  7          DEFENDANT MILLER:  Yes, sir.  I'm done.

12:31:24  8          THE COURT:  All right.  With that, could you get us an

9  un-highlighted copy?

12:31:33 10      *(Sotto voce discussion between the Court and law clerk.)*

12:33:37 11          MR. SMITH:  Your Honor, would it be okay to just break

12  for three minutes and step outside?

12:33:41 13          THE COURT:  Sure.  Why don't we get a chance to use

14  the facilities.  We'll come right back.

12:33:47 15      *(Recess taken from 12:33 p.m. to 12:44 p.m.)*

12:44:59 16          THE COURT:  All right.  Be seated.

12:45:00 17          We have made copies for each of you, and if I can get

18  Tanner to pick one of those to be the original and ask

19  Mr. Miller and Mr. Smith to sign it, and then I will sign it.

12:45:32 20          They're welcome to read it first, but it's just the

21  changes that we made that were suggested.

12:45:39 22      *(Sotto voce discussion between the law clerk and the*

12:45:39 23        *parties.)*

12:45:55 24          LAW CLERK:  Judge, this one doesn't have the signature

25  page for the parties.

12:46:03  1    *(Sotto voce discussion between the Court and law clerk.)*

12:46:14  2         **THE COURT:**  All right.  We have the wrong signature

3    page.

12:46:45  4         **MR. SMITH:**  I'm sorry.  Is he bringing back the copy

5    to sign?

12:46:47  6         **THE COURT:**  He's bringing back the -- we have -- we

7    attached the wrong signature page.

12:46:50  8         That's what happens when you try to do stuff during

9    the lunch hour and my assistant's not there.

12:47:06 10    *(Document handed to the parties.)*

12:49:11 11         **MR. SMITH:**  Your Honor, apologies for not noticing

12   this earlier, but we still have the "filed under seal" language

13   in the caption.  This would not be --

12:49:17 14         **THE COURT:**  I'll change that.

12:49:18 15    *(Document executed.)*

12:51:27 16         **THE COURT:**  Rhonda, will you make two copies?

12:51:29 17         All right.  Gentlemen, I've accepted your agreement on

18   the injunction and signed it, and Rhonda's making copies so each

19   of you have a signed copy.

12:51:40 20         The question now is:  Where do we go from here?  We've

21   touched on it a little bit.  The government -- and again,

22   Mr. Smith, correct me if I'm putting words in your mouth --

23   wants to make sure, to the extent it can, that any consumer who

24   has -- and I won't say rightfully, but who has -- feels they've

25   been ripped off and who can show with some kind of certainty

1    that they have, gets compensated.

12:52:34 2          But to that extent, we've heard Mr. Miller tell us

3    that -- basically, that Turbo Solutions is out of business; Alex

4    Miller Credit is out of business.

12:52:47 5          **DEFENDANT MILLER:**  Yes, sir.

12:52:51 6          **THE COURT:**  I don't think anyone wants to waste money

7    on attorney's fees that they don't have to pay.  And in the

8    government's case, it's maybe not attorney's fees, but it's

9    taxpayers' money.  We all want to be good stewards of the

10   taxpayers' money.

12:53:16 11          And so the question then becomes -- let's assume for

12   argument, hypothetically, that what Mr. Miller has said today --

13   he's gone through a divorce; he's closed his business -- you

14   know, there may not be money out there, even if somebody was

15   wronged, to compensate them.  On the other hand, the

16   government -- and we did this at the break -- and, Tanner, you

17   can hand them a copy of it.

12:53:51 18          We got this off the social media that basically -- at

19   least says or implies that you're multi-millionaire, which makes

20   one suspicious that there is money out there, and -- and I'm not

21   accusing anyone of not telling the truth here today.  I'm

22   not -- I don't have the facts to make that kind of decision, but

23   what I am saying, Mr. Miller, is -- I mean, given what we pulled

24   up in two minutes looking at social media, it at least implies

25   that there is money out there.

12:54:38  1        So -- and I'm just trying to tee up the question.  The

2    government has asked for a receiver and has even suggested one.

3    The one they suggested I think is certainly qualified, but I'm

4    not sure there's a sum of money out there to pay that receiver,

5    and I don't want to have -- I don't want to have the Court

6    appoint somebody, have them work "X" number of hours, and then

7    say, "Too bad.  There's no money," because I just don't think

8    that's fair to the person we appoint.

12:55:23  9        So I'm -- I'm teeing up the question, and I want both

10   sides to weigh in here on how do we proceed from here.

12:55:35 11        Obviously, if I was to represent the government,

12   Mr. Miller, the first thing I'd want to see is -- if you got

13   divorced, and your wife got a whole bunch of the -- the assets,

14   I'd want to see the paperwork that shows that, you know.  I'd

15   want to see your divorce papers and the property settlement,

16   things like that, and that may be all public record.  I mean,

17   that may be stuff you can give them a cause number, and they can

18   go down to family court and pull all that stuff.

12:56:05 19        They probably also want to see the books for, I don't

20   know, pick -- you know, last 12 months or whatever for Turbo

21   Solutions and Alex Miller Credit or something like that.  I

22   mean, they're not in a position, I think -- and again,

23   Mr. Smith, if I'm putting words in your mouth, correct me --

24   that they can just take your word for it.

12:56:38 25             **MR. SMITH:**  That's right, Your Honor, and this is one

1  of the reasons why we have proposed the receiver, because it --

2  identifying and tracing assets, particularly over a period of

3  years, which is the issue here, is a lot of work.  And this

4  particular receiver, we've been -- has come highly recommended

5  as someone who's able to do that, has that --

12:57:00  6         **THE COURT:**  And I'm sure he can.  I'm not doubting his

7  ability.  I mean, I've looked him up.  I know what he's done.

12:57:10  8         There have been times where judges here in the

9  southern district have appointed, for instance -- maybe not a

10  receiver, but an ad litem, and the ad litem spends a lot of time

11  and really works hard, and then at the end of the case, there's

12  nobody to pay them.  And that's what I'm trying to avoid, and so

13  I'm trying to seek at least an inner solution -- go ahead,

14  Mr. Miller.

12:57:37 15         **DEFENDANT MILLER:**  At one point, Your Honor, I had a

16  great life.  Back in 2018, the business was doing very well.

17  2019, 2020, 2021, everything started going backwards because of

18  COVID.  They can do all the research they want.  They'll see

19  credit repair was the last thing people wanted to pay for when

20  they was going to -- through COVID.  Everybody got their money

21  back.

12:58:03 22         So I consider myself a motivational speaker.  I'm

23  going to go around saying that for the rest of my life because I

24  did have a great life at one point.

12:58:14 25         This man knows they've frozen my mom's bank account;

1    my sister's bank account; the business bank account.  Ain't no

2    money in none of those accounts.  I believe they even froze my

3    girlfriend's account.  We found that out on yesterday.  Nobody

4    in my family got no money.

12:58:33  5        They have access to these bank accounts.  They got

6    access to the business account.  There's no money in those

7    business accounts, and those business accounts didn't have money

8    in it way before they even came after me, and they can see that.

12:58:47  9        **MR. SMITH:**  Just to clarify, I am not aware that we or

10   the -- or this court and this proceeding have frozen any

11   accounts.  The TRO that was entered in this case orders

12   Mr. Miller not to make certain expenditures, but there was no

13   asset freeze that came out of this litigation.  So it's possible

14   that there are other legal issues Mr. Miller is facing.

12:59:13  15       **THE COURT:**  Well, let me propose something here, and

16   let me assume right now -- because, again, I haven't heard any

17   evidence.  No one's testified, but let's assume that both sides

18   have legitimate points.

12:59:33  19       Mr. Miller, if you would sign a release -- and the

20   government can prepare it for you -- to let them access, you

21   know, your personal accounts for the last, let's say, 12 months,

22   the -- Turbo's accounts for the last 12 months,

23   Alex -- Alexander Miller Credit for the last 12 months, you

24   know, let them look at your bank accounts, for instance, and let

25   them see -- because, I mean, they could be wrong; they could be

1  right; but -- but regardless, if you're in Mr. Smith's position,

2  you can't take somebody's word for it.

13:00:20  3       **DEFENDANT MILLER:**  Yes, sir.

13:00:20  4       **THE COURT:**  You know, they've got -- and it may be

5  more than bank accounts.  I mean, maybe it's a Merrill Lynch

6  account or, you know, some other kind of account --

13:00:29  7       **MR. SMITH:**  We would propose that -- particularly to

8  address the Court's concern that maybe there is no money, not

9  even enough to pay a receiver, that either the Court authorize

10  us to take some immediate discovery or that the Court order the

11  defendant today to produce certain financial records so that we

12  could just look at them and verify what's there.

13:00:50  13       **THE COURT:**  Well, here's what -- I want y'all to give

14  it some thought about what you want, and send Mr. Miller a list

15  of it.

13:00:57  16       And, Mr. Miller, you know, if you have an objection to

17  that list, you can file it, but, otherwise, just give it to

18  them --

13:01:04  19       **DEFENDANT MILLER:**  Yes, sir.

13:01:04  20       **THE COURT:**  -- and just say, "Look, guys, you know, it

21  ain't there" --

13:01:09  22       **DEFENDANT MILLER:**  Yes, sir.

13:01:09  23       **THE COURT:**  -- and so -- enough to where Mr. Smith --

24  and then, after you've had a chance to look at that -- I mean,

25  if you think there's smoke, that there may be a fire, you know,

1    why don't you file something with the Court.

13:01:23  2             And at that point, Mr. Miller, you --

13:01:30  3             **DEFENDANT MILLER:**  Yes, sir.

13:01:30  4             **THE COURT:**  -- and if you -- I always say an

5    unrepresented person should have a defendant -- or have a

6    lawyer, but I can understand why certain people -- especially if

7    you're broke, you don't want to have to borrow money to go out

8    and hire a lawyer, but at that point you might.

13:01:47  9             But let's -- let's -- let's let Mr. Smith send you --

10    and they may be called "interrogatories."  Interrogatories are

11    just questions.  Say -- and you have to answer them under oath,

12    but you can do that in front of a notary.  And you can just

13    answer the questions, and then he may send you, like, requests

14    for production, which say, "We want to see your last 12 months'

15    bank account statements," or, "Sign this release so we can

16    access your bank account," and -- and let him do it if -- I

17    mean, obviously, you can object.

13:02:21 18            And if you object, I'll have a hearing on it, but that

19    way -- I don't want both sides to waste a lot of time and money

20    if there's nothing here, especially after, you know, Mr. Miller

21    has basically agreed he's out of the business.  And -- and he

22    agreed to this injunction today, which -- which I think was a

23    good thing for him to do, if he's truly out of the business,

24    because, you know, he -- he -- this injunction will be easy for

25    him to comply with because he's not doing any credit repair.

13:02:56  1          **DEFENDANT MILLER:**  Yes, sir.

13:03:00  2          **THE COURT:**  So let's do that.  That way -- I don't

3   want to ask Mr. Smith to do this on the record right now because

4   he's going to have to give it some thought, but -- but he

5   needs -- he needs to know and have some reasonable assurance

6   that, you know, he is trying to get blood out of a turnip, as

7   the saying goes.

13:03:25  8          **MR. SMITH:**  And I will just add for the record this

9   was -- the requests are probably going to include things like

10  tax returns, any payment receipts for -- from the business that

11  would show money coming in, expenses of the business and

12  personal expenses to show money going out, and it's going to

13  have to go back more than 12 months, unfortunately, because --

14  particularly if 2018 was the boom year, that's when a lot of

15  this -- the money could have come in, and we may need to go back

16  that far.

13:03:54 17          **THE COURT:**  And to the extent that you either have it,

18  or if you don't have it -- if you have it, you can give it to

19  him; if you don't have it, you can give him a release so he can

20  get it from the bank, and -- and that may be the -- the proof

21  that Mr. Smith's -- needs to say, you know, "We don't need to go

22  any further.  I mean, in 2018, it's clear Mr. Miller was killing

23  it" --

13:04:15 24          **DEFENDANT MILLER:**  Yeah.

13:04:15 25          **THE COURT:**  -- "but in '19 and '20, everything went

1    to, you know, hell in a handbasket."

13:04:23  2            All right.  Let's take it from there.  If there's a

3    dispute over what's being asked, I'll probably do it over the

4    phone.  I'll do a conference call.  But to the extent

5    you -- everybody can cooperate with each other, it's going to be

6    cheaper, faster, and let's just see if there's any reason that

7    we need to continue this lawsuit.  If not, you know, the four of

8    y'all can get on with your lives.

13:04:49  9            **DEFENDANT MILLER:**  Thank you, Your Honor.

13:04:50 10            **MR. SMITH:**  That sounds fine to us, Your Honor.  Could

11   we -- because it's not certain Mr. Miller's going to have

12   representation, for the purposes of communicating, could we ask

13   Mr. Miller to state the best way to reach him on the record,

14   e-mail address and a mailing address?

13:05:09 15            **THE COURT:**  Yes.  Could you do that, Mr. Miller?

13:05:10 16            **DEFENDANT MILLER:**  Yes, sir.  I wanted to delete my

17   Alex Miller Credit Repair e-mail, but it's the only one I

18   actually use because it doesn't have spam.  So I don't know what

19   to do.  Should I delete that e-mail and -- and -- I don't know.

13:05:23 20            **THE COURT:**  Well, Mr. Smith and even the Court,

21   Ms. Hawkins, because she's the one that communicates on my

22   behalf, is going to need a good e-mail for you --

13:05:33 23            **DEFENDANT MILLER:**  That's the only one I really

24   could --

13:05:35 25            **THE COURT:**  All right.  Well, I wouldn't delete it

1    yet.

13:05:37 2              **DEFENDANT MILLER:**  Okay.

13:05:38 3              **MR. SMITH:**  But I would also not use it to promote

4    credit repair services.

13:05:41 5              **DEFENDANT MILLER:**  Yes, sir.

13:05:42 6              **THE COURT:**  Right.  Now, if you get a new e-mail,

7    like, you know, you get a, you know, Alex Miller Gmail account

8    or something, you know, then you can delete it.  Just make sure

9    Mr. Smith and Ms. Hawkins have a good e-mail for you --

13:05:55 10             **DEFENDANT MILLER:**  Yes, sir.

13:05:55 11             **THE COURT:**  -- and also a good phone number, whether

12   it's your cell, whether it's your -- and -- and a good address

13   for you.

13:06:02 14             **DEFENDANT MILLER:**  Yes, sir.

13:06:03 15             **THE COURT:**  And so if you could give -- if

16   you -- could you give us your cell and your address right now on

17   the record?

13:06:09 18             **DEFENDANT MILLER:**  Yes, sir.  My phone number is

19   (832)312-0224.  The address that I'm always at and I get mail is

20   8811 Sienna Springs Boulevard, Apartment 2111.  Again, 8811

21   Sienna Springs Boulevard, Apartment 2111.  That's Missouri City,

22   Texas 77459.

13:06:53 23             **THE COURT:**  All right.  And -- and right now the

24   current e-mail is --

13:06:57 25             **DEFENDANT MILLER:**  Alex@AlexMillerCreditRepair.com.

13:07:04  1          **THE COURT:**  Okay.  But I think Mr. Smith's

2  admonishment may be one you might want to take to heart.  It

3  might be a good thing to go ahead and get a new e-mail --

13:07:15  4          **DEFENDANT MILLER:**  Yes, sir.

13:07:15  5          **THE COURT:**  -- and -- and if and when you do that,

6  provide it to Ms. Hawkins and -- and Mr. Smith.

13:07:22  7          **DEFENDANT MILLER:**  Yes, sir.

13:07:25  8          **MR. SMITH:**  Just a technicality, but ask that

9  Mr. Miller consent to service under Rule 5 via e-mail for

10  discovery documents and other filings.

13:07:35 11          **THE COURT:**  Yeah.  Mr. Miller, is that okay with you

12  if he sends just -- sends you the documents we were talking

13  about, the questions and the requests, via e-mail?

13:07:43 14          **DEFENDANT MILLER:**  Yes, sir.  Yes, sir.

13:07:44 15          **THE COURT:**  Okay.  Good.

13:07:47 16          **MR. SMITH:**  And I'm also -- just to notify the

17  defendant, we will be -- have not served a summons and complaint

18  yet in the case, and we will be sending, I think, a waiver of

19  summons -- waiver of service to the defendant, and we'll do that

20  in writing via e-mail --

13:08:03 21          **THE COURT:**  Okay.

13:08:04 22          **MR. SMITH:**  -- in the next few days.

13:08:05 23          **THE COURT:**  All right.  All right.  I think that's all

24  we can resolve today, but let's take a hard look at this, both

25  sides, and -- and let's try to accommodate each other and -- so

1    that the everybody's in a position to evaluate, let's say in 30

2    to 45 days, where we go from here.

13:08:26  3        MR. SMITH:  One more issue, and that is the existing

4    TRO, which prevents certain expenditures outside of ordinary

5    course of business, the government would ask that be entered as

6    a preliminary injunction to prevent any dissipation of assets

7    while this -- while we're trying to work all of this out.

13:08:47  8        THE COURT:  All right.  Any objection to that,

9    Mr. Miller?

13:08:50 10        DEFENDANT MILLER:  No, sir.

13:08:50 11        THE COURT:  All right.  Then I'll do that.

13:08:53 12        Okay.  All right.  Thank y'all.

13:08:55 13        DEFENDANT MILLER:  Thank you, sir.

13:08:56 14        MR. SMITH:  Thank you.

13:08:56 15        THE COURT:  We appreciate you trying to work this out.

13:08:59 16        *(Proceedings concluded at 1:08 p.m.)*

17                          -o0o-

18        I certify that the foregoing is a correct transcript

19    from the record of proceedings in the above matter.

20

21    Date:  May 13, 2022

22                          */s/ Heather Alcaraz*
                          Signature of Court Reporter

23

24

25