# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>TURBO SOLUTIONS INC., f/k/a Alex Miller Financial Services Inc., d/b/a Alex Miller Credit Repair, and<br><br>ALEXANDER V. MILLER, in his individual and corporate capacity,<br><br>    Defendants. | Civil Action No. 4:22-mc-00369 |

## APPENDIX TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**Document**                                                                                           **Page**

### Exhibits

Exhibit A: Affidavits of Service regarding TRO ...................................................................Appx1

Exhibit B: March 18, 2022 Hearing Transcript ...................................................................Appx3

Exhibit C: April 12, 2022 email from United States to alex@alexmillercreditrepair.com ..Appx11

Exhibit D: May 13, 2022 Declaration of regarding Mailing of Waiver of Service Forms...Appx12

Exhibit E: April 20, 2022 email from Alexander Miller to the United States and United States' May, 6, 2022 reply ............................................................................................Appx13

Exhibit F: May 9, 2022 email from United States to Brian L. Ponder, Esq. .......................Appx18

Exhibit G: May 13, 2022 email from United States to Brian L. Ponder, Esq. .....................Appx19

Exhibit H: Affidavit of non-service for Alexander V. Miller ...............................................Appx20

Exhibit I: Declaration of Jason Humbert and Exhibits, 6/3/2022 ........................................Appx22

Exhibit J: Excerpt from ECF No. 3-1,
       Declaration of Kathleen Nolan and Exhibits, ...........................................................Appx27

Exhibit K: Excerpt from ECF No. 3-9,
       Declaration of Jason Humbert and Exhibits, ...........................................................Appx53

Exhibit L: Letter from United States to Brian Ponder, Esq.
       And email response, ..................................................................................................Appx74

Exhibit M: Wyoming Secretary of State Corporate Filing Information,
       Turbo Solutions, Inc. .................................................................................................Appx76

## Authorities

*Astra Oil Trading NV v. Petrobras America Inc.*,
   2010 WL 3069793 (S.D. Tex. Aug. 4, 2010) ................................................... Appx79

*Castillo v. Kerry*,
   2016 WL 11189809 (S.D. Tex. Dec. 20, 2016) ............................................. Appx87

*FTC v. CyberSpy Software, LLC*,
   2009 WL 455417 (M.D. Fla. 2009) ................................................................ Appx90

*FTC. v. Direct-Prom, Inc.,*
   2005 WL 1313846 (W.D. Tex. May 26, 2005) ............................................. Appx92

*FTC. v. GTP Mktg., Inc.*,
   1990 WL 54788 (N.D. Tex. Mar. 15, 1990) .................................................. Appx99

*FTC v. Hornbeam Special Situations, LLC*,
   2018 WL 6521516 (N.D. Ga. 2018) ........................................................... Appx104

*United States v. Com. Recovery Sys., Inc.*,
   2016 WL 9244671 (E.D. Tex. Apr. 18, 2016) ............................................. Appx109

*Wilson v. City of Mission, Tex.*,
   2020 WL 2079359 (S.D. Tex. Apr. 29, 2020) ............................................. Appx114

# EXHIBIT A

## UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS

---

**United States of America**

**Plaintiff**

Case No.: 4:22-mc-369

*vs.*

**Turbo Solutions Inc. f/k/a Alex Miller Financial Services Inc., d/b/a Alex Miller Credit Repair, et al.**

---

**Defendant(s)**

### **AFFIDAVIT OF SERVICE**

I, Pam Black, a Private Process Server, being duly sworn, depose and say:

That I am over the age of eighteen years and not a party to or otherwise interested in this action.

That I have been duly authorized to make service of the Complaint for Civil Penalties, Permanent Injunction, Monetary Relief, and Other Relief; Civil Cover Sheet; Proposed Order Temporarily Sealing the Docket and the Entire File; Plaintiff's Ex Parte Motion to Temporarily Seal the Docket and the Entire File; Plaintiff's Ex Parte Motion for Temporary Restraining Order, Order Appointing Receiver, and Order to Show Cause Why a Preliminary Injunction Should Not Issue; Proposed Temporary Restraining Order; Order Appointing Receiver; Temporary Restraining Order; and Exhibits in the above entitled case.

That on 03/07/2022 at 6:30 PM, I served Alexander V. Miller at 8811 Sienna Springs Boulevard, Apartment 2111, Missouri City, Texas 77459-7334 with the Complaint for Civil Penalties, Permanent Injunction, Monetary Relief, and Other Relief; Civil Cover Sheet; Proposed Order Temporarily Sealing the Docket and the Entire File; Plaintiff's Ex Parte Motion to Temporarily Seal the Docket and the Entire File; Plaintiff's Ex Parte Motion for Temporary Restraining Order, Order Appointing Receiver, and Order to Show Cause Why a Preliminary Injunction Should Not Issue; Proposed Temporary Restraining Order; Order Appointing Receiver; Temporary Restraining Order; and Exhibits by serving Lynn Daniels, sister of Alexander V. Miller, a person of suitable age and discretion, who stated that he/she resides therein with Alexander V. Miller.

Lynn Daniels is described herein as:

Gender: Female   Race/Skin: Black   Age: 40's   Weight: 190   Height: 5'2"   Hair: Black   Glasses: No

I declare under penalty of perjury that this information is true and correct.

March 8, 2022

Executed On

Pam Black

Client Ref Number:N/A
Job #: 1600101

Capitol Process Services, Inc. | 1827 18th Street, NW, Washington, DC 20009 | (202) 667-0050

Appx1

## UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS

---

**United States of America**

                              **Plaintiff**

                                                    Case No.: **4:22-mc-369**

                                          *vs.*

**Turbo Solutions Inc. f/k/a Alex Miller Financial Services Inc., d/b/a Alex Miller Credit Repair, et al.**

---

                              **Defendant(s)**

### AFFIDAVIT OF SERVICE

I, Pam Black, a Private Process Server, being duly sworn, depose and say:

That I am over the age of eighteen years and not a party to or otherwise interested in this action.

That I have been duly authorized to make service of the Complaint for Civil Penalties, Permanent Injunction, Monetary Relief, and Other Relief; Civil Cover Sheet; Proposed Order Temporarily Sealing the Docket and the Entire File; Plaintiff's Ex Parte Motion to Temporarily Seal the Docket and the Entire File; Plaintiff's Ex Parte Motion for Temporary Restraining Order, Order Appointing Receiver, and Order to Show Cause Why a Preliminary Injunction Should Not Issue; Proposed Temporary Restraining Order; Order Appointing Receiver; Temporary Restraining Order; and Exhibits in the above entitled case.

That on 3/7/2022 at 6:30 PM, I served Turbo Solutions Inc. f/k/a Alex Miller Financial Services Inc. d/b/a Alex Miller Credit Repair c/o Alexander V. Miller at 8811 Sienna Springs Boulevard, Apartment 2111, Missouri City, Texas 77459-7334 with the Complaint for Civil Penalties, Permanent Injunction, Monetary Relief, and Other Relief; Civil Cover Sheet; Proposed Order Temporarily Sealing the Docket and the Entire File; Plaintiff's Ex Parte Motion to Temporarily Seal the Docket and the Entire File; Plaintiff's Ex Parte Motion for Temporary Restraining Order, Order Appointing Receiver, and Order to Show Cause Why a Preliminary Injunction Should Not Issue; Proposed Temporary Restraining Order; Order Appointing Receiver; Temporary Restraining Order; and Exhibits by serving Lynn Daniels, sister of Alexander V. Miller, a person of suitable age and discretion residing therein.

Lynn Daniels, sister of Alexander V. Miller is described herein as:

Gender: Female    Race/Skin: Black    Age: 40's    Weight: 190    Height: 5'2"    Hair: Black    Glasses: No

I do solemnly declare and affirm under penalty of perjury that I have read the foregoing information set forth herein is correct to the best of my knowledge, information, and belief.

*March 8, 2022*
Executed On                                             Pam Black

                                                    Client Ref Number:N/A
                                                    Job #: 1600099

Capitol Process Services, Inc. | 1827 18th Street, NW, Washington, DC 20009 | (202) 667-0050

Appx2

# EXHIBIT B

```
 1                  IN THE UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
 2                        HOUSTON DIVISION
   _____
 3                                     )
   UNITED STATES OF AMERICA,           )
 4            Plaintiff,               )
                                       ) CIVIL ACTION NO.
 5   VS.                               ) 4:22-MC-369
                                       )
 6   TURBO SOLUTIONS INC., f/k/a Alex  )
     Miller Financial Services Inc.,   )
 7   d/b/a Alex Miller Credit Repair,  )
     and ALEXANDER V. MILLER, in his   ) 10:25 A.M.
 8   individual and corporate capacity,)
              Defendants.              )
 9   _____)

10

                      PERMANENT INJUNCTION HEARING
11            BEFORE THE HONORABLE ANDREW S. HANEN
                  UNITED STATES DISTRICT JUDGE
12                     MARCH 18, 2022

13   APPEARANCES:

14   FOR PLAINTIFF:
     MR. MARCUS P. SMITH
15   MR. STEPHEN C. TOSINI
     United States Department of Justice
16   450 5th Street NW, Suite 6400-South
     Washington, DC  20001
17   (202)353-9712

18   FOR DEFENDANT:
     MR. ALEXANDER V. MILLER
19   Pro Se

20   ALSO PRESENT:
     MR. WILFRED MILLER
21

     COURT REPORTER:
22   Heather Alcaraz, FCRR, RMR
     Official Court Reporter
23   515 Rusk, Suite 8004
     Houston, Texas  77002
24   (713)250-5584

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
```

```
10:25:26  1         (Call to Order of the Court.)

10:25:27  2              THE COURT:  Thank you.  Be seated.

10:25:32  3              Okay.  We're here today in United States versus Turbo

          4    Solutions and Alexander Miller, which is 22-MC-369.

10:25:42  5              Who do I have here for the government?

10:25:45  6              MR. SMITH:  Morning, Your Honor.  Marcus Smith on

          7    behalf of the plaintiff, United States.

10:25:51  8              THE COURT:  All right.

10:25:52  9              MR. TOSINI:  And good morning.  My name is Steve

         10    Tosini, and I represent the United States as well.

10:25:56 11              THE COURT:  All right.  And Mr. Miller?

10:26:01 12              DEFENDANT MILLER:  Yes.  My name's Alex Miller.

10:26:03 13              THE COURT:  All right.  And are you here representing

         14    yourself?

10:26:08 15              DEFENDANT MILLER:  No, sir.  I couldn't afford an

         16    attorney, but I'm looking for an attorney right now.  I've been

         17    talking to one, and he said that he'll take on my -- help me.

10:26:18 18              THE COURT:  Okay.  All right.  Let me -- let me just

         19    see if I can short-circuit this.  Mr. Miller, the government is

         20    claiming the way you operate your business violates the law --

10:26:43 21              DEFENDANT MILLER:  I don't want to fight, Your Honor.

10:26:44 22              THE COURT:  Pardon me?

10:26:46 23              DEFENDANT MILLER:  I don't want to fight the

         24    government, Your Honor.

10:26:47 25              THE COURT:  And that's where I was going, and I don't
```

10:32:03  1          **THE COURT:**  Okay.  Did you -- go ahead, Mr. Miller.

10:32:11  2          **DEFENDANT MILLER:**  Inaccurate.  So, Your Honor, I have

       3  a huge social media following, and my Instagram has what you

       4  call BlueCheck verify.  It means that, like, my page is the

       5  original social media page, and I have numerous people using my

       6  images to steal people's money.

10:32:33  7          Do I do credit repair?  Yes, sir.  Have I helped

       8  people?  Yes, sir.  Have I dropped the ball on a few customers?

       9  Yes, sir.  Do I go back and fix it?  Yes, I do.

10:32:47 10          But my issue is scam artists -- my last -- most recent

      11  post on my Instagram is seven Instagram scammers using my images

      12  to steal from people.  Turbo Solutions, I quit credit repair,

      13  man.

10:33:01 14          **THE COURT:**  You what?

10:33:03 15          **DEFENDANT MILLER:**  Turbo Solutions, the name of the

      16  company, I want to quit credit repair.  I just want to get out

      17  all of it altogether.  I know that once somebody -- the

      18  government is after you, it's best to just stop.  Whether I'm

      19  right or wrong, whether people are using my images to scam

      20  people -- I just made a post on Facebook and Instagram last

      21  night.  People find images; scam artists using my pictures.  I

      22  don't care.

10:33:29 23          I just want to quit credit repair, period, altogether.

      24  I can change my Instagram name.  I'm no longer marketing my

      25  master class.  I don't want to teach people credit repair.  I

```
           1    don't want to do none of it.
10:33:42   2             I got a halfway house and a drug treatment facility
           3    that I'm working on because that's part of my past that I want
           4    to move in to that and just start doing other stuff for my life.
10:33:54   5         THE COURT:  Well, are you willing to enter into an
           6    agreement here on the record with the government that -- that
           7    you will, both individually and as Turbo Solutions, stop
           8    operating in the credit repair industry?
10:34:17   9         DEFENDANT MILLER:  Yes, sir.
10:34:18  10         THE COURT:  All right.  That takes care of part of the
          11    problem.
10:34:21  12         MR. SMITH:  I would just also add:  I believe the
          13    defendant has incorporated another entity, AMCR Win (phonetic)
          14    LLC, just within the last month or two; that it's unclear
          15    exactly what the purpose of that company is.  But any -- any
          16    agreement about the defendant getting out of the credit repair
          17    business has to include any entities in which he's involved.
10:34:45  18         THE COURT:  And you understand that?
10:34:46  19         DEFENDANT MILLER:  No, sir, I don't understand that
          20    part.
10:34:48  21         THE COURT:  Well, let me -- what -- what Mr. Smith is
          22    saying is he doesn't want Turbo Solutions to go out of the
          23    credit repair business and then find out that you turned around
          24    and -- and opened Miller Credit Solutions --
10:35:09  25         DEFENDANT MILLER:  No.  No.
```

```
         1    to, you know, hell in a handbasket."

13:04:23 2           All right.  Let's take it from there.  If there's a

         3    dispute over what's being asked, I'll probably do it over the

         4    phone.  I'll do a conference call.  But to the extent

         5    you -- everybody can cooperate with each other, it's going to be

         6    cheaper, faster, and let's just see if there's any reason that

         7    we need to continue this lawsuit.  If not, you know, the four of

         8    y'all can get on with your lives.

13:04:49 9           DEFENDANT MILLER:  Thank you, Your Honor.

13:04:50 10          MR. SMITH:  That sounds fine to us, Your Honor.  Could

        11    we -- because it's not certain Mr. Miller's going to have

        12    representation, for the purposes of communicating, could we ask

        13    Mr. Miller to state the best way to reach him on the record,

        14    e-mail address and a mailing address?

13:05:09 15          THE COURT:  Yes.  Could you do that, Mr. Miller?

13:05:10 16          DEFENDANT MILLER:  Yes, sir.  I wanted to delete my

        17    Alex Miller Credit Repair e-mail, but it's the only one I

        18    actually use because it doesn't have spam.  So I don't know what

        19    to do.  Should I delete that e-mail and -- and -- I don't know.

13:05:23 20          THE COURT:  Well, Mr. Smith and even the Court,

        21    Ms. Hawkins, because she's the one that communicates on my

        22    behalf, is going to need a good e-mail for you --

13:05:33 23          DEFENDANT MILLER:  That's the only one I really

        24    could --

13:05:35 25          THE COURT:  All right.  Well, I wouldn't delete it
```

```
         1    yet.
13:05:37 2               DEFENDANT MILLER:  Okay.
13:05:38 3               MR. SMITH:  But I would also not use it to promote
         4    credit repair services.
13:05:41 5               DEFENDANT MILLER:  Yes, sir.
13:05:42 6               THE COURT:  Right.  Now, if you get a new e-mail,
         7    like, you know, you get a, you know, Alex Miller Gmail account
         8    or something, you know, then you can delete it.  Just make sure
         9    Mr. Smith and Ms. Hawkins have a good e-mail for you --
13:05:55 10              DEFENDANT MILLER:  Yes, sir.
13:05:55 11              THE COURT:  -- and also a good phone number, whether
         12   it's your cell, whether it's your -- and -- and a good address
         13   for you.
13:06:02 14              DEFENDANT MILLER:  Yes, sir.
13:06:03 15              THE COURT:  And so if you could give -- if
         16   you -- could you give us your cell and your address right now on
         17   the record?
13:06:09 18              DEFENDANT MILLER:  Yes, sir.  My phone number is
         19   (832)312-0224.  The address that I'm always at and I get mail is
         20   8811 Sienna Springs Boulevard, Apartment 2111.  Again, 8811
         21   Sienna Springs Boulevard, Apartment 2111.  That's Missouri City,
         22   Texas 77459.
13:06:53 23              THE COURT:  All right.  And -- and right now the
         24   current e-mail is --
13:06:57 25              DEFENDANT MILLER:  Alex@AlexMillerCreditRepair.com.
```

13:07:04  1          **THE COURT:**  Okay.  But I think Mr. Smith's

2   admonishment may be one you might want to take to heart.  It

3   might be a good thing to go ahead and get a new e-mail --

13:07:15  4          **DEFENDANT MILLER:**  Yes, sir.

13:07:15  5          **THE COURT:**  -- and -- and if and when you do that,

6   provide it to Ms. Hawkins and -- and Mr. Smith.

13:07:22  7          **DEFENDANT MILLER:**  Yes, sir.

13:07:25  8          **MR. SMITH:**  Just a technicality, but ask that

9   Mr. Miller consent to service under Rule 5 via e-mail for

10  discovery documents and other filings.

13:07:35 11          **THE COURT:**  Yeah.  Mr. Miller, is that okay with you

12  if he sends just -- sends you the documents we were talking

13  about, the questions and the requests, via e-mail?

13:07:43 14          **DEFENDANT MILLER:**  Yes, sir.  Yes, sir.

13:07:44 15          **THE COURT:**  Okay.  Good.

13:07:47 16          **MR. SMITH:**  And I'm also -- just to notify the

17  defendant, we will be -- have not served a summons and complaint

18  yet in the case, and we will be sending, I think, a waiver of

19  summons -- waiver of service to the defendant, and we'll do that

20  in writing via e-mail --

13:08:03 21          **THE COURT:**  Okay.

13:08:04 22          **MR. SMITH:**  -- in the next few days.

13:08:05 23          **THE COURT:**  All right.  All right.  I think that's all

24  we can resolve today, but let's take a hard look at this, both

25  sides, and -- and let's try to accommodate each other and -- so

```
 1   that the everybody's in a position to evaluate, let's say in 30

 2   to 45 days, where we go from here.

13:08:26  3        MR. SMITH:  One more issue, and that is the existing

 4   TRO, which prevents certain expenditures outside of ordinary

 5   course of business, the government would ask that be entered as

 6   a preliminary injunction to prevent any dissipation of assets

 7   while this -- while we're trying to work all of this out.

13:08:47  8        THE COURT:  All right.  Any objection to that,

 9   Mr. Miller?

13:08:50 10        DEFENDANT MILLER:  No, sir.

13:08:50 11        THE COURT:  All right.  Then I'll do that.

13:08:53 12        Okay.  All right.  Thank y'all.

13:08:55 13        DEFENDANT MILLER:  Thank you, sir.

13:08:56 14        MR. SMITH:  Thank you.

13:08:56 15        THE COURT:  We appreciate you trying to work this out.

13:08:59 16     (Proceedings concluded at 1:08 p.m.)

 17                    -o0o-

 18        I certify that the foregoing is a correct transcript

 19   from the record of proceedings in the above matter.

 20

 21   Date:  May 13, 2022

 22                    /s/ Heather Alcaraz
                       Signature of Court Reporter
 23

 24

 25
```

# EXHIBIT C

| | |
|---|---|
| **From:** | Smith, Marcus P. |
| **To:** | Alex Miller |
| **Cc:** | Tosini, Stephen (CIV) |
| **Subject:** | United States of America v. Turbo Solutions Inc. and Alexander V. Miller, Case No. 4:22-mc-00369 |
| **Date:** | Tuesday, April 12, 2022 6:21:00 PM |
| **Attachments:** | 2. Turbo - Waiver of Service of Summons.pdf |
| | 2. Miller - Waiver of Service of Summons.pdf |
| | 3. 2022.03.01 Complaint.pdf |
| | 1. Miller - Waiver of Service of Summons Request (final).pdf |
| | 1. Turbo - Waiver of Service of Summons Request (final).pdf |
| **Importance:** | High |

Mr. Miller – Pursuant to Rule 4(d) of the Federal Rules of Civil Procedure, attached you will find 1) a Notice of Lawsuit and Request to Waive Service of a Summons; 2) a Waiver of the Service of Summons; and 3) the Complaint in this case. Separate copies of 1) and 2) are attached for you and for Turbo Solutions, Inc. Please read these documents carefully. If you agree to waive service of a summons, then you should complete and return both Waiver of Service of Summons forms—one on behalf of yourself and one on behalf of Turbo Solutions Inc.—to me **within 30 days**. Email is preferred. If you return hard copies of the forms, please confirm you are using the correct address. Please let me know if you have any questions.


**Overnight Delivery Address (FedEx/UPS)**
Marcus P. Smith
Consumer Protection Branch
U.S. Department of Justice
450 Fifth Street, NW Sixth Floor South
Washington, D.C. 20001

**Mailing Address (First-Class Mail)**
Marcus P. Smith
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044

Regards,

**Marcus P. Smith**
Trial Attorney
Consumer Protection Branch
U.S. DEPARTMENT OF JUSTICE
(202) 353-9712
marcus.p.smith@usdoj.gov

# EXHIBIT D

**DECLARATION OF OLIVIA V. MURPHY**
**PURSUANT TO 28 U.S.C. § 1746**

I, Olivia V. Murphy, have personal knowledge of the following facts and matters discussed in this declaration and, if called as a witness, could and would testify to the facts stated in this declaration.

1. I am a citizen of the United States and am over eighteen (18) years of age. I am currently employed as a Document Management Analyst at the U.S. Department of Justice (DOJ) in the Consumer Protection Branch (CPB).

2. On April 13, 2022, pursuant to a request by Trial Attorney Marcus P. Smith, I mailed one copy of Exhibit A, one copy of Exhibit B, two copies of Exhibit C, two copies of Exhibit D, one copy of Exhibit E, and a postage prepaid return envelope addressed to Mr. Smith to the following address via first-class mail:

> ALEXANDER MILLER
> TURBO SOLUTIONS INC.
> 8811 SIENNA SPRINGS BLVD
> APT 2111
> MISSOURI CITY, TX 77459

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 13th, 2022, in Washington, District of Columbia.

*Olivia V. Murphy*
Olivia V. Murphy

# EXHIBIT E

| | |
|---|---|
| **From:** | Smith, Marcus P. |
| **To:** | Alex Miller |
| **Cc:** | Tosini, Stephen (CIV) |
| **Subject:** | RE: [EXTERNAL] United States of America v. Turbo Solutions Inc. and Alexander V. Miller, Case No. 4:22-mc-00369 |
| **Date:** | Friday, May 06, 2022 4:09:00 PM |

Mr. Miller – I sent you discovery requests on March 29, which required you to provide written responses and to produce documents within 30 days. Your time to respond has expired, and I have not received any information or documents responsive to those requests whatsoever. Based on your non-compliance with your discovery obligations, I will be renewing the government's motion asking the court to appoint a receiver, to authorize third-party subpoenas, and to order any sanctions that may be appropriate. Do you consent to this relief?

You say below that you will not have any access to your phone until approximately June 20 because you will be entering a rehab center as of April 20 for 60 days. An investigator from my office confirmed your presence at Into Action Recovery Centers on or about April 26. When I called yesterday to verify your continued presence there, the person to whom I spoke would neither confirm nor deny that you continue to be a patient of the facility. You indicate below that a marketing company will operate your social media accounts while you complete the rehab program, but your social media accounts appear to show you personally in Atlanta, Georgia holding a box full of U.S. dollars and shopping, all within the last few days. Have you been a patient at Into Action Recovery Centers at all times from April 21 through the present? Please contact me as soon as you have access to a phone or your email.

**Marcus P. Smith**

Trial Attorney

Consumer Protection Branch

U.S. Department of Justice

(202) 353-9712

marcus.p.smith@usdoj.gov

---

**From:** Alex Miller <alex@alexmillercreditrepair.com>
**Sent:** Wednesday, April 20, 2022 6:08 PM
**To:** Smith, Marcus P. <Marcus.P.Smith@usdoj.gov>
**Cc:** Tosini, Stephen (CIV) <Stephen.Tosini@usdoj.gov>
**Subject:** Re: [EXTERNAL] United States of America v. Turbo Solutions Inc. and Alexander V. Miller, Case No. 4:22-mc-00369

Today I am entering a rehab center for the next 60 days. The name of the rehab is

called intoactionrecovery.com. This drama you have created in my life has made me loose all these years of sobriety and mental health I have been working on for the last 5 years of my life. It's just too much too deal with. If anyone has any questions about me or my mental health you can call that place. I will not have access to my phone. I have a marketing company who will be using my Instagram and my Facebook to keep my other companies going in order to provide income to pay my child support and pay my bills.

I just wanted to put this on record so there will be no warrant put out for my arrest and everyone will know where I am going to be for the next 60 days starting today.

Sent from my iPhone

> On Apr 13, 2022, at 10:55 AM, Smith, Marcus P. <Marcus.P.Smith@usdoj.gov> wrote:
>
> Mr. Miller – The fax number here is 202-514-8742. Please confirm the documents have been faxed by email, so I can make sure we have received everything. Thank you
>
> ---
>
> **From:** Alex Miller <alex@alexmillercreditrepair.com>
> **Sent:** Tuesday, April 12, 2022 1:45 PM
> **To:** Smith, Marcus P. <Marcus.P.Smith@usdoj.gov>
> **Cc:** Tosini, Stephen (CIV) <Stephen.Tosini@usdoj.gov>
> **Subject:** Re: [EXTERNAL] United States of America v. Turbo Solutions Inc. and Alexander V. Miller, Case No. 4:22-mc-00369
>
> Can I fax my docs in? Is there a fax number?
>
> Sent from my iPhone
>
>
> > On Apr 6, 2022, at 9:07 PM, Smith, Marcus P. <Marcus.P.Smith@usdoj.gov> wrote:
> >
> > Mr. Miller – As an attorney for the United States, I am not able to advise you regarding any articles that have been published about you or this case. If you have questions about the requests for information and documents that I sent you last week, I am happy to discuss those with you or with any attorney you retain.
> >
> > Regards,
> >
> > **Marcus P. Smith**

Trial Attorney

Consumer Protection Branch

U.S. Department of Justice

(202) 353-9712

marcus.p.smith@usdoj.gov

---

**From:** Alex Miller <alex@alexmillercreditrepair.com>
**Sent:** Tuesday, April 5, 2022 6:53 PM
**To:** Smith, Marcus P. <Marcus.P.Smith@usdoj.gov>
**Cc:** Tosini, Stephen (CIV) <Stephen.Tosini@usdoj.gov>
**Subject:** Re: [EXTERNAL] United States of America v. Turbo Solutions Inc. and Alexander V. Miller, Case No. 4:22-mc-00369

Marcus I just read articles about me and my case. I am wrongly labeled as "The Texan Scam Artist."

Not kool. Question who is exactly responsible for putting out these news about my case when it's not even over?

Sent from my iPhone

> On Apr 1, 2022, at 3:14 PM, Smith, Marcus P. <Marcus.P.Smith@usdoj.gov> wrote:
>
> Great, thank you.
>
> Sent from my iPhone

> On Apr 1, 2022, at 12:37 AM, Alex Miller <alex@alexmillercreditrepair.com> wrote:
>
> I just received your email. But the screen is cracked on this computer. I will  go to another computer on tomorrow and print this stuff out and fill out for you. And send back asap.

Thanks,
Alex

---

**From:** Smith, Marcus P.
<Marcus.P.Smith@usdoj.gov>
**Sent:** Tuesday, March 29, 2022 2:06 PM
**To:** Alex Miller
<alex@alexmillercreditrepair.com>
**Cc:** Tosini, Stephen (CIV)
<Stephen.Tosini@usdoj.gov>
**Subject:** [EXTERNAL] United States of America
v. Turbo Solutions Inc. and Alexander V. Miller,
Case No. 4:22-mc-00369

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Mr. Miller – Please see the attached, which requests financial information from you as authorized by the Court on March 18th. Note that the attached requests require you to provide written responses—including completed forms OBD-500 and OBD-500C, blank copies of which are also attached—and to produce certain documents in your possession or control. When you are prepared to produce the requested information, any documents that you have in hard copy form can be sent to me at the address below (note it is a different address for first class mail and for overnight couriers like UPS and FedEx). Any documents you have in electronic form can be sent to me by email, or if too voluminous for email, I will send you a link to DOJ's secure file sharing platform, which will allow you to upload the documents you wish to produce. **Your responses are due in 30 days.**

If you have retained counsel in this matter, please provide contact information so I can communicate directly with them. If you have any questions about these requests,

please do not hesitate to reach out to me by phone or by email. **Please confirm receipt of this email.**

**Overnight Delivery Address**
Marcus P. Smith
Consumer Protection Branch
U.S. Department of Justice
450 Fifth Street, NW Sixth Floor South
Washington, D.C. 20001

**Mailing Address**
Marcus P. Smith
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044

Regards,

**Marcus P. Smith**
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
(202) 353-9712
marcus.p.smith@usdoj.gov

# EXHIBIT F

| | |
|---|---|
| **From:** | Smith, Marcus P. |
| **To:** | Brian L. Ponder, Esq. |
| **Cc:** | Tosini, Stephen (CIV) |
| **Subject:** | U.S. v. Turbo Solutions Inc. et al, Case No. 4:22-mc-00369 |
| **Date:** | Monday, May 09, 2022 5:50:00 PM |
| **Attachments:** | United States of America v. Turbo Solutions Inc. and Alexander V. Miller Case No. 422-mc-00369.msg |
| | United States of America v. Turbo Solutions Inc. and Alexander V. Miller Case No. 422-mc-00369.msg |
| | 3-12 Proposed Receivership Order.pdf |
| | 3-8 Declaration of Vincent Bundy.pdf |
| | 3-9 Declaration of Jason Humbert.pdf |
| | 3-10 FICO_Declaration_Dornhelm.pdf |
| | 3-11 Proposed TRO.pdf |

Mr. Ponder – The last time I checked the docket, the first 10 or so docket entries were all sealed. When we spoke earlier, I thought that was still the case. I see now that every docket entry is available on Pacer with the exception of Exhibits 8-12 to ECF No 3 ( I don't know why these remain sealed). Those exhibits are attached. If there is some reason you cannot access the other docket entries, please let me know.

Also attached is the email to Mr. Miller attaching the Government's discovery requests to Defendants. Responses are overdue. Please let me know before the close of business on Wednesday, May 11, when we can expect Defendants' responses.

Also attached please find waiver of service forms for Defendants. Please complete and return these forms as soon as possible. I direct your attention to Rule 4, which states that your client "has a duty to avoid unnecessary expenses of serving the summons." If you refuse to complete the waiver of service forms, the Government will serve the summons and complaint on Defendants and ask the court to require Defendants to pay the expenses of making service. If you would like to discuss an extension of time to respond to the Complaint, I am happy to discuss such an extension at your convenience.

Regards,

**Marcus P. Smith**

Trial Attorney

Consumer Protection Branch

U.S. Department of Justice

(202) 353-9712

marcus.p.smith@usdoj.gov

# EXHIBIT G

| | |
|---|---|
| **From:** | Smith, Marcus P. |
| **To:** | Brian L. Ponder, Esq. |
| **Cc:** | Tosini, Stephen (CIV) |
| **Subject:** | United States of America v. Turbo Solutions Inc. and Alexander V. Miller, Case No. 4:22-mc-00369 |
| **Date:** | Friday, May 13, 2022 12:12:00 PM |
| **Attachments:** | Ex. E 3. 2022.03.01 Complaint.pdf |
| | Ex. A 1. Miller - Waiver of Service of Summons Request (final).pdf |
| | Ex. B 1. Turbo - Waiver of Service of Summons Request (final).pdf |
| | Ex. C 2. Miller - Waiver of Service of Summons.pdf |
| | Ex. D 2. Turbo - Waiver of Service of Summons.pdf |
| | 2022.05.13 Declaration re Mailing of Waiver of Service Forms.pdf |

Mr. Ponder – Please see the attached regarding waiver of service. If you fail to return the signed waiver forms on behalf of defendants by end of the day today, we will proceed with service and a motion for expenses.

Regards,

**Marcus P. Smith**

Trial Attorney

Consumer Protection Branch

U.S. Department of Justice

(202) 353-9712

marcus.p.smith@usdoj.gov

# EXHIBIT H

### AFFIDAVIT OF NON-SERVICE

| Case:<br>4:22-<br>MC-<br>369 | Court:<br>IN THE UNITED STATES DISTRICT COURT FOR THE<br>SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION | County: | Job:<br>7082758 (1602809) |
|---|---|---|---|
| Plaintiff / Petitioner:<br>UNITED STATES OF AMERICA | | Defendant / Respondent:<br>TURBO SOLUTIONS INC., F/K/A ALEX MILLER FINANCIAL SERVICES<br>INC., D/B/A ALEX MILLER CREDIT REPAIR, AND ALEXANDER V.<br>MILLER, IN HIS INDIVIDUAL AND CORPORATE CAPACITY | | |
| Received by:<br>Pam Black | | For:<br>CAPITOL PROCESS SERVICES INC | | |
| To be served upon:<br>ALEXANDER V. MILLER | | | |

I, PAM BLACK, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:**   ALEXANDER V. MILLER, 8811 SIENNA SPRINGS BLVD APT 2111, MISSOURI CITY, TX 77459

**Manner of Service:**   Unsuccessful Attempt

**Documents:**   SUMMONS AND COMPLAINT FOR CIVIL PENALTIES, PERMANENT INJUNCTION, MONETARY RELIEF, AND OTHER RELIEF (Received May 13, 2022 at 9:43am CDT)

**Additional Comments:**

1) Unsuccessful Attempt: May 14, 2022, 11:20 am CDT at 8811 SIENNA SPRINGS BLVD APT 2111, MISSOURI CITY, TX 77459

There was no answer at the door.

I have served papers before at this address for this Defendant. When I attempted to serve the papers a couple of months ago, I spoke with an African American female who lived here. She knew Alexander V Miller and I believe she told me she worked for the company. She also said the company belonged to the wife of Alexander Miller. I think she told me she got that in the divorce settlement. But when I was there , she got Alexander Miller on the phone. He instructed me to give those papers to the female I was speaking with. But again, I was told he does not live there.

2) Unsuccessful Attempt: May 16, 2022, 9:10 am CDT at 8811 SIENNA SPRINGS BLVD APT 2111, MISSOURI CITY, TX 77459

There was no answer at the door.

3) Unsuccessful Attempt: May 17, 2022, 4:28 pm CDT at 8811 SIENNA SPRINGS BLVD APT 2111, MISSOURI CITY, TX 77459

There was no answer at the door.

4) Unsuccessful Attempt: May 19, 2022, 8:48 am CDT at 8811 SIENNA SPRINGS BLVD APT 2111, MISSOURI CITY, TX 77459

There was no answer at the door.

5) Unsuccessful Attempt: May 24, 2022, 5:50 pm CDT at 8811 SIENNA SPRINGS BLVD APT 2111, MISSOURI CITY, TX 77459
I knocked and knocked. I could hear people inside of the unit, but no one would answer the door. I rang the ring door bell, but no one would answer. I rang it again and a female responded. She remembered me from a couple of months ago. She said she lives here with her children and there is no male who lives here with her, including, Alexander Miller. She told me she was asked by Alexander Miller's wife/ex-wife to not communicate with Alexander Miller anymore. I told her I was leaving my call back information on her door and I asked if she would please pass it on to Mr. Miller for me. She gave me an address of where the office used to be. She said it was 2709 Chimney Rock Rd, Houston, TX.

6) Unsuccessful Attempt: May 25, 2022, 5:00 pm CDT at 2709 CHIMNEY ROCK LN, HOUSTON, TX 77056

Bad address. Address for service is a business address. It is now a vape shop. I spoke with the young male behind the counter. He said he hasn't worked here very long. I asked how long the business has been here and he said not too long. They opened sometime this year. Defendant is not known at this address.

**In addition to my personal attempts, I tried to call the Defendant at the number provided. 832.312.0224.**

Appx20

5/18/2022 @ 12:50 pm - sent text
5/20/2022 @ 3:35 pm - called, left message on voice mail
5/24/2022 @ 5:17 pm - called, mail box was full - sent text
5/26/2022 @4:52 pm - called from land line, left message on his voice mail

Fees:

_____          _____
PAM BLACK                    Date
PSC 16215

Capitol Process Services, Inc.
1827 18th Street, NW
Washington, DC 20009
202.667.0050

*Subscribed and sworn to before me by the affiant who is*
*personally known to me.*

_____
Notary Public

_____
Date                    Commission Expires

CARILISA A. ALEXANDER
Notary Public, State of Texas
Comm. Expires 05-19-2024
Notary ID 132485719

# EXHIBIT I

## DECLARATION OF JASON HUMBERT
## PURSUANT TO 28 U.S.C. § 1746

I, Jason Humbert, have personal knowledge of the following facts and matters discussed in this declaration and, if called as a witness, could and would testify to the facts stated in this declaration.

1. I am a citizen of the United States and am over eighteen (18) years of age. I am currently employed as an investigator at the U.S. Department of Justice (DOJ) in the Consumer Protection Branch (CPB).

2. As an investigator in CPB, I routinely conduct internet investigations including reviews of social media accounts.

3. On June 1, 2022, I visited the Defendant's Instagram account accessible at https://www.instagram.com/alexmillerofficial/ and observed a post dated May 31, 2022 which reads, "We back open for new business!" The text of the post from @alexmillerofficial reads, "If you started credit repair with AMCR within the last 3-4 months you probably didn't see any results bc I had to shut shop down to focus on these frivolous federal credit charges. We are now again accepting new clients. Call Kenya for NEW SALES (281) 630-7336 or call Jordan's line for NEW SALES (713) 302-6280 . . . I WILL RELEASE A SPECIAL PHONE NUMBER LATER THIS WEEK FOR ALL CURRENT CLIENTS TO GET BACK PN *[sic]* TRACK." **Attachment A** is a true and correct copy of the Instagram post observed on June 1, 2022.

4. Also on June 1, 2022, I observed another post that is dated May 31, 2022, on the Defendant's account, https://www.instagram.com/alexmillerofficial/. The post

1

**Appx22**

includes an image that reads, "Update: About 3 months ago my company was hit with a frivolous lawsuit. And I decided to shut my shop down until so I could focus on the matter at hand . . ." The text of the post from @alexmillerofficial reads, "Our credit repair department has reopened! Call Kenya +1(713)444 0558 directly to for NEW CLIENT SALES. Current credit repair clients that was put on a 90 day pause will have a DIFFERENT REP to call on tomorrow." **Attachment B** is a true and correct copy of the Instagram post observed on June 1, 2022.

5. Further on June 1, 2022, I visited the Defendant's Facebook account accessible at https://www.facebook.com/thealexmillercreditrepair and observed a post like the post included in Attachment A. **Attachment C** is a true and correct copy of the Facebook post observed on June 1, 2022.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 3, 2022, in Washington, District of Columbia.

JASON HUMBERT
Digitally signed by JASON HUMBERT
Date: 2022.06.03 17:00:07 -04'00'

_____

Jason Humbert

2



🌟🌟🌟🌟🌟

**We back open for new business!**

We are back tracking all of the client files that was put on hold 2-3 months ago!

And all this weird talking on my page gotta stop right now!!!!!

I just lost $3,000,000 Million Dollars!

**So please miss me with your $1,500.**

My Oath: I will never leave a customer behind!





**alexmillerofficial** ⚫ · Follow
Alex Miller

**alexmillerofficial** ⚫ If you started credit repair with AMCR within the last 3-4 months you probably didn't see any real results bc I had to shut shop down to focus on these frivolous federal credit charges. We are now again accepting new clients. Call Kenya for NEW SALES (281) 630-7336 or call Jordan's line for NEW SALES (713) 302-6280. Do NOT tie up these NEW SALES lines if you are a current client who we had to put on pause
.
I WILL RELEASE A SPECIAL PHONE NUMBER LATER THIS WEEK FOR ALL CURRENT CLIENTS TO GET BACK PN TRACK. Stay tuned for the other number
.
If anyone knows me or done business with me they know I go above and beyond for my clients. I truly put my heart and soul in my work. I want to thank the HUNDREDS OF CREDIT REPAIR COMPANIES that showing me SUPPORT through all this. Weather

♡ ◯ ◁  

**12,268 likes**

20 HOURS AGO

 Add a comment...

Post

Appx24

 

tagram.com/p/CePbo9yJ2Oh/



**alexmillerofficial** • Follow
Alex Miller

**alexmillerofficial**  Our credit repair department has reopened Call Kenya +1 (713)444.0558 directly to for NEW CLIENT SALES. Current credit repair clients that was put on a 90 day pause will have a DIFFERENT REP to call on tomorrow

If you are a current client that was previously enrolled but we didn't finish I will post a DIFFERENT NUMBER to call on tomorrow

PLEASE DONT WASTE KENYA's time if you are a current client. Kenya for New Client Sales 713.444.0558

Edited · 1d

**Update:**

About 3 months ago my company was hit with a frivolous lawsuit. And I decided to shut my shop down until so I could focus on the matter at hand.

Honestly my first mind was to just retire from credit repair and just walk away as The Goat and the Richest MF that ever did it.




**sharonadams9** I'm so excited your back and running. I wish I lived closer I would come work with you.



12,238 likes

1 DAY AGO

Add a comment...

Appx25

May 31 at 7:37 PM · Houston, TX · 🌐

If you started credit repair with AMCR within the last 3-4 months you probably didn't see any real results bc I had to shut shop down to focus on these frivolous federal credit charges. We are now again accepting new clients. Call Kenya for NEW SALES (281) 630-7336 or call Jordan's line for NEW SALES (713) 302-6280. Do NOT tie up these NEW SALES lines if you are a current client who we had to put on pause
.
I WILL RELEASE A SPECIAL PHONE NUMBER LATER THIS WEEK FOR ALL CURRENT CLIENTS TO GET BACK PN TRACK. Stay tuned for the other number
.
If anyone knows me or done business with me they know I go above and beyond for my clients. I truly put my heart and soul in my work. I want to thank the HUNDREDS OF CREDIT REPAIR COMPANIES that showing me SUPPORT through all this. Weather your company consist just of a single person or if you got 50 employees I appreciate your support yall been giving me. When you the BIGGEST. You've helped the most people. And you shine the hardest then you become THE TARGET. The one to get picked on. BUT GOD IS GOING TO GET THE GLORY OUT OF ALL THIS!

🤩🤩🤩🤩🤩
**We back open for new business!**

We are back tracking all of the client files that was put on hold
page gotta stop right now!!!!!

**I just lost $3,000,000 Million Dollars!**

So please miss me with your $1,500.

My Oath: I will never leave a customer behind!

😂😂😂😂😂
ye the way if y'all ould have signed n with any other ompany y'all shii ouldn't be done b now anyway!!!
😝😝😝😝😝😝😝😝

👍❤️😮 8

👍 Like       💬 Comment       ↪ Share

Most relevant ▾

Write a comment...

# EXHIBIT J

# Exhibit 1

**DECLARATION OF KATHLEEN NOLAN**
**PURSUANT TO 28 U.S.C. § 1746**

I, Kathleen Nolan, have personal knowledge of the following facts and matters discussed in this declaration and, if called as a witness, could and would testify to the facts stated in this declaration.

1.     I am a citizen of the United States and am over eighteen (18) years of age.  I am currently employed as an investigator at the Consumer Financial Protection Bureau.

I was employed as a Federal Trade Investigator (Investigator) for the Federal Trade Commission (FTC) from March of 2014 until September of 2021.  I worked at the Division of Financial Practices in the FTC's Bureau of Consumer Protection.

2.     Prior to joining the FTC, I was an investigator at the U.S. Department of Labor, Office of Labor-Management Standards, for eight years.  I have been a Certified Fraud Examiner (CFE) since November 2015.  The CFE is a certification awarded by the Association of Certified Fraud Examiners.  To become a CFE, I had to pass an exam which tested four subject areas: (1) fraud prevention and deterrence; (2) fraudulent financial transactions; (3) fraud investigations; and (4) legal elements of fraud.  Since obtaining my certification, I need to recertify every year by taking continuing education credits in investigational skills and ethics.  I received a Bachelor of Arts in History from the University of Virginia and received a Master's in Public Policy from George Mason University.

3.     The FTC maintains a website, identitytheft.gov, where people can file identity theft reports and receive personal recovery plans.  Credit reporting agencies ("CRA") reported to the FTC that they are being inundated with what they believe to be fraudulent identity

1

Appx28

theft reports. It was thought that some credit repair organizations were filing fraudulent reports on behalf of their customers in an attempt to clean up the customers' credit report. Investigating this matter further, a loan servicer referred Alex Miller Credit Repair to me, as one such company that may be filing fraudulent identity theft reports.

4.　　After further research, I found that Alex Miller Credit Repair is an alias name of a Wyoming company called Turbo Solutions Inc. that was previously called Alex Miller Financial Services Inc., and that its principal is Alexander V. Miller. The FTC opened an investigation on this credit repair business and I was assigned as the lead investigator on the case (Turbo Solutions Inc. and Alexander Miller are referred to as "Defendants"). Once assigned to the case, it was my responsibility to find evidence of potential violations of the various laws and regulations related to credit repair services, including Section 5 of the FTC Act, the Credit Repair Organization Act ("CROA"), and the FTC's Telemarketing Sales Rule ("TSR"). As part of my work, I engaged in the following investigative activities: (1) capturing the Alex Miller Credit Repair Instagram account and website; (2) making an undercover call to Alex Miller Credit Repair asking about their services; (3) working with the FTC's identitytheft.gov contractor, Leidos, to identify fraudulent reports the Defendants filed on identitytheft.gov; (5) reviewing Civil Investigative Demand (CID) responses; and (6) conducting an analysis of the evidence, including a financial analysis of the Defendants' bank accounts.

### @AlexMillerCreditRepair Instagram

5.　　As part of my investigation, I regularly visited the Defendants' Instagram account @AlexMillerCreditRepair. I periodically preserved selected posts from the Instagram account using Snagit, a screen capture software program from a virtual desktop.

2

6.  I identified numerous posts on Defendants' Instagram account in which Alex Miller claims that Defendants significantly improved a customer's credit score. For example, **Attachment A** is a true and correct capture from June 7, 2020, on the Defendants' Instagram account where Alex Miller shows a screenshot of a purported client's new improved 732 credit score, reflecting an alleged 118 score improvement. Numerous other posts similarly make unsubstantiated claims of dramatic improvements in clients' credit scores, often over short periods of time.

7.  Several of Alex Miller's Instagram posts claim that their credit repair services have allowed clients to purchase a new home, car, or business. **Attachments B and C** reflect unsubstantiated posts claiming that clients' improved credit scores permitted them to buy or build new homes.

8.  Alex Miller regularly claims on Defendants' Instagram account that improving one's credit is a two-step process involving (1) removing negative accounts, and (2) purchasing credit building products. **Attachment D** is a true and correct capture from the Defendants' Instagram account.

9.  I identified numerous Instagram account posts in which Alex Miller claims to have deleted negative items and/or accounts from a client's credit reports. For example, **Attachment E** is a true and correct capture from October 19, 2019, on the Defendants' Instagram account where Alex Miller claims he is able to delete numerous negative items clients' credit reports. The post includes in large font and bold, "Student Loans = Deleted[,] Collections = Deleted[,] Charge offs = Deleted[,] Evictions = Deleted[,] Bankruptcies = Deleted[,] Repos = Deleted[,] Late Payments = Deleted[,] Hospital Bills = Deleted[,] Foreclosures = Deleted." **Attachment F** is a true and correct capture from

Appx30

November 12, 2020, on the Defendants' Instagram account where Alex Miller states he was able to delete 31 negative accounts from a client's credit report in the first round of his credit repair program.

10. I also identified numerous posts on Defendants' Instagram account that indicate Defendants charge customers for credit repair services on a monthly basis, or otherwise show that customers are charged before Defendants complete their services. For example, **Attachment G** is a true and correct capture from the Defendants' Instagram account from November 7, 2020 where Alex Miller states customers had to pay monthly fees in order to receive credit repair services. **Attachment H** is a true and correct capture from the Defendants' Instagram account from September 22, 2020, where Alex Miller states that if a customer writes a negative review on social media he will cancel their credit repair plan and the customer will not get a refund.

11. I have attached additional examples of Defendants' Instagram posts advertising their services.

12. **Attachment I** is a true and correct capture from the Defendants' Instagram account from October 7, 2020 where Alex Miller claims that he improved a customer's credit score to 739.

13. **Attachment J** is a true and correct capture from the Defendants' Instagram account from October 25, 2020, where Alex Miller states he was able to remove 30 negative accounts from a customer's credit report in one round.

14. **Attachment K** is a true and correct capture from the Defendants' Instagram account from September 10, 2020 where Alex Miller states that if the company is unable to

4

Appx31

successfully bill customers' credit cards every month the company will cease their credit repair services.

15. **Attachment L** is a true and correct capture from the Defendants' Instagram account from September 29, 2020, where Alex Miller boasts a 105 improvement which got his client to a 721 credit score, and states credit repair is a two-step process. Step 1 is described as the "removal of at least 85% of your inaccurate negative accounts" while step 2 is the addition of credit building products/tradelines by the client.

16. **Attachment M** is a true and correct capture from November 7, 2020, on the Defendants' Instagram where Alex Miller states he fixed his client's credit and she bought a house. The client purportedly purchased both credit repair and credit building products from the defendants.

17. **Attachment N** is a true and correct capture from December 30, 2020, on the Defendants' Instagram account where Alex Miller claims that he raised his client's credit score by 125 points, enabling his client to buy an Audi and a Jeep.

18. **Attachment O** is a true and correct capture from June 5, 2020, on the Defendants' Instagram account where Alex Miller posts a picture or video of an Apple card, and writes that a client "invested $1,500 into credit repair and received $40K right back." Miller's post appears to indicate that the client received a $40,000 Apple card as a result of his credit services.

19. **Attachment P** is a true and correct capture from August 21, 2020, on the Defendants' Instagram account where Alex Miller claims, "get a Tradeline and this will INSTANTLY populate you a credit score and instant history."

5

Appx32

20. **Attachment Q** is a true and correct capture from August 5, 2019, on the Defendants' Instagram account where Alex Miller shows a screenshot of all of the negative items he purportedly removed from a client's credit report.

21. **Attachment R** is a true and correct capture from February 28, 2020, on the Defendants' Instagram account where Alex Miller wrote, "New clients [sic] results!" next to a screenshot of a purported Equifax credit score report of an individual with a 706 credit score, and a 124 point score improvement.

22. **Attachment S** is a true and correct capture from May 12, 2020, on the Defendants' Instagram account where Alex Miller shows a screenshot of a purported credit score report that shows an initial score of 614, a current score of 732, and a score improvement of 118.

23. **Attachment T** is a true and correct capture from May 12, 2020, on the Defendants' Instagram account where Alex Miller shows a screenshot of a text exchange between himself and a client. Alex Miller claims he was able to delete 32 out of 33 negative accounts for the client.

### AlexMillerCreditRepair.com Website

24. As part of my investigation, I also regularly visited the defendants' Internet website, alexmillercreditrepair.com. I periodically captured this website using WINHTTtrack, a website capture application.

25. Defendants' website included unsubstantiated statements describing Defendants' purported ability to improve the credit score for consumers.

26. **Attachment U** is a true and correct capture on the "About Alex" page from March 16, 2021, where it states, "Alex coined his credit repair process 'The 3 Round Burst' which is

6

Appx33

now known as the most effective way to get inaccurate negative accounts deleted off credit reports. In the last 3 years, Alex Miller Credit Repair has helped over 10,000 clients repair their credit and purchase the cars, home and businesses of their dreams! The company has earned well over $15 million in revenue and Alex has been featured on the front page of Yahoo Finance as one of the top businessmen to watch in 2020."

27.    Defendants claim the ability to remove negative information from clients' credit history and that Defendants can provide credit building products (such as trade lines) to build positive credit. **Attachment V** is a true and correct capture of the website stating they "Provide tradelines (credit boosters)," from October 2019.

28.    Defendants claim the ability to remove negative items on a customer's credit report by conducting three rounds of "advance disputing" items with the credit agencies. **Attachment W** is a true and correct capture from March 16, 2021, of the Frequently Asked Questions page where it states, "The 3 Round Burst consist of 3 master rounds of advanced disputing. Each round is 30-40 days. You will see massive deletion results at the end of each round."

29.    **Attachment X** is a true and correct capture of the Defendants' website from March 16, 2021, stating, "we guarantee results in 40 days."

30.    **Attachment Y** is a true and correct capture of the Defendants' website from March 16, 2021, where the defendants promise to delete inaccurate and negative accounts.

31.    **Attachment Z** is a true and correct capture of the Frequently Asked Questions page from March 16, 2021, where it states, "Will my score go up? Your score will increase according to how many positive accounts you have after we delete the negative accounts. If you don't have any positive account then your scores will reset. A rest credit score is

7

Appx34

neither bad nor good.  It just means you don't have any credit.  Giving you a fresh start & clean slate to start building positive credit from there."

32. The Alex Miller Credit Repair website features embedded videos advertising the company's services.  On the March 2021 capture I witnessed a video where the company claimed: "You're your credit," "700+ credit scores," "Larger loan amounts," and "Higher credit card limits."

33. **Attachment AA** is a true and correct capture of the website from March 16, 2021, where it states Alex Miller Credit Repair "Delete[s] Negative Accounts."

34. **Attachment BB** is a true and correct capture of the website from March 16, 2021, where it states on the Mission Statement that, "Your scores will increase according to how many Positive Accounts you have after the Negative/Inaccurate accounts are deleted.  If you don't have any Positive Accounts then we have Credit Building Products that will help strengthen your credit scores."

35. **Attachment CC** is a true and correct capture of the stating, "Repair your credit today! Guaranteed results in 40 days," from October 2019.

<u>**Undercover Call**</u>

36. On or about September 25, 2020, I conducted and recorded an undercover phone call with the Defendants.  I called the Defendants at phone number 877-503-9737 (the number listed on their website) posing as a potential customer in need of credit repair.  I stated that I was out of a job because of Covid-19 and had failed to pay my debts.  I stated that I anticipated I was getting a new job soon and would like to purchase their credit repair services once I had a steady paycheck.

8

37.    As noted in the highlighted sections of **Attachment DD**, the Alex Miller Credit Repair sales representative said it was the company's job to dispute anything negative or inaccurate on my credit report, including repossession, a bankruptcy, a collection, charge-off, and any credit inquiries that were not tied to open accounts, as well as correcting late payments.

38.    The representative further stated that once the company was able to remove negative accounts from my credit report, my credit score would be based on any positive accounts that remained.  It was imperative that I had positive accounts on my credit report and that I only utilized 30% of my available credit—i.e., if I have a credit card with a $1,000 limit I should only have a $300 balance or less.

39.    The representative stated that the company typically charges $1,500 for their services, but I could join for $750.  The $750 could be broken up into multiple payments if I paid $250 today and then made payments every 2 months.

40.    The representative stated Alex Miller Credit Repair removed negative items from credit reports by disputing them.

41.    The representative stated the company's goal was to get customers to a credit score in the 700s.

42.    After I completed the call, I submitted a copy of the recording to a transcription service. The original of the recording is maintained in a secure location at the FTC and is available upon request.  After receiving the written transcription of the call, I compared the recorded file of the call with the written transcription and confirmed that the written transcription accurately reflected the audio recording.  A true and correct copy of the transcript of this call (with my highlights added) is attached as **Attachment DD**.

9

### Consumer Sentinel Identity Theft Reports

43.    Identitytheft.gov is a FTC website where consumers can electronically file identity theft

reports and receive personal recovery plans.  Identity theft reports are searchable on

Consumer Sentinel. [1]  I searched for everyone who filed a consumer complaint against

Alex Miller Credit Repair on Consumer Sentinel to see if identity theft reports were filed

under their names.

44.    I found numerous examples where the complainants also had identity theft reports filed in

their name.  When I reviewed the identity theft reports, I noticed that for each report the

consumer opted out of creating an identitytheft.gov account.  In my experience,

consumers who are actual victims of identity theft, typically create such an account so

that they can track the report and receive their personal recovery plan.  I also observed

that the "Comments" field in these identity theft reports contained one of three almost

identical statements that I have identified as report A, report B, and report C.  The three

versions (with the differences in bold, italics) are:

**Report A**:  I recently found that there are several *inaccurate* items on my credit report
that don't belong to me.  I do not have a record doing business with these companies.  If
these items are not deleted off my credit report immediately I will be forced to contact a
consumer's right's attorney and sue.  I have documented all correspondence with your
company.  Please remove these *inaccurate* accounts, as you know they are in violation of
the Fair Credit Reporting Act.

**Report B**:  I recently found that there are several *fraudulent* items on my credit report
that don't belong to me.  I do not have a record doing business with these companies.  If
these items are not deleted off my credit report immediately I will be forced to contact a
consumer's right's attorney and sue.  I have documented all correspondence with your

---

[1] The Consumer Sentinel Network ("Consumer Sentinel") is a free, online database of consumer reports available
only to law enforcement.  It includes reports about identity theft, fraud, financial transactions, debt collection, and
credit reports, among other subjects.  Consumer Sentinel is based on the premise that sharing information can make
law enforcement even more effective.  To that end, Consumer Sentinel provides law enforcement members with
access to consumer reports provided directly to the FTC, as well as to reports shared by other data contributors.

company.  Please remove these *fraudulent* accounts, as you know they are in violation of the Fair Credit Reporting Act.

**Report C**:  I recently found that there are several *fraudulent* items on my credit report that don't belong to me.  I do not have a record *of* doing business with these companies. If these items are not deleted off my credit report immediately I will be forced to contact a consumer's right's attorney and sue.  I have documented all correspondence with your company.  Please remove these *fraudulent* accounts, as you know they are in violation of the Fair Credit Reporting Act.

45.    I then ran a search on Consumer Sentinel for identity theft reports containing the

language of Report A in the "Comments" field and found 4,194 identity theft reports filed

from September 13, 2018 through December 17, 2019.  I ran a similar search for identity

theft reports containing the language of Report B and found 2,015 identity theft reports

filed from April 22, 2019 through December 4, 2020.  I ran a similar search for identity

theft reports containing the language of Report C and found 3,811 reports filed from

December 2, 2019 through February 25, 2021.  In total, I found 10,020 identity theft

reports containing the language of Report A, B, or C that were filed between September

13, 2018 and February 25, 2021.

46.    During the investigation, the FTC issued a civil investigative demand to PayPal, Inc.,

which was processing payments for the defendants through March 19, 2020.  I cross-

matched the PayPal transaction data with identity theft reports from the three searches

described above.  I found that approximately 1,225 identity theft reports were associated

with an individual that had paid defendants using PayPal.  When I did a spot check of

several identity theft reports/payment transactions, I found that the defendants typically

took payment from a consumer about a week before the identity theft report was filed.

47.    Leidos Holdings Inc. ("Leidos") is a third-party contractor who services the FTC's

identity theft report database.  The FTC identified a random sample of 196 identity theft

reports from the 10,020 reports identified during the above-described searches, or in other words, that contained language similar to identity theft reports filed by the defendants.[2] Leidos provided the IP addresses associated with the sample of reports. I used Whois Domain Tools reverse IP address lookup and searched the IP addresses provided by Leidos. Of those 196 reports, 184 were filed from an IP address located in the Philippines. A true and correct copy of a spreadsheet reflecting my IP address search is attached as **Attachment EE**.

48. As stated, my review showed that the overwhelming majority of identity theft reports in the sample were filed from the Philippines. My review of the identity theft reports themselves showed that none of the consumers, in whose name those reports were filed, lived in the Philippines, all reside in the United States. As discussed in more detail below, during the investigation, the FTC issued a civil investigative demand to Bank of America where the defendants maintain bank accounts. As discussed below, my review of records produced by Bank of America shows that the defendants sent frequent wire transfers to the Philippines.

### Better Business Bureau Customer Reviews

49. During the course of the investigation, the FTC obtained from the BBB serving greater Houston and south Texas copies of reviews posted to the BBB's website relating to Alex Miller Credit Repair. The BBB provided 16 negative and 18 positive reviews of Alex Miller Credit Repair. The copies provided by the BBB included the email address, zip code, and IP address from where the online reviews were filed.

---

[2] This sample was taken from reports dated after February 2020, which is the time period in which Leidos had preserved metadata for identity theft reports.

12

50. I used Whois Domain Tools reverse IP address lookup to determine the address for all of the IP addresses for the BBB reviews. The negative reviews were filed from locations throughout the country such as Mahwah, NJ; Tucker, GA; Louisville, KY; Fort Worth, TX; and Los Angeles, CA. The negative reviews and the reverse IP address lookup information are attached hereto as **Attachment FF.**

51. For the positive reviews, 12 were filed from Houston, TX, and 10 of the Houston, TX complaints were filed from the exact same IP address. Alex Miller Credit Repair is based in Houston, TX. The positive reviews and the reverse IP address lookup information are attached hereto as **Attachment GG**.

<u>**Investigative Analysis**</u>

52. During the investigation, the FTC issued civil investigative demands to Bank of America, where the defendants maintain bank accounts, and PayPal and PayArc Inc., both of which the defendants used to process consumer payments.

53. I obtained bank records for multiple Alex Miller Financial Services Bank of America accounts. I used a software program called CFIS to convert the records received from Bank of America into a spreadsheet reflecting the financial transactions for each account.

54. My review of the Bank of America documents shows that Alex Miller Financial Services Bank of America account ending in 6108 is the main operating account for the business. The payment processors PayPal and PayArc deposited customer payments directly into this account. From October 2018 to December 2020, Alex Miller Credit Repair had a gross revenue of $9,358,224.30.

55. My review of the defendants' bank records also shows that Alex Miller Credit Repair wired Cherry Mae Priego numerous times from their account ending in 6108 to her

account at the Union Bank of the Philippines. From March 2, 2020 through December 29, 2020, Priego received $121,887.23. A chart of these payments is attached hereto as **Attachment HH**. I found a LinkedIn profile for Priego where she states that she is based in the Philippines and works as a credit repair specialist. I captured that profile and attached it hereto as **Attachment II**. As stated above, most of the identity theft reports filed on Identitytheft.gov by Alex Miller Credit Repair were from the Philippines.

56.    Reviewing the Alex Miller Financial Services Bank of America account ending in 6108, I noticed numerous purchases that appear to serve no obvious business purpose. Those purchases made from October 2018 through December 2020 include the following:

- $193,149 in bank teller cash withdrawals

- $82,668.84 in ATM withdrawals

- $71,427.67 in auto expenses

- $29,511.07 in designer clothes

- $6,680.70 in jewelry

- $26,677 at strip clubs

These withdrawals and expenditures totaled $410,114.28 from the company's operating account. These purchases are attached hereto in table format as **Attachment JJ**.

57.    A spreadsheet reflecting certain relevant transactions for Alex Miller Financial Services' Bank of America account ending in 0508 is attached as **Attachment KK**.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

14

Appx41

Executed on, in Washington, District of Columbia.

_____  2/18/22

Kathleen Nolan

Appx42

# Attachment A

Case 4:22-mc-00369 Document 3-1 Filed on 03/01/22 in TXSD Page 18 of 298

Instagram

**alexmillercreditrepair** · Follow
Alex Miller Credit Repair

**alexmillercreditrepair** New client results are in! To score is the final score! I'm so happy this woman will be able to finally build her new house and get approved for a new car. Hallelujah

5w

**anetthfriedlmau** Can i get more details on that.

5w Reply

**tadinagmrt** Please check your DM alex

3,834 likes

JUNE 7

Add a comment...

I fixed his credit!

732

614 Initial Score

732 Current Score

118 Score Improvement

626

700

@alexmillercreditrepair

626

597

700

29

$72,000 Approval

$14,000 Approval

Appx44

SBA U.S. Small Business Administration

# Attachment J



Appx46

# Attachment R

Instagram



**alexmillercreditrepair · Follow**
Alex Miller Credit Repair



**alexmillercreditrepair**
#NewClientResults TO GET STARTED
ON YOUR CREDIT CLICK THE LINK
THE BIO AND FILL OUT THE SHORT
FORM OR CALL NOW 877-503-973

.

CreditRepair #CreditRepairAtlanta
#AtlantaCreditRepair
#AlexMillerCreditRepair
#HoustonCreditRepair
#CreditRepairHouston
#CreditRepairLA #CreditScoreGuru
#AlexMiller

13w

iam_abdul_quawi

13w  Reply

♡ ○ ◁

**3,975 likes**

FEBRUARY 28

Add a comment...



**Date: 02/27/2020**

706

582
Initial Score

706
Current Score

124
Score
Improvement

**Equifax**

New clients results!

He got a Tesla!

App 48

766

763

734

# Attachment U

mustered the courage to apply for a corporate sales job at American Express. Even though Amex required him to have a college degree, he applied anyway placing his faith before his reality. During the job interview his radiant personality touched the heart of the sales floor manager and he landed the job and got his first shot at making 6 figures. He quickly rose through the ranks and became American Express #1 rookie of the month & later became sales rep of the year!

It was in his five year impeccable sales career at Amex that he realized how important it is to have great credit and the power of having a high credit score. His commission check was based on how many of his clients got approved for Amex loan and he realized credit was king. As his sales career soared based on his approvals his heart went out to his clients that did notget approved. Alex began to study how credit works with the thought that he could help change the lives of others. He began studying credit and credit repair. He went on to master the Laws that regulate the industry, the Fair Credit Reporting Act, Fair and Accurate Transaction Act, Fair Debt Collection Practices Act, HIPPA Law & The State Statute of Limitation on Debts.

Before he knew it, he quit his job at Amex and relocated to Houston, Texas.  This is when his own company, Alex Miller Credit Repair, was born in a small 2  bedroom apartment with the second bedroom being a home office. Already having a natural talent in sales & marketing he used free social media outlets like Instagram & Facebook to post the results of his clients to draw in more clients. Within the following 9 months he went from having his best friend as his only partner and employee to outgrowing 5 office locations in Houston and becoming an overnight International company with over 100 plus employees from America to the Philippines. He built an International company without ever stepping foot outside of Houston! Alex coined his credit repair process "The 3 Round Burst" which is now known as the most effective way to get inaccurate negative accounts deleted off credit reports. In the last 3 years, Alex Miller Credit Repair has helped over 10,000 clients repair their credit and purchase the cars, homes and businesses of their dreams! The company has earned well over $15 million in revenue and Alex has even been featured on the front page of Yahoo Finance as one of the top businessmen to watch in 2020. Alex has recently partnered with Credit Fixrr Technology Inc to offer DIY Affordable Credit Repair Services on a cutting  edge online platform. 2021 will be a year for the books so stay tuned!





Phone: 877  503  9737
Email : credit@alexmillercreditrepair.com
Address : 440 Louisiana St, Houston, TX 77002

  

Privacy Policy

Refund Policy

Alex Miller Credit Repair

Appx50

# Attachment V

**Delete Negative Accounts.**

**10 + Years Of Experience**

**Aggressive Cleaning Strategy.**

**Results Driven.**

**Free Credit Analysis With Live Person.**

## Meet the Founder, Alex Miller



The founder of Alex Miller Credit Repair, is a Credit Repair Expert on Debt Validation. Over the years he has analyzed thousands of credit giving him extensive knowledge on credit trending. Alex is certified on consumer credit laws including the Fair Credit Reporting Act and Accurate Transaction Act. Alex has helped thousands of consumers enforce their credit rights and dramatically improve their credit and He has become well known in both consumer and business credit arenas for helping consumers dramatically improve their credit profil

Alex has mastered:

- Laws that regulate the industry
- Fair Credit Reporting Act
- Fair and Accurate Transaction Act
- Fair Debt Collection Practices Act
- HIPPA Law
- State Statute of Limitation on Debts.

## At Alex Miller Credit Repair, we make credit repair simple.

- We do all of the work for you!
- We provide trade lines (Credit Boosters).
- A trusted company. Licensed and Bonded.

Appx52

# EXHIBIT K

# Exhibit 9

# DECLARATION OF JASON HUMBERT
## PURSUANT TO 28 U.S.C. § 1746

I, Jason Humbert, have personal knowledge of the following facts and matters discussed in this declaration and, if called as a witness, could and would testify to the facts stated in this declaration.

1. I am a citizen of the United States and am over eighteen (18) years of age. I am currently employed as an investigator at the U.S. Department of Justice (DOJ) in the Consumer Protection Branch (CPB).

2. Prior to joining DOJ, I was the Chief of the Health Fraud Branch (HFB) in the U.S. Food and Drug Administration's (FDA) Office of Regulatory Affairs for three years. I was an investigator or acting team leader in the HFB at FDA for the prior eight years. I received a Bachelor of Science in Nursing from Capital University in Columbus, Ohio, a Master's in Professional Studies with an emphasis in homeland security and public health preparedness from the Pennsylvania State University's College of Medicine and a graduate certificate in fraud and forensics from Carlow University in Pittsburgh, Pennsylvania.

3. As an investigator in CPB, I routinely conduct internet investigations using browsing software and an Internet Protocol (IP) address not attributable to DOJ. On February 4, 2022, I visited the website, alexmillercreditreport.com, and found the website inactive. **Attachment A** is a true and correct capture of how the website, alexmillercreditreport.com, appeared on February 9, 2022.

4. Each website on the internet has an electronic address known as a domain name. Congress has defined a "domain name" as "any alphanumeric designation which is

registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet." Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1127.

5. A person may register a desired domain name by applying through any accredited registrar. One common registrar, GoDaddy, has been accredited by the Internet Corporation for Assigned Names and Numbers ("ICANN"). ICANN is a nonprofit organization responsible for coordinating the maintenance and procedures of several databases related to the namespaces and numerical spaces of the Internet, ensuring the network's stable and secure operation. ICANN, ICANN by-laws (28 November 2019), https://www.icann.org/resources/pages/governance/bylaws-en.

6. Once the registrar determines that a requested domain name is available and accepts the registration application, the registrar would typically then require the registrant to provide contact and technical information to complete the registration and make that information publicly available through its WHOIS database. A WHOIS database is a public online database that allows users to learn domain name information, such as the registrant's name, address, phone number, and e-mail address, that has been compiled by the registrar from the registrant's information. *See Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1064 n.22 (9th Cir. 2009).

7. Using my DOJ computer, I searched a WHOIS database for website registration information for the following domain name: alexmillercreditrepair.com. The WHOIS registrant is "REDACTED FOR PRIVACY" and lists a registrant address in Paris, France. The domain registrar is GANDI SAS, a French company. **Attachment B** is a

2

true and correct copy of the domain name registration for alexmillercreditrepair.com as of February 9, 2022.

8.  The WHOIS database also offers historical domain name registration information. Searching through records from when the domain name was created and registered, I found a domain name registration from October 26, 2017, which lists the registrant as Alexander Miller at an address in Paris, France. The domain registrar is listed as GANDI SAS. **Attachment C is** a true and correct copy of the October 26, 2017 WHOIS record as observed on February 9, 2022.

9.  As part of my investigation, I visited the Defendants' various social media accounts, including Facebook, Instagram, Twitter, LinkedIn, as well as online profiles including those on Google and Yelp. Using screen capturing software, I collected images of social media profiles and posts on February 9-14, 2022.

10. On February 9 and 10, 2022, I visited the Defendants' Facebook page accessible at https://www.facebook.com/thealexmillercreditrepair. The most recent post at that time was a February 9, 2022 post about "establishing Great Credit" which provided the phone number, (877) 503-9737, where consumers could reach the Defendant. **Attachment D** is a true and correct copy of the Defendants' Facebook page observed on February 10, 2022.

11. The Facebook page reveals a February 2022 interaction between the Defendants and an apparent employee, @Q_amcr, about a pending appointment regarding a potential deal which may make the employee late for work. The post included a screen capture of a $1000 transfer to "Alex Miller." The Defendants included in the post, "@Q_amcr

3

You are excused." **Attachment E** is a true and correct copy of the Defendants' Facebook page observed on February 9, 2022.

12. On February 9 and 10, 2022, I visited the Defendants' Instagram page accessible at https://www.instagram.com/alexmillercreditrepair. The Instagram account, @alexmillercreditrepair, includes posts as recent as February 9, 2022 where the Defendants provide phone numbers to "start the credit repair process." **Attachment F** is a true and correct copy of the Defendants' Instagram page observed on February 9, 2022.

13. The Defendants' Instagram account includes a February 4, 2022, post titled, "WHY HIDE YOUR PRICES?" The post includes a list of services, including "Credit Cleaning" for $1500. The post also includes a comment from a potential customer who attempted to reach the Defendants and "didn't get a response." The account, @alexmillercreditrepair, responded "check dm" to which the consumer replied, "just got it. I responded. Thank you". The post also includes the phone number, (877) 503-9737, which is included in accounts and posts elsewhere. **Attachment G** is a true and copy of this post observed on February 10, 2022.

14. On February 9, 2022, I visited the Defendants' Twitter account (@AlexMil42913873) accessible at https://twitter.com/alexmil42913873. The account joined Twitter in November 2018 per the account bio, which includes the website address, alexmillercreditrepair.com, the phone number, (877) 503-9737, and the statements, "Repair Your Credit Today! At Alex Miller Credit Repair, we make credit repair simple." **Attachment H** is a true and copy of this post observed on February 9, 2022.

4

15. On February 9, 2022, I conducted a Google search of the phone number, (877) 503-9737, which is featured throughout many of the Defendants' social media accounts. The search results included links to the aforementioned social media accounts, as well as a Google profile for "Alex Miller Credit Repair" offering "Online appointments" and "Open 24 hours" with a link to the Defendants' Facebook page: https://fb.com/book/AlexMillerCreditRepair/. The address listed is 440 Louisiana St., Houston, TX 77002 in Lyric Tower. **Attachment I** is a true and copy of this post observed on February 14, 2022.

16. On February 9, 2022, I visited the Yelp page for "Alex Miller Credit Repair," accessible at https://www.yelp.com/biz/alex-miller-credit-repair-houston that includes a link to the Defendants' website, http://alexmillercreditrepair.com, the phone number, (877) 503-9737, the business address, 440 Louisiana St., Houston, TX 77002, and the business hours, 8:00 AM – 6:00 PM. Upon visiting the Yelp page, the business was listed as "Open." **Attachment J** is a true and copy of this post observed on February 9, 2022.

17. On February 10 and then again on February 14, 2022, I visited the Defendants' LinkedIn account accessible at https://www.linkedin.com/in/alexander-miller-56770996/. The account lists Alexander Miller as the "Chief Executive Officer at Alex Miller Credit Repair" since January 2012. **Attachment K** is a true and copy of this post observed on February 14, 2022.

18. On February 10, 2022, I visited the Facebook account of Kenya Selman accessible at https://www.facebook.com/kenya.selman, which includes a February 4 post which reads: "DM/Call Me directly if interested. (281) 630-7336 @alexmillercreditrepair

5

#Repair #Rebuild #GetApproved". **Attachment L** is a true and copy of this post observed on February 10, 2022.

19. On February 10, 2022, I visited the Instagram account for @q_amcr, accessible at https://www.instagram.com/q_amcr/. This account included a February 4, 2022, post which reads, "Whose *[sic]* ready to get their credit fixed by the goat? If your *[sic]* ready to take action today and ready to change your life and get approved for houses, cars, loans etc. Dm or txt me your first and last name, email, and phone number for a free credit analysis. #alexmillercreditrepair #creditrepair #realestate # houstontx #credit #entrepeneur #trucking #business". The post includes a photo with @q_amcr holding a sign which includes the phone number, (281) 971-3325 and features a comment from @alexmillercreditrepair which reads, "I approve!!" As of February 14, 2022, this Instagram account has been removed. **Attachments M and N** are true and correct copies of this post observed February 14, 2022 and on February 10, 2022.

20. On February 10 and 14, 2022, I visited several other Instagram accounts, including @alexmillercreditcardrepair, @customerserviceamcr and @alexxmillercreditrepair.

21. The account, @alexmillercreditcardrepair is accessible at https://www.instagram.com/alexmillercreditcardrepair/ and includes a link to http://www.alexmillercreditrepair.com. The most recent post on this Instagram account is dated October 22, 2021. **Attachments O and P** are true and correct copies of this account and post observed on February 14, 2022 and February 10, 2022.

22. The account, @customerserviceamcr, is accessible at https://www.instagram.com/CustomerserviceAMCR/ and is listed as the "Official Customer Support Page for @alexmillercreditrepair" and includes a link to the

Defendants' website, www.alexmillercreditrepair.com.  **Attachment Q** is a true and copy of this post observed on February 10, 2022.

23. The account, @alexxmillercreditrepair,  is accessible at https://www.instagram.com/alexxmillercreditrepair  but has no information  in the bio nor does it contain any posts or list and followers or accounts following. **Attachment R** is a true and copy of this post observed on February 10, 2022.

24. I also reviewed certain information  received by the Federal Trade Commission  (FTC) from Bank of America related to Alex Miller  Financial  Services accounts ending  in 0508 and 6108.  I reviewed a spreadsheet reflecting certain financial  data related to account ending  in 0508, which is attached to the Declaration of Kathleen Nolan as Attachment KK. My review showed that significant  funds were transferred from Alex Miller  Financial  Services' account ending  in 6108 to the account ending  in 0508—a total of $2,985,662.50  from January 4, 2019 to December 18, 2020.  These transactions are attached hereto in table format as **Attachment S**.

25. A review of records for the account ending  in 0508 also shows numerous transactions that appear to serve no business purpose. Those transfers and purchases from April 29, 2019 to December 10, 2020 include:

- $1,196,100.18  in cash or customer withdrawals
- $376,000 in payments to music  label and/or recording companies
- $5,863.51  in auto expenses

26. These withdrawals and expenditures  totaled $1,311,863.69  from the company's account ending  in 0508.  These purchases are attached hereto in table format as **Attachment T**.

27. I also reviewed signature cards received by the FTC from Bank of America for accounts ending in 0508 and 6108. Alexander V. Miller is the signatory for the account ending in 0508. Alexander V. Miller and Hannah Miller are the signatories for the account ending in 6108.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 23, 2022, in Washington, District of Columbia.

JASON HUMBERT   Digitally signed by JASON HUMBERT
Date: 2022.02.23 11:23:17 -05'00'

_____
Jason Humbert

8

# Attachment I





877.503.9737

All | Maps | Shopping | Images | Videos | More | Tools

About 13 results (0.46 seconds)

https://www.instagram.com › ...
### Alex Miller on Instagram: " I ain't got time today.... To start credit ...
4862 Likes, 17 Comments - Alex Miller (@alexmillercreditrepair) on Instagram: " I ain't got time today.... To start credit repair call 877.503.9737"

https://www.instagram.com › CPmQyemJdwG
### DM: 1) Full name 2) Email 3) phone number - Instagram
Jun 2, 2021 — I fixed her credit! Call 877.503.9737 to start my 2 step credit repair.

https://twitter.com › alexmil42913873
### Alex Miller (@AlexMil42913873) / Twitter
Repair Your Credit Today! At Alex Miller Credit Repair, we make credit repair simple. https://t.co/4ZiHL2Cxmy 877-503-9737.

https://mobile.twitter.com › alexmil42913873 › status
### Alex Miller в Twitter: "We help change lives one at a time. Call us for ...
We help change lives one at a time. Call us for FREE credit analysis. Fill out the form in the bio Now is here, do it now! For a guaranteed 90 days credit ...

https://www.facebook.com › Pages › Public figure
### Alex Miller - Home | Facebook
DM me your FULL NAME, EMAIL & PHONE NUMBER if you got your money ready and you are ready to get started today! . To START THE CREDIT CLEANING PROCESS DM 1) Full ...

https://ne-np.facebook.com › posts · Translate this page
### Alex Miller - I fixed her credit! Call 877.503.9737 to... | Facebook
I fixed her credit! Call 877.503.9737 to start my 2 step credit repair process today.

https://thebluntpost.com › Blunt Posts
### ASK THE EXPERT: ALEX MILLER, CREDIT REPAIR - Blunt ...
Ask the Expert: Alex Miller, Credit Repair, discusses repairing and protecting one's credit with best tips, with The Blunt Post.

### Images for 877.503.9737

Feedback

View all

https://www.pixwox.com › profile › alexmillercreditrepair
### @alexmillercreditrepair Instagram profile, stories - Pixwox
After 2 LONG YEARS of living with her the constant emotional abuse had me feeling worthless and paralyzed... Ohhhh I'm acting petty today!! I'm a keep this post ...

https://www.webcontactus.com › credit-repair-customer...
### Credit Repair Customer Service Number - Webcontactus.com
International callers who experience difficulties calling these numbers should contact their telephone service providers for assistance. Option 1: Free annual ...

https://www.yumpu.com › document › view › this-wee...
### This Week in Palm Springs Feb. 6 , to Feb. 12, 2019 - Yumpu
Feb 6, 2019 — FREE VALENTINE MESSAGES TOO! DON'T MISS OUT! 2 The original Gay Desert Daily Guide. View our Free Digital Version on-line. For over 23 years ...

https://hoursfinder.com › a-hours › alex-miller-credit-re...
### Alex Miller Credit Repair Hours - hoursfinder.com
49 customer reviews of Alex Miller Credit Repair. One of the best Business Consulting, Business Services business at 77 Sugar Creek Center, #600, Sugar Land TX, ...

https://www.find-repair-service.com › alex-miller-credit-r...
### Alex Miller Credit Repair Bbb - Find Repair Service
Alex Miller Credit Repair Better Business Bureau® Profile. Repair. (7 days ago) Since October 2020, the BBB Houston began receiving several complaints and ...

https://excelnow.pasquotankrod.com › m-companies
### Miller John Customer Service — Contact | John Miller

## Alex Miller Credit Repair

Directions | Save | Call

4.6 ★★★★★ 333 Google reviews

Credit counseling service in Houston, Texas

**Service options:** Online appointments

**Located in:** Lyric Tower

**Address:** 440 Louisiana St, Houston, TX 77002

**Hours:** Open 24 hours

**Health & safety:** Mask required · Temperature check required · Staff wear masks · Staff get temperature checks · Staff required to disinfect surfaces between visits · More details

**Phone:** (877) 503-9737

**Appointments:** fb.com

Suggest an edit · Own this business?

### Add missing information
Add website

### Questions & answers
See all questions (1)

Ask a question

**Send to your phone** Send

### Reviews
Write a review | Add a photo

"She was able to give me an affordable **price** that worked within my **budget**." ★★★★★

"This **gentleman** carries himself well and to see the **company** horrible service." ★

"Got scammed before but this **place** is legit!" ★★★★★

View all Google reviews

### From Alex Miller Credit Repair
"Trusted Credit Specialist. Results In 40 Days!"

### Profiles
LinkedIn | Twitter | Instagram

### People also search for
View 15+ more

| Xpert Credit Repair | Texas Best Credit Repair | ASAP Credit Repair | Elite Credit Repair Services | ANG Credit Solutions - Credit Re... |
|---|---|---|---|---|
| Credit counseling service | Credit counseling service | Credit counseling service | Credit counseling service | Credit counseling service |

About this data | Feedback

4/9/22, 5:14 PM

877.503.9737 - Google Search

Searching for miller john customer service? Here is the most relevant information connected with miller john customer service, including phone numbers.

*In order to show you the most relevant results, we have omitted some entries very similar to the 13 already displayed.*
*If you like, you can repeat the search with the omitted results included.*

⊙ **Atlanta GA, Georgia** · From your IP address · Update location

Help      Send feedback      Privacy      Terms

# Attachment J

yelp

tacos, cheap dinner, Max's | Charlotte, NC 28280 | 🔍

For Businesses | Write a Review | Log In | Sign Up

Restaurants ▾ | Home Services ▾ | Auto Services ▾ | More ▾

# Alex Miller Credit Repair

⭐⭐ 17 reviews

✓ Claimed • Debt Relief Services  Edit

Open 8:00 AM - 6:00 PM

Write a Review | Add Photo | Share | Save

http://www.alexmillercreditrep... 🔗

(877) 503-9737 📞

**Get Directions** 🧭
440 Louisiana St Houston, TX 77002

Message the Business 💬

## Photos & videos

See all 5 photos →



## You Might Also Consider
Sponsored ⓘ

**Noel Vallejo - State Farm Insurance Agent**
⭐⭐⭐ 4    📍 6.0 miles away from Alex Miller Credit Repair

Korry T. said "We are happy with State Farm , appreciate the wonderful service and Mr. Noel Vallejo always sends a sweet gesture of sending us out birthday cards on our birthday's (its always nice to be remembered). Thanks Mr. Noel V for the..." read more

in Insurance, Life Insurance

**Allstate Insurance: Syed Raza**
⭐⭐⭐⭐⭐ 1    📍 18.0 miles away from Alex Miller Credit Repair

Jocelyn V. said "Awesome service at this office. Always courteous and attentive. The staff is constantly trying to look out for possible discounts you may qualify for. They always prompt at returning your call or email. Even though we live in..." read more

in Life Insurance, Auto Insurance, Home & Rental Insurance

**Loan Factory**
⭐⭐⭐⭐⭐ 26    📍 12.8 miles away from Alex Miller Credit Repair

Khanh N. said "Hanh and her team is very helpful in getting my loan approved. My income is contract based on the amount of work changes through the season, which makes it harder to get an approval. I am glad that Hanh and her team went out of..." read more

in Mortgage Lenders

## You Might Also Consider
Sponsored ⓘ

**Premier America Credit Union**
⭐⭐⭐⭐ 5
10.4 miles

"I've had an account here for almost four years now. My mother has had an account..." read more

**Novo's Insurance & Multiservice**
11.6 miles

We have service of, transfers of vehicle titles, motorcycles, trucks, lost titles,... read more

## About the Business

 **Alex M.**
Business Owner

We are a national credit repair and restoration company working with a wide array of clients and creditors. At Alex Miller Credit Repair, we specialize in the removal of negative, delinquent & collection items, as well as the removal of the list of inquiries which are negatively impacting your...

Read more

## Location & Hours

Mon  8:00 AM - 6:00 PM
Tue  8:00 AM - 6:00 PM
Wed  8:00 AM - 6:00 PM  Open now
Thu  8:00 AM - 6:00 PM
Fri  8:00 AM - 6:00 PM
Sat  8:00 AM - 6:00 PM
Sun  Closed

440 Louisiana St
Houston, TX 77002
Downtown, Fourth Ward

Get directions

Edit business info

## Amenities and More

✓ Staff wears masks    Black-owned

4/9/22, 5:21 PM                    ALEX MILLER CREDIT REPAIR - 27 Reviews - Debt Relief Services - 490 Louisiana St, Houston, TX - Phone Number

### Ask the Community                                                    Ask a question  +

Yelp users haven't asked any questions yet about **Alex Miller Credit Repair**.

---

### Recommended Reviews

> ⓘ **Your trust is our top concern,** so businesses can't pay to alter or remove their reviews. **Learn more.**                                                                    ✕

| Search within reviews   🔍 |        | Yelp Sort ⌄ |



**Username**
Location
📷 0   ▶ 0                                     Start your review of **Alex Miller Credit Repair.**

---

**James C.**                                                                    ⋯
Mid-West, Houston, TX
📷 0   ▶ 1

★★★★★  4/7/2020

Alex Miller, Hannah Miller, and his whole devoted team are literally the PERFECT example of an "AMERICAN SUCCESS STORY"... A young man who comes from nothing having something and then trying to share it with the world. Now, though at times, he might come off as "flashy" or even "over the top" with his extreme glam, it is quite understandable when a young man who comes from meager beginnings to the wealth that he has SURELY, earned "struts his stuff". I have more than enough knowledge and account to this story as I have the pleasure of not only being a devoted employee of ALEX but also a Client of his process. What these disgruntled clients of ALEX FAIL MISERABLY TO REALIZE is that this is a 2 part process, CREDIT REPAIR. And to think of it, so is life. If you don't follow instructions in life when someone is helping you, then, you will never receive the desired results. If they had follow instructions in life, paying on time and never slacking in the first place, just maybe they wouldn't need CREDIT REPAIR OR ANY KIND OF REPAIR IN THE FIRST PLACE... just saying. So, to those reading this post and the previous negative whining from these so-called factors in opinion, the quote goes "let he who is without sin, cast the first stone"... THIS PROCESS WORKS BUT YOU GOTTA WORK WITH THE PROCESS AND SIMPLY FOLLOW THE INSTRUCTIONS TO GET THE BEST RESULTS... HATS OFF AND CUPS UP TO YOU MR. Alex Miller and Mrs. Hannah Miller for inviting the world into your wonderful journey... They are more success stories to be written through yours...
your friend and VERY HAPPY CLIENT, JAMES.... P.S. I wont post my RESULTS CAUSE IT AINT NOBODIES BUSINESS...

| 👍 Useful 2 |   | 😆 Funny 1 |   | 😎 Cool |

---

**Dontae G.**  `Elite 2022`                                                     ⋯
Charlotte, NC
📷 33   ▶ 59   📷 77

★☆☆☆☆  3/3/2021

Scam.. took my money never did anything and then denied giving it back after the construct state such after three months of no supply

| 👍 Useful 4 |   | 😆 Funny |   | 😎 Cool |

> **Alex M.**
> Business Owner
>
> 6/23/2021
>
> Hello Dontae, I am sorry you had a bad experience with Alex Miller Credit Repair. Thank you for letting us know. As the business owner, I am embarrassed to hear this. I will personally get involved in seeing this...
> **Read more**

---

**Brittany S.**                                                                 ⋯
Chino, CA
📷 0   ▶ 2

★☆☆☆☆  6/14/2021

Around last year in August I began the process in hopes of wanting to get a few things off. I had only 2 late payments and wanted some inquires off and I just canceled it today. Nothing was taking off so taking a L on giving them 1000 and 300$ on having to pay identity IQ every month. wouldn't recommended.

| 👍 Useful 2 |   | 😆 Funny 2 |   | 😎 Cool |

> **Alex M.**
> Business Owner
>
> 6/23/2021
>
> Hello Brittany, We are sorry you had a bad experience with Alex Miller Credit Repair. Thank you for letting us know. As the business owner, I am embarrassed to hear this. I will personally get involved in seeing this...
> **Read more**

---

**Chris T.**                                                                    ⋯
Central LA, West Hollywood, CA

Appx67

4/9/22, 5:22 PM · ALEX MILLER CREDIT REPAIR - 27 Reviews - Debt Relief Service - 405 Louisiana St, Houston, TX - Phone Number



⭐ 4/19/2021 · ⟳ Updated review

Having checked my credit again today I see now that they accidentally removed an active account (that it is in EXCELLENT standing) from one of the credit reporting agencies.  It is the card with the highest limit and will show my utilization at such a low rate.

The items that should have been removed are still on my credit report, and I've had to hire another company to do what they could not do.  All of this after a year and a half of service.  They are a waste of time and money.  RUN far away from them.

⊙ Useful 1    ☺ Funny    ☺ Cool

⭐⭐⭐⭐ 6/14/2020 · Previous review

Service.  When paying for a consulting service you want to make sure you are being heard, your needs are being met and your questions are being answered. With a doubt, this is what Tara at Ale...
**Read more**

**Ayman I.**
Brooklyn, Brooklyn, NY
📷 0  ⊡ 1  📷 3

⭐ 8/31/2021

This company and alex Miller is total fraud they scammed me out of 10K I paid for the trade line they offered on IG and never got the trade line or my money back since 1/20 I have txt mssgs and voice recording to proof everything. They promised me after 60 days I will see the trade line posted after 60 days I checked my credit nothing then they said you have to wait another 45 days cuz it takes two billing cycles then I post I waited for another 45 days I checked my credit nothing I start calling the company non stop I got transferred from one person to another I ended up speaking with Vito in the trade line department I told him what had happen he said let me check what's going on and I will call you back it will take up to 48 hours to get a call back after 2 days I called back they said the person you need to speak with is Vito and his not working today or tomorrow long story make it short I get a call back saying your trade line didn't post cuz of a problem with the third party company that actually offer the trade line I requested a refund back that's when I was told your request will be submitted and alex have to approve it I contacted alex many times for a whole week kept calling and calling until he answered me acted like he doesn't know what's going on even tho I paid him personally the money back on 1/21/21 he promised he will fix the problem and I will get my money back I waited for 2 days and I start calling again he straight up said sorry can not refund you the money I don't have it. I called my credit card bank they said I can not file dispute cuz it's passed the time for dispute I have all proofs for the whole story then I got on insta and I posted everything happened he ended up blocking me. I will do whatever it takes to make sure he get locked up so far he did this with 4 different people that reached out to me on insta and told me he also took money from them and did not deliver the service and no refund also check the BBB couple people on there had the same situation

⊙ Useful 2    ☺ Funny    ☺ Cool

**Freddy N.**
FL, FL
📷 0  ⊡ 1

⭐ 7/16/2021

I found this company on IG and saw they had a lot of followers and had a blue check .. at first the process was good they spoke to me every time they sent their round of disputes .. but nothing was coming off .. NOT ONE .. after the 3 rounds I tried calling the person who was assigned my case Kenya and guess what . Her phone was disconnected ! I called customer service .. no answer for 25 mins until it says to leave a voicemail and they will get back to you ASAP .. so when I called back and dialed 1 for new customers they answered !!! Unbelievable . This company is a joke . Don't waste your 1500 . I'm going to Credit Saint or Lexington Law . Wish they had zero stars .. cause this was the worst

⊙ Useful 1    ☺ Funny    ☺ Cool

**Anna C.**
Opelousas, LA
📷 0  ⊡ 1

⭐ 3/6/2020

I was foolish to spend 1500 a month on credit. Things started off good but then, no communication, slow service. 2 months went by, no results. I was still billed after i pulled out. Unfinished business. The thing that has ppl sceptical is how flashy Alex is on his Instagram.  It makes people think,he is just money hungry.
I dont like to do business with arrogant ppl
Stop jumping on the hype bandwagon.  Research and you will see. You could find locals for way cheaper who do the same things smh. Better yet,you can do this yourself.

⊙ Useful 8    ☺ Funny    ☺ Cool

**Anyae H.**
West Philadelphia, Philadelphia, PA
📷 7  ⊡ 2

⭐ 4/29/2021

I paid for a tradeline in November and it still hasn't showed up on my report. I get the run around from Vito and Jonathan and it's now almost May and no tradeline. This company is a scam. Don't waste your time or money.

⊙ Useful 2    ☺ Funny    ☺ Cool

**Alex M.**

Appx68



4/9/22, 5:22 PM   ALEX MILLER CREDIT REPAIR - 27 Reviews - Debt Relief Services - 440 Louisiana St, Houston, TX - Phone Number...

6/23/2021

Hello Anyae, We are sorry you had a bad experience with Alex Miller Credit Repair. Thank you for letting me know. As the business owner, I am embarrassed to hear this. I will personally get involved in seeing this...

Read more

**Tonya B.**
South Central Houston, Houston, TX

 0   4

⭐☆☆☆☆ 7/14/2020

1500 for nothing, no results, they talk a good game to bring you in. I should have pulled out after the first month. The ball was dropped they do not communicate well with each other or their clients. Serval  employees quit or was fired and no one knew who was over my case...
Long story short I see no improvements whats so ever

Useful 5    Funny    Cool

**Alex M.**
Business Owner

6/23/2021

Tonya, here at Alex Miller Credit Repair, we are committed to providing the highest level of service and would like to hear more about your specific situation. Please reach out to me on IG DM @alexmillercreditrepair and...

Read more

**Nicole R.**
Las Vegas, NV

 188   2

⭐☆☆☆☆ 2/22/2020

Does not deliver on service, nor customer service. Alex miller himself is very arrogant and does not care about his customers. I paid $1500 for unfinished services.

Useful 7    Funny    Cool

‹   **1**   2   ›                                                    1 of 2

75 other reviews that are not currently recommended  ⌄

**You Might Also Consider**  Sponsored ⓘ



**Texan Insurance**
⭐⭐⭐⭐⯨ 9                          📍 9.0 miles away from Alex Miller Credit Repair

**Risha J. said** "Texan Insurance continues to be my go to agency for all my insurance needs. Recently engaged and moved to my husband to be home, he was up for renewal and I told him he had to talk to Jennifer Lastrape to get a deal I trusted. As…"   read more
in Insurance

**Rocket Financial Services**

Highest rated Credit Repair Service. 5 Stars on All platforms. Awarded Best Credit Repair Company in DFW. Money-Back Guarantee. Let's face it: living with a low credit score is just HARD! You pay more for everything, live in fear of…   read more
in Debt Relief Services

**People Also Viewed**







**Porterie Tax Solutions**
⭐⭐⭐⭐⭐ 1
Tax Services, Financial Advising, Accountants

**Weston Legal**
⭐⭐⭐⭐⭐ 16
Bankruptcy Law

**Browse Nearby**                **Near Me**                      **Other Debt Relief Services Nearby**

🍴 Restaurants                    Debt Relief Services Near Me     Find more Debt Relief Services near Alex Miller Credit
                                                                  Repair
🍸 Nightlife

🛍 Shopping

···

4/9/22, 5:24 PM                     ALEX MILLER CREDIT REPAIR - 27 Reviews - Debt Relief Services - 440 Louisiana St, Houston, TX - Phone Number

Show all

### Frequently Asked Questions about Alex Miller Credit Repair

**How is Alex Miller Credit Repair rated?**

Alex Miller Credit Repair has 2 stars.

**What days are Alex Miller Credit Repair open?**

Alex Miller Credit Repair is open Mon, Tue, Wed, Thu, Fri, Sat.

**About**

About Yelp
Careers
Press
Investor Relations
Trust & Safety
Content Guidelines
Accessibility Statement
Terms of Service
Privacy Policy
Ad Choices

**Discover**

Yelp Project Cost Guides
Collections
Talk
Events
The Local Yelp
Yelp Blog
Support
Yelp Mobile
Developers
RSS

**Yelp for Business**

Claim your Business Page
Advertise on Yelp
Yelp for Restaurant Owners
Table Management
Business Success Stories
Business Support
Yelp Blog for Business

**Languages**

English ⌄

**Countries**

United States ⌄

Copyright © 2004–2022 Yelp Inc. Yelp, **yelp** and related marks are registered trademarks of Yelp.

Appx70

# Attachment L



Appx73

# EXHIBIT L

| | |
|---|---|
| **From:** | Brian L. Ponder, Esq. |
| **To:** | Smith, Marcus P. |
| **Cc:** | Tosini, Stephen (CIV) |
| **Subject:** | [EXTERNAL] Re: U.S. v. Turbo Solutions Inc. et al, Case No. 4:22-mc-00369 |
| **Date:** | Wednesday, May 18, 2022 4:19:46 PM |

Mr. Smith,

Delete them from the caption if the government deems them as parties who should not be joined. Please provide a copy of the stipulation for me to review. Or dismiss the action.

The government added them improperly per the motion. It is the government's duty to justify that improper nonjoinder, yet seeking affirmative relief against the listed nonparties.

Sincerely,

Brian Ponder

On Wed, May 18, 2022, 3:53 PM Smith, Marcus P. <Marcus.P.Smith@usdoj.gov> wrote:

> Mr. Ponder – Please see the attached.
>
>
> Regards,
>
>
>
> **Marcus P. Smith**
>
> Trial Attorney
>
> Consumer Protection Branch
>
> U.S. Department of Justice
>
> (202) 353-9712
>
> marcus.p.smith@usdoj.gov



**U.S. Department of Justice**
*Consumer Protection Branch*

_____

**Marcus P. Smith, Trial Attorney**
marcus.p.smith@usdoj.gov
Phone:  202-353-9712
Fax:      202-514-8742

**Overnight Delivery Address**
450 Fifth Street, NW
Sixth Floor South
Washington, D.C. 20001

**Mailing Address**
P.O. Box 386
Washington, D.C.  20044

May 18, 2022

**VIA EMAIL**

Brian Ponder, Esq.
200 Park Avenue, Suite 1700
New York, NY 10166

      Re: *United States of America v. Turbo Solutions Inc., et al*, Case No: 4:22-mc-00369

Dear Mr. Ponder:

      In your motion to dismiss filed May 15, 2022, you argue that Alex Miller Financial Services, Inc. and Alex Miller Credit Repair are indispensable parties to this action. *See* ECF No. 22, at 26-30. We have not been able to locate any evidence that these are in fact distinct legal entities. Can you provide documentation supporting the existence of these entities in Texas or elsewhere? Please provide such documentation before the close of business on May 20, 2022, so that we may evaluate whether an amendment to the complaint is appropriate.

                  Sincerely,

                  */s/ Marcus P. Smith*
                  Marcus P. Smith

Cc:    Stephen C. Tosini, Esq.

# EXHIBIT M

## STATE OF WYOMING ✱ SECRETARY OF STATE
## EDWARD A. BUCHANAN
## BUSINESS DIVISION

Herschler Bldg East, Ste.100 & 101, Cheyenne, WY 82002-0020
Phone 307-777-7311
Website: https://sos.wyo.gov · Email: business@wyo.gov

## Filing Information

 Please note that this form CANNOT be submitted in place of your Annual Report.

| | | | |
|---|---|---|---|
| Name | Turbo Solutions | | |
| Filing ID | 2018-000796859 | | |
| Type | Profit Corporation | Status | Inactive - Administratively Dissolved (Tax) |

### General Information

| | | | |
|---|---|---|---|
| Old Name | Alex Miller Financial Services | Sub Status | Current |
| Fictitious Name | | Standing - Tax | Delinquent |
| | | Standing - RA | Good |
| Sub Type | | Standing - Other | Good |
| Formed in | Wyoming | Filing Date | 04/03/2018 10:56 AM |
| Term of Duration | Perpetual | Delayed Effective Date | |
| | | Inactive Date | 06/09/2021 |

### Share Information

| | | | | | |
|---|---|---|---|---|---|
| Common Shares | 1 | Preferred Shares | | Additional Stock | N |
| Par Value | 0.0000 | Par Value | 0.0000 | | |

| Principal Address | Mailing Address |
|---|---|
| 440 Louisiana Street | 440 Louisiana Street |
| ste 575 | ste 575 |
| HOUSTON, TX 77002 | HOUSTON, TX 77002 |

### Registered Agent Address

United States Corporation Agents, Inc.
1623 Central Ave Ste 18
Cheyenne, WY 82001

### Parties

| Type | Name / Organization / Address |
|---|---|
| Incorporator | LegalZoom.com, Inc. |

### Notes

| Date | Recorded By | Note |
|---|---|---|

Appx76

# Filing Information

 **Please note that this form CANNOT be submitted in place of your Annual Report.**

| | |
|---|---|
| Name | Turbo Solutions |
| Filing ID | 2018-000796859 |
| Type | Profit Corporation |

Status: Inactive - Administratively Dissolved (Tax)

## Most Recent Annual Report Information

| | | | | | |
|---|---|---|---|---|---|
| Type | Original | | | AR Year | 2020 |
| License Tax | $50.00 | AR Exempt | N | AR ID | 05912804 |
| AR Date | 9/9/2020 2:25 PM | | | | |
| Web Filed | Y | | | | |

### Officers / Directors

| Type | Name / Organization / Address |
|---|---|
| Director | ALEX MILLER  10814 Bouldin Creek, Missouri City, TX. 77459 |
| President | ALEX MILLER  10814 Bouldin Creek, Missouri City, TX. 77459 |

| Principal Address | Mailing Address |
|---|---|
| 440 Louisiana Street | 440 Louisiana Street |
| ste 575 | ste 575 |
| HOUSTON, TX 77002 | HOUSTON, TX 77002 |

### Annual Report History

| Num | Status | Date | Year | Tax |
|---|---|---|---|---|
| 05912786 | Original | 09/09/2020 | 2019 | $50.00 |

  Principal Address 1 Changed  From: 77 Sugar Creek Center Blvd  To: 440 Louisiana Street
  Principal Address 2 Changed  From: Ste 611  To: ste 575
  Principal City Changed  From: Sugar land  To: HOUSTON
  Principal Postal Code Changed  From: 77478  To: 77002

| Num | Status | Date | Year | Tax |
|---|---|---|---|---|
| 05912804 | Original | 09/09/2020 | 2020 | $50.00 |

## Amendment History

| ID | Description | Date |
|---|---|---|
| 2021-003229758 | Dissolution / Revocation - Tax | 06/09/2021 |

  Filing Status Changed  From: Active  To: Inactive - Administratively Dissolved (Tax)
  Inactive Date Changed  From: No Value  To: 06/09/2021

| ID | Description | Date |
|---|---|---|
| 2021-003163234 | Delinquency Notice - Tax | 04/02/2021 |
| 2020-002935784 | Reinstatement - Tax | 09/09/2020 |

  Filing Status Changed  From: Inactive - Administratively Dissolved (Tax)  To: Active

| ID | Description | Date |
|---|---|---|
| 2019-002569471 | Dissolution / Revocation - Tax | 06/09/2019 |

Appx77

## Filing Information

 **Please note that this form CANNOT be submitted in place of your Annual Report.**

| | | | |
|---|---|---|---|
| Name | Turbo Solutions | | |
| Filing ID | 2018-000796859 | | |
| Type | Profit Corporation | Status | Inactive - Administratively Dissolved (Tax) |

Filing Status Changed  From: Active  To: Inactive - Administratively Dissolved (Tax)
Inactive Date Changed  From: No Value  To: 06/09/2019

| 2019-002527807 | Delinquency Notice - Tax | 04/02/2019 |
|---|---|---|

| 2019-002475342 | Name Change with Other Changes | 01/02/2019 |
|---|---|---|

Filing Name Changed  From: Alex Miller Financial Services  To: Turbo Solutions
Principal Address 1 Changed  From: 7890 Kemper Circle  To: 77 Sugar Creek Center Blvd
Principal Address 2 Changed  From: No value  To: Ste 611
Principal City Changed  From: Beaumont  To: Sugar land
Principal Postal Code Changed  From: 77707  To: 77478

| See Filing ID | Initial Filing | 04/03/2018 |
|---|---|---|

Appx78

2010 WL 3069793
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. Texas,
Houston Division.

ASTRA OIL TRADING NV, Astra GP,
Inc., and Astra Tradeco LP LLC, Plaintiffs,
v.
PETROBRAS AMERICA INC., PAI
PRSI Trading General LLC, and PAI
PRSI Trading Limited LLC, Defendants.

Civil Action No. H–09–1274.
|
Aug. 4, 2010.

**Attorneys and Law Firms**

Beth Bivans Petronio, Andrew B. Russell, K&L Gates LLP, Dallas, TX, Gerald Alan Novack, K&L Gates LLP, New York, NY, for Plaintiffs.

William M. Katz, Jr., Brian W. Stoltz, Lawrence Andrew Melsheimer, Thompson & Knight LLP, Dallas, TX, for Defendants.

*MEMORANDUM AND ORDER*

EWING WERLEIN, JR., District Judge.

**\*1** Pending are Petitioners Astra Oil Trading NV, Astra GP, Inc., and Astra Tradeco LP LLC's Application for Attorneys' Fees and Costs (Document No. 99) and Respondents Petrobras America Inc., PAI PRSI Trading General LLC, and PAI PRSI Trading Limited LLC's Motion to Reconsider Denial of Rule 12(b)(1) Motion (Document No. 102) and Motion to Reconsider Denial of Motion for Partial Vacatur of Arbitration Award (Document No. 107). After carefully considering the motions, responses, new evidence, and legal authorities, the Court GRANTS Respondents' Motion to Reconsider Denial of Rule 12(b) (1) Motion, VACATES the Memorandum and Order entered March 10, 2010, [1] and for

the reasons that follow GRANTS Respondents' Motion to Dismiss (Document No. 19).

### I. *Background*

Petitioners Astra Oil Trading NV ("AOT"), Astra GP, Inc. ("Astra GP"), and Astra Tradeco LP LLC ("Astra LP," collectively with AOT and Astra GP, "Petitioners") seek in this action judicial confirmation of an arbitral award rendered in their favor against Respondents Petrobras America, Inc. ("PAI"), PAI PRSI Trading General LLC ("PAI General"), and PAI PRSI Trading Limited LLC ("PAI Limited," collectively with PAI and PAI General, "Respondents"). Petitioners and Respondents were 50% co-owners of a joint venture consisting of two companies. The first company—Pasadena Refining System, Inc. ("PRSI")—owns a refinery in Pasadena, Texas. PRSI was governed by a Shareholders Agreement between AOT and PAI. The second company—PRSI Trading Company LP (the "Trading Company")—is an entity that supplies feedstocks to the refinery. The Trading Company was governed by the Partnership Agreement between Astra GP, Astra LP, PAI General, and PAI Limited.

Soon after executing the Agreements, the parties began having disputes about the strategic vision of the PRSI refinery and the Trading Company. Eventually, Petitioners invoked their rights under the Agreements "to put" for sale to Respondents their ownership interests in PRSI and the Trading Company, in exchange for Respondents' payments to Petitioners of sales prices set by pricing formulas. Respondents refused to recognize Petitioners' attempt to exercise their put rights, and the parties went to arbitration.

On April 10, 2009, the arbitration panel (the "Panel") in a 70–page ruling issued its Final Award of Arbitrators (the "Award"). Petitioners filed this suit to confirm the Award, and Respondents moved to dismiss it for lack of subject matter jurisdiction and, as well, moved to vacate and/or modify the Award.

### II. *Discussion*

The U.N. Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "U.N. Convention"), implemented at 9 U.S.C. §§ 201–08, deems

actions involving awards under the U.N. Convention as arising under the laws and treaties of the United States, and vests original jurisdiction in federal district courts to hear such actions. 9 U.S.C. § 203. The U.N. Convention applies only to arbitral awards that are "not considered as domestic awards in the State where their ... enforcement is sought," U.N. Convention, art. I(1), 21 U.S.T. 2517, 330 U.N.T.S. 38, that is, the award is not "entirely between U.S. citizens."

9 U.S.C. § 202. Respondents assert that jurisdiction is lacking because AOT, a corporation organized under the laws of the Netherlands, has its principal place of business in Huntington Beach, California, where its Chairman and CEO—Mike Winget—resides, offices, and directs and conducts the business of AOT. Petitioners assert that AOT's principal place of business is "in Europe," where AOT's second-tier parent company-Trans cor Astra Group-makes significant decisions for the conduct of AOT's business. It is undisputed that all other parties to the arbitral award are United States citizens.

A. *Governing Law*

**\*2** The language Congress used in its 1970 enactment of § 202 to define whether a corporation is a citizen of the United States essentially tracks identical language found in the 1958 re-codification of the diversity of citizenship statute, 28 U.S.C. § 1332(c)(1). Thus, under § 1332(c)(1), a corporation is a citizen of the State of its incorporation and where "it has its principal place of business." Under § 202, a corporation is a citizen of the United States if it was incorporated in the United States or if "it has its principal place of business" in the United States. The Supreme Court recently interpreted the meaning of a corporation's "principal place of business" in a diversity case, and that decision guides the Court in applying § 202's identical language in this case:

> We conclude that "principal place of business" is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities. It is the place that Courts of Appeals have called the corporation's "nerve center." And in practice it should normally be the place where the corporation maintains

its headquarters-provided that the headquarters is the actual center of direction, control, and coordination, i.e., the "nerve center," and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion).

*Hertz Corp. v. Friend,* —— U.S. ——, ——, 130 S.Ct. 1181, 1192, ——L.Ed.2d ——, —— (2010). The Court cautioned:

> [I]f the record reveals attempts at manipulation—for example, [if] the alleged "nerve center" is nothing more than a mail drop box, a bare office with a computer, or the location of an annual executive retreat—the courts should instead take as the "nerve center" the place of actual direction, control, and coordination, in the absence of such manipulation.

*Id.* at 1195. The Court based its holding on two premises. First, the phrase "principal place of business" in the diversity statute—28 U.S.C. § 1332(c)(1)—is in the singular and therefore refers to "a single place." *Id.* at 1193. Second, simple tests streamline cases, reduce the likelihood of gamesmanship, and promote predictability. *Id.*

Generally, when a subsidiary is incorporated separately from its parent, it is treated as an independent entity for purposes of determining federal court jurisdiction. *J.A. Olson Co. v. City of Winona, Miss.,* 818 F.2d 401, 414 (5th Cir.1987); *see also Schwartz v. Elec. Data Sys., Inc.,* 913 F.2d 279, 283–84 (6th Cir.1990); *Topp v. CompAir Inc.,* 814 F.2d 830, 837 (1st Cir.1987). The cases in which the Fifth Circuit has found that a corporate parent's citizenship controls its subsidiary "have not rejected the 'general rule.' Rather, in those cases the courts have determined on the basis of particular facts that a subsidiary's principal place of business was the same as that of the corporate parent, *Toms v. Country Quality Meats, Inc.,* 610 F.2d 313 (5th Cir.1980), or that the subsidiaries

Appx80

were not actually separate corporate entities," 🔖 *Frazier v. Alabama Motor Club, Inc.,* 349 F.2d 456, 460 (5th Cir.1965)." *Schwartz,* 913 F.2d at 284–85.

B. *Mike Winget's Role as AOT's Chairman and Chief Executive Officer*

**\*3**  AOT is a holding company, whose worldwide holdings include companies located in Singapore, Switzerland, the United Kingdom, Canada, and the United States. AOT was formed under the laws of the Netherlands and, since November 2008, has been wholly owned by a newly formed Swiss corporation, TAGAM, Ltd., which in turn is wholly owned by Transcor Astra Group ("Transcor"), a Belgium corporation. Transcor has its sole office in Belgium. Before November 2008, Transcor owned 100% of AOT, and AOT's counsel represents that Transcor formed TAGAM as a subsidiary to hold AOT only for tax purposes.

AOT has no employees. Its formal corporate structure consists of a Board of Directors with four directors, and one officer, namely, its Chief Executive Officer Mike Winget, of Huntington Beach, California. Its directors are: Rolf Mueller of Zug, Switzerland; Ernst Cooiman of Rotterdam, Netherlands; Daniel Burla of Zug, Switzerland; and Winget, who is the Board's Chairman.

Three of AOT's four directors (Mueller, Burla, and Winget) are also directors on the nine-member Board of Directors of AOT's second-tier parent corporation, Transcor. Six of the nine Transcor board members reside in Europe, including Gilles Samyn, who is Chairman of the Board of Transcor and who is also the Chief Executive Officer of Compagnie Nationale á Portefeuille ("CNP"), a Belgian publicly-traded corporation that does no business in the United States, and which indirectly owns 80% of the stock of Transcor. Chairman Gilles Samyn presides over Transcor's formal board meetings, which are held at least twice a year and almost always in Europe.

The central dispute regarding AOT's principal place of business is whether Transcor's board of directors, particularly Gilles Samyn, dominates AOT to such an extent that the Court should find that Transcor operates as AOT's "nerve center" in Europe. The evidence establishes that the Transcor board is responsible for setting the policies for AOT and making major decisions for AOT. The Transcor board ultimately decides whether AOT will buy, sell, or hold subsidiary companies. In addition, the Transcor board sets the risk policies that

must be followed by AOT's subsidiaries. Mike Winget, as AOT's CEO, ultimately answers to Gilles Samyn and the other members of Transcor's board of directors.

The evidence also establishes, however, that Mike Winget has significant independent authority as CEO of AOT to direct, control, and coordinate AOT's activities. Under AOT's umbrella are trading companies and refineries, whose employees perform the day-to-day business of the companies and refineries that AOT owns. Significantly, none of Petitioners has argued or contended that AOT is a mere alter ego of Transcor or that it is not a *bona fide* separate corporate entity that does in fact buy, sell, and own trading companies and refineries on a global scale. Winget describes AOT as follows:

> AOT has under it, in the corporate structure, something on the order of about 40 separate holding companies and operating companies, and each of those have their own finance, accounting, sometimes different corporate officers, different directors. They are the ones that actually carry out the activity of doing those strategies, performing those strategies and objectives, that are set forth by AOT NV. It is—to be more specific, it is not something —I do not myself trade oil, as an example. The other subsidiaries that are under AOT, in Switzerland, as example, those traders, those trade managers, would actually implement those strategies. They would actually perform those activities. I do not. [2]

**\*4**  Winget further described AOT's role in the Transcor group:

> AOT buys, sells, holds and directs, creates, you know, creates strategies, pass down strategies from the Transcor Astra Group, to the subsidiaries under

> its—under its wing. They carry that
> out.... They, meaning the subsidiaries
> underneath actually carry out the
> bidding. They conduct the bidding, the
> business. [3]

The Transcor board sets the overall strategies and makes major decisions for AOT and its subsidiaries, but does not micro-manage all of AOT's affairs.

> Q: Does the AOT board exercise any independent decision making, separate and apart from directions or instructions they might get from a higher authority or owner?
>
> A: You used the word any. It's very—it's very all encompassing. The way it works, as I mentioned, is that Transcor SA largely does the bidding of CNP, if you will, follows what CNP wants, and then it is passed down through AOT, and AOT issues the directives, and then the various subsidiaries and—underneath that, whether operating or holding companies, they do the implementation of that.
>
> Now, if you were to be—to say would AOT or a subsidiary of AOT unilaterally go on out and buy a ship for $50 million, no, that wouldn't happen.
>
> If you are asking me if AOT would ever, you know, in following its directives and policies from Transcor SA, would take some minor, you know, local decision to sign something or—you know, then I suppose it could happen. [4]

Among Winget's responsibilities as AOT's sole officer and CEO are at least three major roles. First, Winget is tasked to negotiate and to execute significant contracts on AOT's behalf when the Transcor board has approved AOT entering into such business arrangements. For instance, during his deposition, Winget specifically discussed that he negotiated and signed the following on behalf of AOT: (1) a 2006 stock purchase agreement through which AOT sold an interest in a company to Petrobras; (2) a draft 2008 purchase and sale agreement though which AOT attempted to sell an interest in a company to Petrobras; and (3) the 2006 Shareholders Agreement governing the management of PRSI. [5] Winget also explores merger and acquisition possibilities with other directors of Transcor and officers of CNP, and Winget has proposed mergers and acquisitions to the Transcor board. [6]

Second, Winget directs and supervises AOT's subsidiary companies. Winget testified:

> My role in the Huntington Beach office
> is to be the conduit to the will of the
> Transcor Astra pushed down through
> AOT directives, so I make sure I
> monitor what these other subsidiaries
> do in the group. I do not call the
> shots, as an example, for day-to-day
> trading. You'd have to look at our
> entire structure to get a clear handle
> of that. Most—the vast majority of the
> day-to-day activity in the company is
> handled directly by people that are not
> in that office in California. [7]

He further stated:

> I make sure that [AOT's subsidiaries]
> follow the—that they follow the rules.
> I do not myself, day-to-day trade or,
> you know, get involved with their
> specific activities or say you can do
> this, you can't do that deal. I don't do
> that kind of thing, but I see to it that
> they follow the rules. I monitor what
> they do. [8]

**\*5** For instance, Winget attended the board meetings of PRSI—one of the companies that AOT owned jointly with Respondent PAI—as an "observer." [9] Winget also sets the bonuses for various traders who work for AOT's subsidiaries. [10]

Third, Winget contributes to setting the strategy and direction for AOT and its subsidiaries. During the last four years, Winget has taken more of a supervisory role at AOT. The minutes of the Transcor board meeting on September 20, 2006, report that Gilles Samyn suggested changing Winget's role at AOT:

[Gilles Samyn] expressed the fact that [AOT] has changed in size and has expanded its activities into managing important assets. [Gilles Samyn] suggested for Mike [Winget] to focus more on leading the strategic vision and the trading of the company and free some of his time by hiring a senior shadow person that would help Mike in the minutia of managing the financial and day to day activities. This person should have broad skills and be complementary to Mike. [11]

A year later, at the Transcor board meeting on September 4, 2007, Winget proposed reorganizing the management of AOT's subsidiaries. [12] According to Winget, AOT's subsidiaries were behaving like "independent silos," and Winget wanted to encourage cooperation among the subsidiary companies. [13] After discussion with the Transcor board, Winget "created a trade management committee" comprised of the heads from AOT's various trading subsidiaries. [14] Dennis Haller, the senior trader in the Swiss office, was named as head of the committee, and the managers of all other trading subsidiaries report directly to him. [15] Since this reorganization, Dennis Haller has been "responsible for the day-to-day trading activity." [16]

Newly disclosed emails provide additional examples of how Winget actively manages AOT and its subsidiaries. [17] In the first email chain, dated December 13 and 14, 2006, several of Petitioners' employees discuss problems with the joint venture, including a potential tax problem. In an email from Kari Burke, a CPA who works for one or more of AOT's subsidiaries, she states that they should wait to get direction from Winget:

Anyway, the issues are way to [sic] complicated to deal with on e-mail. I think we should wait for Mike to return, regroup and determine a strategy for the future. [18]

The next day, Winget responds to everyone on the email chain:

Am back now, so lets have that discussion along with setting a strategy re [Petrobras] in terms of the trade versus S+D functions at prsi. We need to go back to [Petrobras] with a firm position so we can stop digging our own tax grave. [19]

In the second email chain, from November 2, 2007, employees of Petitioners further discuss the difficulties they are having with Respondents. [20] Significantly, Mike Winget sent a lengthy email of more than 750 words detailing the significant problems with the joint venture and outlining Petitioners' strategies for handling them. [21] The context and substance of these emails evidence that Mike Winget is the recognized corporate leader and central decision-maker, or "nerve center," for AOT itself and for the subsidiaries "under its wing."

**\*6** Finally, Respondents also proffer portions of Rolf Mueller's deposition, which was taken on March 17, 2010, a week after this Court signed its now vacated Memorandum and Order of March 10. Mueller is the Global CFO for Transcor and its subsidiaries. [22] It is undisputed that AOT's finances are coordinated by Mueller in Switzerland, where he works with auditors and accountants on behalf of AOT. The new evidence establishes, however, that Mueller reports not only to Gilles Samyn but also to *AOT's CEO, Mike Winget:*

Q: Who do you report to?

A: I report one side to Mike Winget, CEO; and on the other side to Gilles Samyn at BNP.

Q: So you have a dual reporting function?

A: I have a dual reporting system.

Q: One of those individuals you said is Mr. Winget who is the CEO of [AOT], right?

A: Correct.

Q: The other one you said is to Mr. Samyn, what is his position?

Appx83

A: He is the Chairman of Transcor Astra Group and he is the Managing Director at CNP. [23]

In sum, Mike Winget, AOT's sole officer, understandably takes directives from AOT's effective owner, Transcor, but as Chief Executive Officer of AOT he holds and exercises all of the authority necessary to direct, control, and coordinate AOT's *own* activities, which he does from Huntington Beach, California.

C. *Toms v. Country Quality Meats and the Nerve Center Test*

Petitioners rely heavily upon 🚩*Toms v. Country Quality Meats Inc. .,* 610 F.2d 313 (5th Cir.1980), for the premise that a subsidiary corporation's "nerve center" may in fact be the place where its parent operates and directs the subsidiary's activities and business. In *J.A. Olson Co. v. City of Winona, Miss.,* the Fifth Circuit summarized its decision in *Toms* as follows:

Country Quality, a Delaware corporation qualified to do business in Georgia, was one of sixty similar corporations created and managed by Brueggemeyer & Wolfe (B & W), a Texas corporation. Country Quality, like the other local corporations, was run by B & W, but paid local taxes, had a local bank account, and had its own staff. B & W, however, exercised almost total control over Country Quality in that it was authorized to discharge employees, it reviewed all sales reports, time cards and payroll sheets and it selected the suppliers from which Country Quality could buy its products. We also noted that Country Quality was vested with so little managerial authority that its highest-ranking employee "wore an apron," that is, "was primarily engaged in meat cutting activities." Even though Country Quality had its only contact with the public in Georgia, we looked at the operation as a whole. The scenario was similar to that of a "far flung" corporation with a concentrated nerve center and diffuse places of activity. Country Quality's operations represented only a single location of the many locations of the corporate activities; the nerve center, however, was in one location. We therefore held that the principal place of business was Texas, the "nerve center" of the operation.

*7 🚩818 F.2d 401, 410–11 (5th Cir.1987) (internal citations and footnotes omitted). The Fifth Circuit further explained:

As demonstrated in *Toms,* a corporation's nerve center does not have to be located within the corporate shell, but can be found wherever the nerve center exists. In *Toms,* the activities and business of Country Quality were operated and directed by a closely affiliated but corporately separate management company. We therefore consider substance over form in determining the nerve center.

*Id.* at 412.

*Toms* does not set a rule that every time a parent corporation exerts control over a separately-incorporated subsidiary, the court must look to the most senior decision-maker in the corporate chain to find the nerve center. It is commonplace and expected for wholly owned subsidiaries to fulfill their legitimate corporate responsibilities consistent with the business plan and requirements of their sole owner. *Toms,* however, is an unusual case where the subsidiary was a "small corporation" that was merely one store among over sixty similar stores in a nationwide meat distribution system. *See* 🔶*Moll v. Allstate Floridian Ins. Co.,* No. 3:05CV160, 2005 WL 2007104, at *6 (N.D.Fla. Aug. 16, 2005) (distinguishing *Toms* because Country Quality Meats, Inc. was a small company while the subsidiary company at issue was not a "small company or a small part of a nationwide business"). All sixty of these small, local subsidiaries were managed by the parent company in Texas. AOT, on the other hand, is not a mere satellite subsidiary of a larger unified business, without substantive executive authority at the subsidiary level. Instead, AOT was formed and/or charged by its owner to act as a holding company, and vested by its owner with authority to own, control, and give oversight to worldwide holdings that include its subsidiary companies in Singapore, Switzerland, the United Kingdom, Canada, and the United States. These subsidiaries are large and diverse: some engage in the business of trading petroleum products, and one subsidiary operates a refinery in the State of Washington. In 2008, the total sales revenues of the operating companies owned by AOT exceeded $16.7 billion.

Second, the Fifth Circuit "noted that Country Quality was vested with so little managerial authority that its highest-ranking employee 'wore an apron,' that is, 'was primarily engaged in meat cutting activities.' " *Olson,* 818 F.2d at 411 (describing *Toms,* 610 F.2d at 315 n. 4). Mike Winget, in contrast, as AOT's Chief Executive Officer, negotiates contracts for AOT in the hundreds of millions of dollars; he explores potential mergers and acquisitions; he "monitors" the employees of AOT's subsidiary companies; he makes or participates in the making of strategic decisions for AOT; and he supervises AOT's finances. *Cf.* *Mercury Fin. Corp. of Ala. v. Aetna Cas. & Sur. Co. of Ill.,* 900 F.Supp. 390, 395 (M.D.Ala.1995) (distinguishing *Toms* because the subsidiary at issue retained control over day-to-day management operations).

D. *AOT's "Nerve Center"*

 **\*8** Presumably, Transcor had its own business reasons for maintaining AOT as a separate legal entity (just as it formed TAGAM, Ltd. for tax purposes and made it AOT's first-tier parent) and for naming Mike Winget as AOT's sole officer and CEO. " '[W]here the corporate separation between a parent and subsidiary, though perhaps merely formal, is real and carefully maintained, the separate place of business of the subsidiary is recognized in determining jurisdiction, even though the parent corporation exerts a high degree of control through ownership or otherwise.' " *Topp,* 814 F.2d at 837) (quoting *Lurie Co. v. Loew's San Francisco Hotel Corp .,* 315 F.Supp. 405, 410 (N.D.Cal.1970)). Focusing on AOT, as *Hertz* requires, leads to the inescapable conclusion that AOT's principal place of business is where its sole officer and CEO—Mike Winget—implements, directs, controls, and

coordinates AOT's business activities. While the Transcor board makes major decisions and sets policies for its subsidiary AOT from Europe, the management, direction, control, and implementation of AOT's business activities are effectuated by AOT's Chief Executive Officer, Mike Winget, in Huntington Beach, California. *See* *Hertz,* 130 S.Ct. at 1192 ("We conclude that "principal place of business" is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities."). Petitioners, who have the burden to show that jurisdiction exists, have failed to show by a preponderance of the evidence that AOT's principal place of business is not in the United States. Accordingly, because all parties to the arbitral award are United States citizens, this Court does not have jurisdiction under 9 U.S.C. § 202.

### III. *Order*

It is therefore

ORDERED that Respondents Petrobras America Inc., PAI PRSI Trading General LLC, and PAI PRSI Trading Limited LLC's Motion to Dismiss pursuant to Rule 12(b)(1) (Document No. 19) is GRANTED, and this action is hereby DISMISSED for lack of subject matter jurisdiction. All other pending motions are DENIED as moot.

The Clerk will enter this Order, providing a correct copy to all counsel of record.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3069793

### Footnotes

1        *See* Document No. 98, *Astra Oil Trading NV v. Petrobras Am. Inc.,* No. H–09–1274, 2010 WL 918438 (S.D.Tex. Mar.10, 2010).

2        Winget Depo. at 41–42.

3        *Id.* at 43.

4        *Id.* at 197.

5      Winget Depo. at 61–62 (2006 SPA), 73–74 (Draft 2008 SPA), 104–105 (2006 Shareholders' Agreement).

6      *Id.* at 226–27 (Come by Chance opportunity presented to Transcor board), ex. 34 at 23.

7      Winget Depo. at 59.

8      Winget Depo. at 15. Later in his deposition, Winget states:

> I told you this morning earlier that the—that my job is to be the conduit to take the direction from AOT and to see to it that the various subsidiaries in the AOT system do the implementation.

> *Id.* at 144.

9      Winget Depo. at 235–37.

10     Document No. 107, ex. 1 ("All of the traders [of the joint venture] will be paid a bonus by Astra, determined by [Winget] for the performance prior to sell as well as from 9/1–12/31.").

11     Winget Depo., ex. 30 at 000067.

12     *Id.,* ex. 34 at 000017.

13     *Id.* at 221–22.

14     *Id.* at 222–23.

15     *Id.*

16     *Id.*

17     This new evidence was obtained in a pending state court proceeding between the Trading Company and Astra. In that proceeding, Astra was required to provide a privilege log for documents produced, including documents previously provided in the arbitration. The Trading Company challenged 1,310 entries of the privilege log, and a specially appointed discovery master compelled Astra to produce 26 documents, including email chains that appear to have been relevant to the arbitration but were not produced.

18     *Id.,* ex. 1 (Burke's email sent 12/13/2006 at 11:42 a.m.).

19     *Id.,* ex. 1 (Winget's email sent 12/14/2006 at 10:03 a.m.).

20     *Id.,* ex. 3.

21     *Id.,* ex. 3 at ASTRA0021583–84.

22     Document No. 104, ex. A–2 at 156 (Mueller Depo.).

23     *Id.,* ex. B at 174–75.

---

**End of Document**                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Appx86

2016 WL 11189809

2016 WL 11189809
Only the Westlaw citation is currently available.
United States District Court, S.D.
Texas, Brownsville Division.

Jose Cruz CASTILLO, Plaintiff,
v.
John F. KERRY, et al., Defendants.

Case No. 1:16-cv-197
|
Signed 12/20/2016

**Attorneys and Law Firms**

Jaime M. Diez, Brownsville, TX; Elisabeth Lisa S. Brodyaga, Attorney at Law, San Benito, TX, for Plaintiff.

Sebastian Alexander Edwards, US Attorneys Office Southern District of Texas, Houston, TX, for Defendants.

**MAGISTRATE JUDGE'S REPORT
AND RECOMMENDATION**

Ignacio Torteya, III, United States Magistrate Judge

**\*1** The Court is in receipt of Defendants' Defendants' Motion to Dismiss Complaint Pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(3), and 12(b)(6)" (hereinafter Defendants' "Motion"). *See* Dkt. No. 7 at 1. For the reasons stated below, the undersigned recommends that Defendants' Motion be GRANTED.

**I. Background**

On August 2, 2016, Plaintiff filed a Complaint seeking a declaratory judgment against Defendants that declares Plaintiff is in fact a United States citizen. Dkt. No. 1 at 6. On October 14, 2016, Defendants filed their original Motion, which the Court ordered be stricken on in its October 17, 2016, order. *See* Dkt. Nos. 4, 6. Defendants refiled their instant Motion on October 17, 2016, arguing that Plaintiff improperly brought his claim under 8 U.S.C. § 1503(a) because the Court lacks subject matter jurisdiction. *See* Dkt. No. 7 at 9. In the alternative, Defendant argues that venue is proper in the Northern District of Alabama, and the action should be dismissed with leave to file. *See id.* at 11. Defendant

also argues that Plaintiff's claim for injunctive relief should be dismissed for failing to state a claim. *Id.* at 12. Finally, Defendant argues that the United States is not a proper defendant, and should be dismissed from the action. *Id.* at 13. Plaintiff argues that the Court does have jurisdiction because his permanent address is in Brownsville, Texas. Dkt. No. 11 at 7. Alternatively, Plaintiff argues that the "residence" clause relates to venue rather than jurisdiction, and that venue is proper in this Court. *Id.* Plaintiff failed to offer argument as to his claim for injunctive relief and whether the United States is a proper defendant. For that reason, the Court assumes Plaintiff concedes these arguments. *See* Civ. LR7.4.

**II. Legal Standards**

A party may move the court to dismiss a plaintiff's cause of action pursuant to Rule 12(b). *See* FED. R. CIV. P. 12(b). However, a party seeking to dismiss a complaint under Rule 12(b) must assert these defenses prior to filing its answer. *Id.* As opposed to motions to dismiss under Rule 12(b)(3) and (b)(6), where the plaintiff's allegations are taken as true and viewed under the best light, the plaintiff bears the burden of proof that jurisdiction exists under Rule 12(b)(1). *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *See* *Ambraco Inc. v. Bossclip B V*, 570 F.3d 233, 238 (5th Cir. 2009). Further, courts must consider a jurisdictional attack under Rule 12(b)(1) prior to considering other grounds for dismissal. *Id.* Finally, in considering whether it has subject matter jurisdiction or is the proper venue to hear a plaintiff's claims, a court may consider matter of fact that are either in dispute or outside the pleadings. *See id*; *Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986); *Ambraco*, 570 F.3d at 238 (noting that both 12(b)(1) and (b)(3) allow courts to look past the pleadings to resolve disputed facts).

A court may dismiss a claim under 12(b)(1), 12(b)(3), or 12(b)(6) if it is "beyond doubt that the plaintiff cannot prove" her "well-pled" factual allegations in the complaint, which are viewed as true and in the light most favorable to the plaintiff. *See* *Ambraco*, 570 F.3d at 237; *Lane v. Halliburton*, 529 F.3d 548 (5th Cir. 2008). Therefore, a complaint must contain sufficient factual matter that states a claim to relief that is " 'plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted). Legal conclusions that are "naked assertions devoid of further factual enhancement" or "formulaic recitation of [a claim's] elements" are not

Appx87

2016 WL 11189809

enough. *Id.* Instead, factual allegations are facially plausible when they allow a court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* However, when factual allegations are intertwined with the merits, i.e. where the allegations shed light to both the basis of federal court subject matter jurisdiction and the cause of action, a court should not dismiss the claims unless they are "immaterial or wholly insubstantial and frivolous." *See Clark*, 798 F.2d at 741. Finally, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable and 'that a recovery is very remote and unlikely.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

### III. Discussion

**\*2** Section 1503(a) of title 8 of the United States Code states that "any person who... is denied such right or privilege by any department..., or official thereof, upon the ground that he is not a national of the United States, such person may institute a [civil] action against the head of such department... for a judgment declaring him to be a national of the United States[.]" 8 U.S.C. § 1503(a). Section 1503(a) continues, stating "[a]n action under this subsection... shall be filed in the district court of the United States for the district in which such person resides or claims a residence, and jurisdiction over such officials in such cases is hereby conferred upon such courts." *Id.*

Defendant argues that § 1503(a)'s "jurisdiction" clause refers to which courts have jurisdiction to hear these sort of claims, and that Plaintiff's claims cannot be heard by this Court as Plaintiff is a resident of the state of Alabama. Dkt. No. 7 at 9-11. Plaintiff argues that the "jurisdiction" clause actually refers to venue, but that regardless Plaintiff is a resident of Brownsville, Texas, which makes jurisdiction and venue proper in this Court. *See* Dkt. No. 11. In essence, Plaintiff seeks that this Court either find that the residency clause in § 1503(a) allows Plaintiff to proceed under his claimed permanent address or, in the alternative, that it take issue with Judge Hilda Tagle's recent opinion in *Villareal* that found § 1503(a)'s "jurisdiction" clause relates to jurisdiction rather than venue. *See* Dkt. No. 7 at 1, 7; *see also Villarreal v. Horn*, —— F.Supp. 3d ——, 2016 WL 5920419 \*2-10 (S.D.Tex. Sept. 13, 2016).

The undersigned first recommends that the Court decline Plaintiff's invitation to rule contrary to Judge Tagle's recent decision.[1] First, other provisions have similar parallel language structures that have been found to be jurisdictional as that in § 1503(a). *See, e.g., Masat v. United States*, 745 F.2d 985, 987 (5th Cir. 1984) (finding that 26 U.S.C. § 7609(h)(1)'s language jurisdictional). Second, while Plaintiff is correct that previous versions of the statute have been found to relate to venue, Congress changed the statute's language, indicating the clause's meaning changed to relate to a jurisdictional rather than a venue limitation. *Compare* Immigration Act of 1940 § 503, 54 Stat. 1171-72 ("If any person who claims a right or privilege as a national of the United States is denied such right or privilege... such person, regardless of whether he is within the United States or abroad, may institute an action... in the district court of the United States for the district in which such person claims a permanent residence for a judgment declaring him to be a national in the United States."), *with* 8 U.S.C. § 1503(a) ("An action under this subsection... shall be filed in the district court of the United States for the district in which such person resides or claims a residence, and jurisdiction over such officials in such cases is hereby conferred upon those courts."); *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Manning*, 136 S. Ct. 1562, 1578 (2016) (noting that a change in statutory language creates a presumption of change in intent, and that Congress would not have changed a statute's language without intending to change the meaning of its text).

A finding that the language is jurisdictional further fulfills the purpose behind the 1952 changes because it prevents plaintiffs from gaining access to a forum that Congress limited by means of a waiver of venue objection. *See Rusk v. Cort*, 369 U.S. 367, 376-78 (1962) (explaining that the purpose of the change was to prevent noncitizens from abusing the system by gaining entry into a United States forum and then "disappear[ing] into the general populace"). For these reasons, the undersigned recommends that the Court find that the "jurisdiction" clause within § 1503(a) relates to which court has jurisdiction to hear a plaintiff's claims.

**\*3** The parties have thoroughly briefed whether a Plaintiff may have two residences under § 1503. It is, however, ultimately immaterial to the Court's reasoning as, for the following reasons, the undersigned finds that Plaintiff's residence is in the Northern District of Alabama. As Plaintiff's residence is a factual allegation determinative of this Court's jurisdiction, the Court may look past the pleadings to

Case 4:22-mc-00369   Document 32-1   Filed on 06/06/22 in TXSD   Page 104 of 144

Castillo v. Kerry, Not Reported in Fed. Supp. (2016)

2016 WL 11189809

determine this disputed fact. *See Clark*, 798 F.2d at 741. First, Plaintiff has continuously used his Alabama address as a permanent address for school purposes and his applications for a United States passport. *See* Dkt Nos. 7-2 at 3, 7, 10, 15; 14-1 at 1-9. Second, Plaintiff appears to have maintained an Alabama driver's license for an extended period of time. *See* Dkt. No. 7-2 at 8, 11. Third, during all important points in the litigation of the instant civil action, including its filing and duration, Plaintiff has admittedly resided in Alabama. *See* Dkt. Nos. 1, 11-1 at 2 (stating that Plaintiff was located in Brownsville, Texas during the action's filing but that he currently resides in Alabama). While Plaintiff does present a declaration stating that his permanent residence is Brownsville, Texas, he presents no evidence to substantiate that assertion and all of the evidence presented goes against said declaration. [2] *See* Dkt. No. 11-1 at 2. For these reasons, the undersigned finds that Plaintiff is a resident of the state of Alabama and that his Complaint should be dismissed for lack of subject matter jurisdiction.

### IV. Recommendation

For the reasons stated above, the undersigned recommends that Defendants' Motion be GRANTED.

### V. Notice to Parties

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Services Auto. Ass'n, 79 F.3d 1415 (5th Cir. 1996).*

### All Citations

Not Reported in Fed. Supp., 2016 WL 11189809

### Footnotes

1    Regardless, the Court could dismiss based upon Federal Rule of Civil Procedure 12(b)(3) because, as discussed below, the undersigned finds that Plaintiff is a resident of Alabama.

2    The parties agree that "residence" is defined by 8 U.S.C. § 1101(a)(33). *See* Dkt. No. 11 at 5; Dkt. No. 14 at 4; 8 U.S.C. § 1101(a)(33) (" 'residence' means the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent."). The evidence points to Alabama as Plaintiff's place of general abode. Plaintiff's declaration largely points to his intention to ultimately reside or allegedly maintain his residence in Brownsville, Texas. *See* Dkt. No. 11-1 at 2. The declaration, however, is inapposite to Plaintiff's argument that he had residence, as defined, in Brownsville, as its worth is solely tied to intent. *See* Dkt. No. 11 at 5-7.

---

**End of Document**                                            © 2022 Thomson Reuters. No claim to original U.S. Government Works.

F.T.C. v. CyberSpy Software, LLC, Not Reported in F.Supp.2d (2009)

2009 WL 455417, 2009-1 Trade Cases P 76,527

2009 WL 455417
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court, M.D. Florida,
Orlando Division.

FEDERAL TRADE COMMISSION, Plaintiff,

v.

CYBERSPY SOFTWARE, LLC,
and Tracer R. Spence, Defendants.

No. 6:08–cv–1872–Orl–31GJK.
|
Feb. 23, 2009.

**Attorneys and Law Firms**

David K. Koehler, Tracy R. Shapiro, Federal Trade
Commission, Washington, DC, for Plaintiff.

Dawn Ivy Giebler-Millner, Mary Ellen Pullum, Michele
L. Johnson, Greenberg Traurig, LLP, Orlando, FL, for
Defendants.

**ORDER**

GREGORY A. PRESNELL, District Judge.

**\*1** This matter comes before the Court on the Motion
for Summary Judgment (Doc. 24) filed by the Defendants,
Cyberspy Software, LLC ("CyberSpy") and Tracer R. Spence
("Spence"), and the response filed by the Plaintiff, the Federal
Trade Commission ("FTC").

The Defendants license a piece of software, called
"RemoteSpy," that when installed on a computer
surreptitiously tracks all of the activity of that computer's
user, from keystrokes entered to web sites visited. RemoteSpy
also transmits this information to a remote hard drive, where
it can be viewed by the licensee. The Defendants contend
that the software is intended to be used only by individuals
with a legitimate right to track the activity on a particular
computer, such as business owners trying to make sure their
employees are not using company laptops to start a competing
business, or parents trying to make sure their children are not
engaging in internet chats with predators. The FTC contends

that the design and marketing of RemoteSpy show that it is
intended to be used illegitimately, by licensees with no right
to track the activity on a particular computer, for purposes
such as identity theft. The FTC instituted the instant action to
enjoin the Defendants' alleged violations of Section 5(a) of the
FTC Act, 15 U.S.C. § 45(a), which prohibits (among other
things) unfair or deceptive acts or practices in or affecting
commerce.

The Defendants contend that the FTC lacks Article III
standing to bring the instant action and that there is no
evidence that they have engaged in any unfair or deceptive
acts or practices in or affecting commerce. The Defendants'
first argument fails as a matter of law, as Congress has
conferred standing on the FTC to pursue the sort of claims
raised here. *See SEC v. Rogers,* 283 Fed.Appx. 242 (5th
Cir.2008) (holding that Congress may confer standing on
federal agencies to bring enforcement actions under its
statutes) *and see Dir., Office of Workers' Compensation
Programs, DOL v. Newport News Shipbuilding and Dry Dock
Co.,* 514 U.S. 122, 133, 115 S.Ct. 1278, 131 L.Ed.2d 160
(1995) (describing how Congress can confer standing on
federal agencies to enforce statutes without infringing Article
III). 15 U.S.C. § 53(a) provides, in pertinent part, that
whenever the FTC has reason to believe that someone is
violating or is about to violate any law enforced by the FTC—
such as, for example, the FTC Act—then the FTC may bring
suit in district court to stop it.

The Defendants' second argument is premature, as discovery
does not close in the instant case until April 20, 2009.
However, to the extent that the Defendants' argument relies
on a lack of evidence of RemoteSpy ever being misused—as
opposed to a lack of evidence that the Defendants intended
that it be misused—the FTC on December 31, 2008 filed
the affidavit of Michael Dodd (Doc. 46–2). Dodd states that
a disgruntled former associate tricked Dodd and two other
employees of Dodd's company into installing RemoteSpy on
their computers (by disguising the installer as a Microsoft
Word resume), where it was used to pilfer passwords, pin
numbers, and other data. Thus, that particular line of argument
appears closed.

**\*2** In consideration of the foregoing, it is hereby

**ORDERED** that the Motion for Summary Judgment (Doc.
24) filed by the Defendants is **DENIED.**

**F.T.C. v. CyberSpy Software, LLC, Not Reported in F.Supp.2d (2009)**

2009 WL 455417, 2009-1 Trade Cases P 76,527

**DONE** and **ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 455417, 2009-1 Trade Cases P 76,527

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Appx91

2005 WL 1313846
Only the Westlaw citation is currently available.
United States District Court,
W.D. Texas, El Paso Division.

FEDERAL TRADE COMMISSION, Plaintiff,
v.
DIRECT-PROM, INC., and
Ramiro Mailland, Defendants.

May 26, 2005.

**Attorneys and Law Firms**

Laura D. Koss, Edwin Rodriguez, Federal Trade
Commission, Washington, D.C., for Plaintiff.

Ray Velarde, El Paso, TX, for Defendants.

STIPULATED FINAL ORDER FOR PERMANENT
INJUNCTION AND OTHER EQUITABLE RELIEF

MONTALVO, J.

 **\*1** WHEREAS Plaintiff, the Federal Trade Commission
("FTC" or "Commission"), has commenced this action by
filing the Complaint herein; Defendant Direct-Prom, Inc.,
and Defendant Ramiro Mailland have waived service of the
Summons and Complaint; the parties have been represented
by the attorneys whose names appear hereafter; and the
parties have agreed to settlement of this action upon the
following terms and conditions, without adjudication of any
issue of fact or law and without Defendants admitting liability
for any of the matters alleged in the Complaint;

NOW, THEREFORE, on the stipulation of Plaintiff,
Defendant Direct-Prom, Inc., and Defendant Ramiro
Mailland, it is hereby ORDERED, ADJUDGED, and
DECREED as follows:

*FINDINGS*

1. This Court has jurisdiction over the subject matter of this
case and jurisdiction over all parties. Venue in the Western
District of Texas is proper under 28 U.S.C. § 1391(b) and
15 U.S.C. § 53(b) and (c).

2. The Complaint states a claim upon which relief can be
granted against the Defendants under Sections 5(a), 12, and
13(b) of the Federal Trade Commission Act ("FTC Act"),
15 U.S.C. §§ 45(a), 52, and 53(b).

3. The acts and practices of Defendants were, and are, in or
affecting commerce, as defined in Section 4 of the FTC Act,
15 U.S.C. § 44.

4. Defendants waive all rights to seek judicial review or
otherwise challenge or contest the validity of this Order.
Defendants also waive any claims that they may have held
under the Equal Access to Justice Act, 28 U.S.C. § 2412,
concerning the prosecution of this action to the date of this
Order.

5. Each party shall bear its own costs and attorneys' fees.

6. Entry of this Order is in the public interest.

7. On November 15, 2004, Direct-Prom, Inc. filed a voluntary
petition for relief under the liquidation provisions of Chapter
7 of the Bankruptcy Code, 11 U.S.C. § 101 et seq., in the
United States Bankruptcy Court for the Western District of
Texas, Case No. 04-32857-lek. Also on November 15, 2004,
Donald S. Leslie ("Bankruptcy Trustee") was appointed the
Chapter 7 trustee for Defendant Direct-Prom, Inc.

8. The Commission's action against Direct-Prom, Inc.,
including the enforcement of a money judgment other than
a money judgment obtained in this action, is not stayed by
11 U.S.C. § 362(a)(1), (2), (3), or (6) because it is an
exercise of the Commission's police or regulatory power as a
governmental unit pursuant to 11 U.S.C. § 362(b)(4) and
thus falls within an exemption from the automatic stay.

*DEFINITIONS*

For purposes of this Order, the following definitions apply:

1. "Commerce" means as defined in Section 4 of the FTC Act,
15 U.S.C. § 44.

Appx92

2. "Competent and reliable scientific evidence" means tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that has been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results.

**\*2**  3. Unless otherwise specified, "Defendants" mean Direct-Prom, Inc., and its successors and assigns ("Direct-Prom") and Ramiro Mailland ("Mailland").

4. "Direct-Prom Bankruptcy Case" means the case commenced upon the filing of the voluntary petition by Direct-Prom on November 15, 2004, for relief under the liquidation provisions of Chapter 7 of the Bankruptcy Code, 11 U.S.C. § § 101 et seq., in the United States Bankruptcy Court for the Western District of Texas, Case No. 04-32857-1*o*k.

5. "Direct-Prom Bankruptcy Estate" means the bankruptcy estate that was created pursuant to 11 U.S.C. § 541(a) upon the commencement of the Direct-Prom Bankruptcy Case.

6. "Endorsement" means as defined in 16 C.F.R. § 255.0(b).

7. "Food" and "Drug" mean as defined in Section 15 of the FTC Act, 15 U.S.C. § 55.

8. The term "including" in this Order means "including, without limitation."

## ORDER

### I.

### PROHIBITED REPRESENTATIONS

IT IS ORDERED that Defendants, and their officers, agents, servants, employees, and attorneys, and all persons and entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any corporation, subsidiary, division, or other entity, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of the following products, in or affecting commerce, are hereby permanently enjoined from

representing, in any manner, expressly or by implication, including through the use of endorsements or trade name, that:

A. ReduCarb, or any substantially similar product, causes substantial weight loss in a short period of time; or

B. ReduCarb, or any food, dietary supplement, or over-the-counter drug, causes substantial weight loss without the need to increase exercise or reduce caloric intake.

### II.

### REPRESENTATIONS PROHIBITED UNLESS TRUE AND SUBSTANTIATED

IT IS FURTHER ORDERED that Defendants, and their officers, agents, servants, employees, and attorneys, and all persons and entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any corporation, subsidiary, division, or other entity, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any product, service, or program in or affecting commerce, are permanently enjoined from making any representation, expressly or by implication, including through the use of endorsements or trade name:

A. That any such product, service, or program:

1. Causes weight loss; or

2. Causes substantial weight loss by blocking or removing curbohydrates; or

B. About the benefits, performance, efficacy, safety, or side effects of any such product, service, or program;

unless, at the time the representation is made, the representation is true, and they possess and rely upon competent and reliable scientific evidence that substantiates the representation.

### III.

### FOOD AND DRUG ADMINISTRATION

2005 WL 1313846

**\*3**  IT IS FURTHER ORDERED that nothing in this Order prohibits Defendants from:

  A. Making any representation for any drug that is permitted in labeling for such drug under any tentative final or final standard promulgated by the Food and Drug Administration, or under any new drug application approved by the Food and Drug Administration; and

  B. Making any representation for any product that is specifically permitted in labeling for such product by regulations promulgated by the Food and Drug Administration pursuant to the Nutrition Labeling and Education Act of 1990.

IV.

MONETARY JUDGMENT

IT IS FURTHER ORDERED that:

  A. Judgment is entered in favor of the Commission and against Defendants. jointly and severally, in the amount of $1,970,000.00 (one million nine hundred and seventy thousand dollars) in U.S. currency ("Judgment") for equitable monetary relief, *provided however,* that subject to the conditions of this Paragraph, the Judgment shall be suspended until further order of the Court, and *provided further* that this Judgment shall be subject to the rights and conditions set forth in Paragraph V of this Order.

  B. Pursuant to section 502 of the Bankruptcy Code, 11 U.S.C. § 502, the FTC shall hold an allowed general unsecured claim in the Direct-Prom Bankruptcy Case in the amount of $1,970,000.00 (one million nine hundred and seventy thousand dollars). The FTC shall be entitled to participate in any payments in the Direct-Prom Bankruptcy Case paid on account of such general unsecured claim, pursuant to section 726 or 1129 of the Bankruptcy Code. 11 U.S.C. §§ 726 and 1129, and in accordance with the priorities of the Bankruptcy Code.

  C. Defendants agree that in the event they fail to meet the obligations set forth in this Order, the facts alleged in the Complaint filed in this matter shall be taken as true without further proof in any subsequent litigation filed by the Commission to enforce its rights pursuant

to this Order including, but not limited to a non-dischargeability complaint in any bankruptcy case.

  D. All funds paid pursuant to this Order shall be deposited into a fund administered by the Commission or its agent to be used for equitable relief, including, but not limited to, consumer redress and any attendant expenses for the administration of such equitable relief. In the event that direct redress to consumers is wholly or partially impracticable or funds remain after redress is completed, the Commission may apply any remaining funds for such other equitable relief (including consumer information remedies) as it determines to be reasonably related to the defendants' practices alleged in the Complaint. Any funds not used for such equitable relief shall be deposited to the United States Treasury as disgorgement. Defendants have no right to challenge the Commission's choice of remedies under this Paragraph. Defendants have no right to contest the manner of distribution chosen by the Commission.

V.

TERMINATION OF SUSPENSION

**\*4**  IT IS FURTHER ORDERED that:

  A. The Commission's agreement to and the Court's approval of this Order is expressly premised on the truthfulness, accuracy, and completeness of Defendants' sworn financial statements and supporting documents submitted to the Commission, including:

  1. The Financial Statement of Corporate Defendant Direct-Prom, Inc., dated October 27, 2004;

  2. The Financial Statement of Individual Defendant Ramiro Mailland, dated October 27, 2004, and Attachments 1-9 thereto; and

  3. The Declaration signed by Ramiro Mailland, individually and as President of Direct-Prom, Inc., dated February 15, 2005, which certifies the truth of the information identified in that Declaration.

Such financial statements and supporting documents contain material information upon which the Commission relied in negotiating and agreeing to this Order.

Appx94

B. If, upon motion by the Commission, a Court finds that any Defendant has failed to disclose any material asset, or made any other material misrepresentation or omission in the financial statements and supporting documents described in Paragraph V.A. above, the suspension of the monetary Judgment will be terminated and the entire Judgment amount of $1,970,000.00 (one million nine hundred and seventy thousand dollars) in U.S. currency, which amount Defendants stipulate is their gross sales of ReduCarb, will become immediately due and payable, less any payment already made, including but not limited to payments to the Commission from the Direct-Prom Bankruptcy Estate. Interest computed at the rate prescribed in 28 U.S.C. § 1961 shall immediately begin to accrue on the balance. For the purposes of this Paragraph and any subsequent proceedings to enforce the Commission's rights under this Order, including but not limited to a non-dischargeability complaint filed in a bankruptcy case, the Defendants waive any right to contest any of the allegations in the Complaint filed in this action or the $1,970,000.00 Judgment referenced in Paragraph IV above. Provided however, that in all other respects this Stipulated Final Order remains in full force and effect unless otherwise ordered by the Court; and provided further, that proceedings instituted under this paragraph V are in addition to, and not in lieu of, any other civil or criminal remedies that may be provided by law, including any other proceedings the Commission may initiate to enforce this Order.

VI.

ACKNOWLEDGMENT OF RECEIPT OF ORDER

IT IS FURTHER ORDERED that Defendant Direct-Prom, Inc., by and through the Bankruptcy Trustee, and Defendant Ramiro Mailland, within five (5) business days of receipt of this Order as entered by the Court, must each execute and submit to the Commission a truthful sworn statement acknowledging receipt of this Order.

VII.

CESSATION OF BUSINESS ACTIVITIES

IT IS ORDERED that Defendant Direct-Prom, Inc. shall not engage in any business and Donald S. Leslie, as the Bankruptcy Trustee, shall not seek authority to operate the business of Defendant Direct-Prom, Inc., pursuant to Section 721 of the Bankruptcy Code, 11 U.S.C. § 721, or otherwise.

VIII.

PROHIBITION ON SELLING OF CUSTOMER LISTS

**\*5** IT IS FURTHER ORDERED that Defendant Direct Prom, Inc., by and through the Bankruptcy Trustee, is permanently restrained and enjoined from selling, renting, leasing, transferring, or otherwise disclosing the name, address, telephone number, credit or debit card number, bank account number, e-mail address, or other identifying information of any person who paid any money to Defendant Direct-Prom, Inc. at any time prior to entry of this Order in connection with Defendant Direct-Prom's marketing of ReduCarb, *provided. however,* that Defendant Direct-Prom, Inc., by and through the Bankruptcy Trustee, may disclose such identifying information to a law enforcement agency or as required by any law, regulation, or court order. *Provided further* that the Bankruptcy Trustee, upon notice to the FTC, shall immediately abandon or dispose of any such customer list by transferring such list, including all copies, to the FTC. If necessary, the Bankruptcy Trustee may retain a copy of such customer list for its records but the Bankruptcy Trustee agrees not to dispose of any such customer list as an asset.

IX.

CORPORATE BOOKS AND RECORDS

IT IS FURTHER ORDERED that the Bankruptcy Trustee shall provide notice to the FTC of the proposed abandonment or disposition of the corporate books and records of Defendant Direct-Prom, Inc., and, upon the FTC's request, the Bankruptcy Trustee shall transfer such books and records to the FTC.

## X.

### DISTRIBUTION OF ORDER

IT IS FURTHER ORDERED that, for a period of three (3) years from the date of entry of this Order, Defendant Mailland shall deliver copies of the Order as directed below:

A. Individual Defendant Mailland as control person: For any business that Defendant Mailland controls, directly or indirectly, or in which Defendant Mailland has a majority ownership interest, Defendant Mailland must deliver a copy of this Order to all principals, officers, directors, and managers of that business. Defendant Mailland must also deliver copies of this Order to all employees, agents, and representatives of that business who engage in conduct related to the subject matter of the Order. For current personnel, delivery shall be within ten (10) days of date of entry of this Order upon Defendant. For new personnel, delivery shall occur prior to them assuming their responsibilities.

B. Defendant Mailland as employee or non-control person: For any business where Defendant Mailland is not a controlling person of a business but otherwise engages in conduct related to the subject matter of this Order, Defendant Mailland must deliver a copy of this Order to all principals and managers of such business before engaging in such conduct.

C. Defendant Mailland must secure a signed and dated statement acknowledging receipt of the Order, within thirty (30) days of delivery, from all persons receiving a copy of the Order pursuant to this Paragraph.

## XI.

### COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring and investigating compliance with any provision of this Order:

**\*6** A. Within ten (10) days of receipt of written notice from a representative of the Commission, Defendant Mailland must submit additional written reports, sworn to under penalty of perjury; produce documents for inspection and copying; appear for deposition; and/or provide entry during normal business hours to any business location in Defendant Mailland's possession or direct or indirect control to inspect the business operation;

B. In addition, the Commission is authorized to monitor compliance with this Order by all other lawful means, including but not limited to the following:

1. Obtaining discovery from any person, without further leave of court, using the procedures prescribed by Fed.R.Civ.P. 30, 31, 33, 34, 36, and 45;

2. Posing as consumers and suppliers to Defendant Mailland, his employees, or any other entity managed or controlled in whole or in part by him, without the necessity of identification or prior notice; and

C. Defendant Mailland must permit representatives of the Commission to interview any employer, consultant, independent contractor, representative, agent, or employee who has agreed to such an interview, relating in any way to any conduct subject to this Order. The person interviewed may have counsel present.

*Provided, however,* that nothing in this Order shall limit the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1, to obtain any documentary material, tangible things, testimony, or information relevant to unfair or deceptive acts or practices in or affecting commerce (within the meaning of 15 U.S.C. § 45(a)(1)).

## XII.

### COMPLIANCE REPORTING

IT IS FURTHER ORDERED that, in order that compliance with the provisions of this Order may be monitored:

A. For a period of three (3) years from the date of entry of this Order, Defendant Mailland must notify the Commission of the following:

1. Any changes in his residence, mailing addresses, and telephone numbers, within ten (10) days of the date of such change;

Appx96

Federal Trade Com'n v. Direct-Prom, Inc., Not Reported in F.Supp.2d (2005)

2005 WL 1313846

2. Any changes in his employment status (including self-employment), and any change in his ownership in any business entity, within ten (10) days of the date of such change. Such notice must include the name and address of each business that he is affiliated with, employed by, creates or forms, or performs services for; a statement of the nature of the business; and a statement of his duties and responsibilities in connection with the business or employment;

3. Any changes in his name or use of any aliases or fictitious names; and

4. Any changes in any business entity that he directly or indirectly control(s), or has an ownership interest in, that may affect compliance obligations arising under this Order, including but not limited to a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor entity; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order; the filing of a bankruptcy petition; or a change in the corporate name or address, at least thirty (30) days prior to such change, *provided* that, with respect to any proposed change in the corporation about which Defendant learns less than thirty (30) days prior to the date such action is to take place, Defendant must notify the Commission as soon as is practicable after obtaining such knowledge.

**\*7** B. Ninety (90) days after the date of entry of this Order, Defendant Mailland shall provide a written report to the FTC, sworn to under penalty of perjury, setting forth in detail the manner and form in which the Defendants have complied and are complying with this Order. This report shall include, but not be limited to:

1. Defendant Mailland's then-current residence address, mailing addresses, and telephone numbers;

2. Defendant Mailland's then current employment and business addresses and telephone numbers, a description of the business activities of each such employer or business, and his title and responsibilities for each such employer or business;

3. Any other changes required to be reported under subparagraph A of this Section;

4. A copy of each acknowledgment of receipt of this Order, obtained pursuant to Paragraph X; and

5. Any other changes required to be reported under subparagraph A of this Section.

C. For the purposes of this Order, Defendant Mailland shall, unless otherwise directed by the Commission's authorized representatives, mail all written notifications to the Commission to:

Associate Director for Enforcement

Federal Trade Commission

600 Pennsylvania Avenue, N.W.

Washington, DC 20580

Re: *FTC v. Direct-Prom et al.,* Civil Action No. EP-05-CA-*0* 186.

D. For purposes of the compliance reporting and monitoring required by this Order, the Commission is authorized to communicate directly with Defendants.

XIII.

RECORD KEEPING PROVISIONS

IT IS FURTHER ORDERED that, for a period of six (6) years from the date of entry of this Order, Defendant Mailland, in connection with any business where (1) he is the majority owner, an officer, or director of the business, or directly or indirectly manages or controls the business and (2) the business engages in, or assists others engaged in, the manufacturing, advertising, promotion, offering for sale, sale, or distribution of any product, service, or program in or affecting commerce, and their agents, employees, officers, corporations, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, is hereby restrained and enjoined from failing to create and retain the following records:

A. Accounting records that reflect the cost of goods, services, or programs sold, revenues generated, and the disbursement of such revenues;

Appx97

B. Personnel records accurately reflecting; the name, address, and telephone number of each person employed in any capacity by such business, including as an independent contractor; that person's job title or position; the date upon which the person commenced work; and the date and reason for the person's termination, if applicable;

C. Customer files containing the names, addresses, telephone numbers, dollar amounts paid, quantity of goods, services, or programs purchased, and description of goods, services, or programs purchased, to the extent such information is obtained in the ordinary course of business;

**\*8** D. Complaints and refund requests (whether received directly, indirectly, or through any third party) and any responses to those complaints or requests;

E. Copies of all sales scripts, training materials, advertisements, promotional materials, or other materials utilized in the advertising, labeling, promotion, offering for sale of any product, service, or program;

F. All materials that were relied upon in making any representations contained in the materials identified in Part E of this Paragraph;

G. All other documents evidencing or referring to the accuracy of any claim in the materials identified in Part E of this Paragraph or to the safety or efficacy of any product, service, or program including, but not limited to, all tests, reports, studies, demonstrations, or other evidence that confirm, contradict, qualify, or call into question the safety or efficacy of any such product, service, or program;

H. Records accurately reflecting the name, address, and telephone number of each person or entity engaged in the development or creation of any testing obtained for the purpose of advertising, labeling, promoting, offering for sale, distributing, or selling any product, service or program; and

I. All records and documents necessary to demonstrate full compliance with each provision of this Order, including but not limited to, copies of acknowledgments of receipt of this Order, required by Paragraphs VI and X, and all reports submitted to the FTC pursuant to Paragraph XII.

XIV.

RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

XV.

SCOPE OF ORDER

IT IS FURTHER ORDERED that this Order resolves only claims against the named Defendants and does not preclude the Commission from initiating further action or seeking any remedy against any other persons or entities, including without limitation persons or entities who may be subject to portions of this Order by virtue of actions taken in concert or participation with Defendants, and persons or entities in any type of indemnification or contractual relationship with Defendants.

SO STIPULATED:
JUDGMENT IS THEREFORE ENTERED pursuant to all the terms and conditions recited above.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 1313846

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Appx98

1990 WL 54788, 1990-1 Trade Cases P 68,959

1990 WL 54788
United States District Court,
N.D. Texas, Fort Worth Division.

FEDERAL TRADE COMMISSION

v.

GTP MARKETING, INC., et al.

CIV. A. No. 4–90–123–K.
|
March 15, 1990.

Memorandum Opinion

BELEW, District Judge.

**\*1** Plaintiff, the Federal Trade Commission, (the Commission), has filed a complaint for a permanent injunction and other equitable relief in this matter, pursuant to Section 13(b) of the Federal Trade Commission Act, (FTC ACT), 🚩 15 U.S.C. § 53(b). After issuing an Order requiring the Defendants to show cause why a preliminary injunction should not issue and, after a hearing, the Court, having considered the complaint, the evidence presented, the exhibits, and the applicable law, the Court is of the opinion that the Motion for Preliminary Injunction should be granted in part and denied in part.

*I. Findings of Fact*

The Court is of the opinion that the Federal Trade Commission has a substantial likelihood of establishing the following facts:

1. GTP Marketing, Inc., (GTP), is a Texas Corporation, incorporated in December of 1988. GTP maintains offices at 1201 N. Watson Road, Arlington, Texas 76006.

2. GTP is a telemarketing sales company which sells products to consumers.

3. Telstar Marketing Network, Inc., (Telstar), is a Texas Corporation which was incorporated in December of 1988. Telstar also maintains offices at 1201 N. Watson Road, Arlington, Texas 76006.

4. Telstar is a telemarketing sales company which sells products to consumers.

5. HS Marketing Network, Inc., (HS Marketing), is a Texas Corporation which was incorporated in January of 1990. HS Marketing maintains offices at 1201 N. Watson Road, Arlington, Texas 76006.

6. HS Marketing is a telemarketing sales company which sells products to consumers.

7. Unitel Marketing Consultants, Inc., (Unitel), is a Texas Corporation which was incorporated in January of 1990. Unitel maintains offices at 1201 N. Watson Road, Arlington, Texas 76006.

8. Unitel transacts business with third parties on behalf of the corporate defendants.

9. MBC Group, Inc., (MBC), is a Texas Corporation which was incorporated in January of 1988. MBC maintains offices at 1201 N. Watson Road, Arlington, Texas 76006.

10. MBC maintains payroll and banking accounts for the corporate defendants.

11. Todd Alan Arnold transacts business at 1201 N. Watson Road, Arlington, Texas 76006 and is president of Unitel and Telstar.

12. Pat Arnold transacts business at 1201 N. Watson Road, Arlington, Texas 76006 and is vice president of Unitel.

13. By virtue of the locations of the corporate defendants' offices, all defendants have transacted business in the Northern District of Texas, Fort Worth Division.

14. Defendants GTP, Telstar, HS Marketing, Unitel, MBC, Todd Alan Arnold, and Pat Arnold have participated personally in the acts and practices upon which this complaint is based.

15. From at least September of 1988 to 21 February 1990, all of the named defendants have engaged in a substantial course of commerce between Texas and other states.

16. Defendants have transacted business and furthered the acts and practices upon which this complaint is based through

F.T.C. v. GTP Marketing, Inc., Not Reported in F.Supp. (1990)
1990 WL 54788, 1990-1 Trade Cases P 68,959

the following corporate entities: MW1, HL Marketing, Inc., Teletech Industries, Inc.

**\*2**  17. From at least September of 1988, defendant GTP sent postcards to consumers nationwide which promised awards with no additional purchase requirement if the consumer called a telephone number listed on the postcard.

18. From at least November of 1989, defendant Telstar sent postcards to consumers nationwide which promised awards with no purchase necessary if the consumer called a telephone number listed on the postcard.

19. From at least January of 1990, defendant HS Marketing sent postcards to consumers nationwide which promised awards with no purchase necessary if the consumer called a telephone number on the postcard.

20. The award notices sent to consumers by the defendants read:

One of the fabulous awards listed below has been secured in your name. You are ABSOLUTELY GUARANTEED at least one of these, NO PURCHASE NECESSARY. But, we must hear from you as soon as possible, CALL IMMEDIATELY.

NEW CHEVY BLAZER

$5,000 RETAIL MERCHANDISE CHECKS

$5,000 CASHIER'S CHECK

MEN'S AND LADIES' GEORGIO MONTI' DIAMOND WATCHES

$1,000 SERIES EE U.S. SAVINGS BOND

Notice: This offer is not available to the general public. Only those notified by mail are eligible. This is not a contest or lottery.

BONUS: CALL IMMEDIATELY AND ASK HOW YOU CAN ACTUALLY RECEIVE MORE THAN JUST ONE OF THE FIVE AWARDS LISTED ABOVE!

21. When the recipient of a GTP, Telstar, or HS Marketing postcard called the telephone number listed thereon, the call was answered by a salesperson, or "telemarketer," who delivered a scripted sales pitch for a product, such as a home

security system (HS Marketing) or a water purifier (GTP and Telstar).

22. Although defendants' telemarketers were provided with scripts to use during their sales presentations, the telemarketers often deviated from the text of these scripts. By deviating from the sales script, numerous misrepresentations were made to the consumers who called the defendants to claim their promised awards.

23. As part of their sales presentation, defendants' telemarketers would ask consumers about the color of the postcard which they had received. Regardless of the response, the defendants would then tell consumers that the color of their postcards indicated that they were top award winners or that they had won a specific valuable prize such as a Chevy Blazer. In reality, the color of the postcard had no significance.

24. Some consumers were told by defendants that they would win two prizes if a product was purchased. The telemarketers further encouraged the purchase of the expensive water purifiers or home security systems by suggesting that the awards would be worth more than the cost of the product.

25. During the telephone sales pitch, defendants' telemarketers also asked many consumers for their credit card account numbers to verify consumers' eligibility to participate in defendants' awards promotion.

26. After obtaining consumers' credit card account numbers for the avowed purpose of verifying eligibility for the promotion, defendants often charged the consumers' credit card accounts for the price of defendants' product without authorization from the consumers resulting in a massive number of complaints and "charge backs": as high as 60% of ostensible sales resulted in "charge backs."

**\*3**  27. The individual defendants knew or should have known of the large amounts of complaints and "charge backs."

28. Many consumers decided to purchase a product from defendants based upon defendants' representation regarding the worth of the prizes to be awarded.

29. Although defendants told consumers who purchased a product that the product would be provided to them, a significant number of consumers did not receive the product for which they had paid the defendants.

1990 WL 54788, 1990-1 Trade Cases P 68,959

30. After October of 1989, the defendants did not authorize shipment of products to consumers who were sending defendants installment payments for purchase of a product.

31. Defendants solicited orders and accepted payments for home security systems when defendants possessed neither the means nor capabilities to fulfill consumers' orders.

32. The individual Defendants knew or should have known that the third parties were not shipping products to consumers.

33. A number of consumers who declined to purchase defendants' product requested the one award to which the postcard entitled them. Defendants instructed these consumers to send to the address listed on the postcard a check or money order for either $9.95, $12.95, or $14.95 for the awards' shipping and handling fees.

34. After sending in the respective shipping and handling fee, the defendants would routinely send the $5,000 in merchandise checks, which were held out to the consumers as a $5,000 shopping spree.

35. The defendants failed to inform, and thereby concealed from the consumers, that in order to use the merchandise checks, they would have to expend large amounts of their own funds.

36. After sending the shipping and handling fees, consumers either received nothing from the defendants or received a catalog of off-brand products which accompanied by $5,000 in merchandise discount "checks."

37. When the consumers received the catalog and merchandise checks, they learned for the first time that they would be required to spend large amounts of their own funds in order to redeem the merchandise checks.

38. The aforementioned acts and practices are ones that a reasonable man, in the place of the individual defendants, would have known to be dishonest or fraudulent.

39. The misrepresentations and omissions are of a type which are usually relied upon by reasonably prudent persons.

40. Consumer injury in the form of substantial monetary loss has resulted from these false and misleading practices.

41. Financial institutions incurred substantial monetary losses, in the form of "charge backs", due to the defendants' deceptive acts and practices.

42. The individual defendants either participated directly in the deceptive practices and acts, or knew of, or should have known of, the deceptive practices and had the authority to control them.

## II. Conclusions of Law

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1345, and 15 U.S.C. § 53(b). The Court has personal jurisdiction over the individual defendants, Todd Alan Arnold and Pat Arnold in this action through proper service of process. The Court has determined that it lacks jurisdiction over Stephen Gregg Echols as he has not been properly served. See Federal Rule of Civil Procedure 4(d) 1.

**\*4** Venue in the Northern District of Texas is proper under 28 U.S.C. §§ 1391(b) and (c), and under 15 U.S.C. § 53(b).

The factors traditionally considered in determining whether to grant a preliminary injunction are (1) a substantial likelihood of plaintiff's success on the merits; (2) a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) that granting the preliminary injunction will not disserve the public interest. *F.S.L.I.C. v. Dixon,* 835 F.2d 554, 559 (5th Cir.1987). The preliminary injunction is an extraordinary remedy and should only be granted if the movant has clearly carried the burden of persuasion on all four prerequisites. *Mississippi P & L v. United Gas Pipe Line,* 760 F.2d 618, 621 (5th Cir.1985).

The motion for preliminary injunction in this action was brought by the government pursuant to the FTC Act.[1] The Commission's Complaint alleges that the Defendants' marketing practices are violative of Section 5 of the FTC Act.[2] The fact that the Court is asked to issue an injunction authorized by a statute of the United States to enforce and implement Congressional policy is decidedly different from determining whether to grant a preliminary injunction in

1990 WL 54788, 1990-1 Trade Cases P 68,959

a case between private litigants. 🚩 *U.S. v. Odessa Union Warehouse Co–Op,* 833 F.2d 172, 175 (9th Cir.1987). Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the courts to enforce them when asked. 🚩 *TVA v. Hill,* 437 U.S. 153, 194 (1978). Accordingly, where an injunction is authorized by statute, and the statutory conditions are satisfied, the agency to whom the enforcement of the right has been entrusted is not required to show irreparable injury. 🚩 *U.S. v. Odessa,* 833 F.2d at 175–176. As irreparable harm is presumed in a statutory enforcement action, the district court need only find some chance of probable success on the merits. 🚩 *F.T.C. v. World Wide Factors, LTD.* [1989–2 TRADE CASES ¶ 68,707], 882 F.2d 344, 347 (9th Cir.1989). This will be satisfied by a prima facie showing of illegality. *Commodity Futures v. Muller,* 570 F.2d 1296, 1300 (1978); 🚩 *S.E.C. v. First Fin. Ins. Group,* 645 F.2d 429, 434 (5th Cir.1981). Notwithstanding the foregoing discussion, the apparent paucity of guidance in the Fifth Circuit leads this Court to believe that the prudent route would be to base our determination on the traditional factors governing preliminary injunction decisions.

As noted above, the motion for preliminary injunction in this action was brought by the government pursuant to the FTC Act. The Commission's Complaint alleges that the Defendants' marketing practices are violative of Section 5 of the FTC Act. The Court is convinced that its Findings of Fact demonstrate a clear violation of Section 5(a)(1). Moreover, the Court finds that the evidence before it, demonstrates a substantial likelihood of irreparable harm resulting from the continued business activities of the defendants. Furthermore, this Court finds that the threatened injury resulting from the grant of a preliminary injunction, conclusively outweighs any harm that might befall the defendants. Finally, the Court is persuaded that enforcing congressional law does not disserve, but rather serves, the public interest.

**\*5** The Court also finds that there is a strong likelihood of recurring violations based upon the pervasive nature of the fraudulent activity. An extensive history of violations does beget an inference that future violations are likely to occur. 🚩 *U.S.A. v. Odessa Union,* 833 F.2d at 176. Additionally, because the Court has found that the individual defendants either knew or should have known of the deceptive nature of their business practices, the Court finds it to be in the interest of the public to freeze their assets, as restitution in this case is substantially likely.

The Court further finds that the Federal Trade Commission has failed to establish a likelihood of success on the merits concerning their claim against COMTECH Mobile Systems, Inc. Accordingly, the Court will deny the Commission's Motion for Preliminary Injunction as it relates to COMTECH Mobile Systems, Inc.

### III. Conclusion

Commensurate with the foregoing findings of fact and conclusions of law, it is the Court's opinion, that the defendants, both individual and corporate, with the exception of Stephen Gregg Echols and COMTECH Mobile Systems, Inc., have violated Section 5 of the FTC Act. The Court finds further that the evidence demonstrates that the Federal Trade Commission has satisfied the four preliminary injunction elements traditionally required in this circuit. Therefore, the Federal Trade Commission's Motion for Preliminary Injunction should be Granted in part and Denied in part. Accordingly, an Order in conformance with this Memorandum Opinion will issue this day.

### All Citations

Not Reported in F.Supp., 1990 WL 54788, 1990-1 Trade Cases P 68,959

### Footnotes

1    Section 13(b) provides as follows:

        "*Temporary restraining orders; preliminary injunctions*

Case 4:22-mc-00369   Document 32-1   Filed on 06/06/22 in TXSD   Page 118 of 144

F.T.C. v. GTP Marketing, Inc., Not Reported in F.Supp. (1990)
1990 WL 54788, 1990-1 Trade Cases P 68,959

"(b) Whenever the Commission has reason to believe—

"(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

"(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond: Provided however, That if a complaint is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect: Provided further, That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction. Any such suit shall be brought in the district in which such person, partnership, or corporation resides or transacts business."

2      Section 5 of the Federal Trade Commission Act, 🚩15 U.S.C. § 45 provides in part as follows:

"(a)(1) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful."

---

End of Document                                   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Appx103

Case 4:22-mc-00369   Document 32-1   Filed on 06/06/22 in TXSD   Page 119 of 144

Federal Trade Commission v. Hornbeam Special Situations, LLC, Not Reported in Fed....

2018 WL 6521516

2018 WL 6521516
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

FEDERAL TRADE COMMISSION, Plaintiff,

v.

HORNBEAM SPECIAL
SITUATIONS, LLC, et al., Defendants.

CIVIL ACTION FILE NO. 1:17-cv-3094-TCB
|
Signed 07/10/2018
|
Filed 07/11/2018

**Attorneys and Law Firms**

Amanda C. Basta, Federal Trade Commission, Elizabeth J. Averill, Korin Ewing Felix, Omolara Bewaji Joseney, Reenah L. Kim, Hong Park, Pro Hac Vice, Kimberly L. Nelson, Pro Hac Vice, Federal Trade Commission, Washington, DC, Anna Mirshak Burns, R. Michael Waller, Federal Trade CommissionAtlanta Regional Office, Atlanta, GA, for Plaintiff.

Alexis Miller Buese, Lauren M. De Lilly, Michael L. Mallow, Sidley Austin, LLP, Los Angeles, CA, Jessica Rutledge Watson, Jeffrey L. Mapen, Nelson Mullins Riley & Scarborough, LLP, Atlanta, GA, for Defendants EDebitPay, LLC, Dale Paul Cleveland, William R. Wilson.

Leonard L. Gordon, Pro Hac Vice, Matthew S. Renick, Venable, LLP, New York, NY, Mary M. Gardner, Venable, LLP, Washington, DC, Julia Blackburn Stone, Michael A. Caplan, Caplan Cobb LLP, Atlanta, GA, for Defendants iStream Financial Services, Inc., Kris Axberg, Richard Joachim.

Cody Sams Wigington, Baker & Hostetler, LLP, Atlanta, GA, Michael Dominic Meuti, Baker & Hostetler LLP, Cleveland, OH, for Defendant Earl G. Robinson.

Bryan B. LaVine, Katie Lamb Balthrop, Keith Jerrod Barnett, Tiffany Nichols Bracewell, Troutman Sanders, LLP, Atlanta, GA, for Defendant James McCarter.

Allison S. H. Ficken, Edward Joseph Dovin, Dovin Ficken, LLC, Atlanta, GA, for Defendant Patricia Brandmeier Robinson.

Andrew Case, Richard Lawson, Manatt, Phelps & Phillips, LLP, New York, NY, Julia Blackburn Stone, Michael A. Caplan, Caplan Cobb LLP, Atlanta, GA, for Defendant Guadalupe L. Andrews.

Earl G. Robinson, Atlanta, GA, pro se.

Mark Ward, Woodland Hills, CA, pro se.

**ORDER**

Timothy C. Batten, Sr., United States District Judge

**\*1** This case comes before the Court on certain Defendants'[1] motion [183] to dismiss for lack of subject-matter jurisdiction.

**I. Background**
The factual background of this case is set forth in the Court's order [181] denying several Defendants' motions to dismiss. After the motion was denied, the presently moving Defendants now challenge the FTC's constitutional standing to bring this action, an issue which implicates the Court's subject-matter jurisdiction.

**II. Legal Standard**
Standing is a fundamental issue going to the Court's subject-matter jurisdiction, or power to hear the case, and cannot be waived. See ⚑ *Maverick Media Grp. v. Hillsborough Cty.*, 528 F.3d 817, 819 (11th Cir. 2008). A challenge to the subject-matter jurisdiction of the Court under Federal Rule of Civil Procedure 12(b)(1) may either be "facial" or "factual." ⚑ *McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). When considering a facial attack under Rule 12(b)(1), the Court takes all allegations in the complaint as true. *Id.* A Rule 12(b)(1) motion may also be based on a "factual attack," which allows the Court to go beyond the pleadings to determine whether the claim of subject-matter jurisdiction is credible. *See id.*

Defendants present only a facial attack to the Court's subject-matter jurisdiction here, *see* [183-1] at 16 n.5; that is, they contend that even if true, the averments in the complaint are insufficient to establish subject-matter jurisdiction.[2]

Appx104

## III. Discussion

Defendants challenge the FTC's standing to sue under Article III of the U.S. Constitution. They argue that the FTC's claims are not redressable—an essential element of standing—because the FTC has failed to sufficiently plead its claims for relief under 🚩 15 U.S.C. § 53(b). [3] The FTC counters that it has standing and that Defendants' contentions are merits-based and therefore inappropriate as a challenge to subject-matter jurisdiction. The Court agrees, though it will revisit an issue related to the merits upon further briefing by the parties as set forth below.

**\*2** Article III, section 2, of the U.S. Constitution provides federal courts the power to resolve "Cases" and "Controversies" between "litigants who have standing to sue," 🚩 *Nicklaw v. Citimortgage, Inc.*, 839 F.3d 998, 1001 (11th Cir. 2016). The "irreducible constitutional minimum of standing," 🚩 *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), requires proof that (1) the plaintiff suffered injury-in-fact that is concrete and particularized, as well as actual or imminent; (2) there is a causal connection between the defendants' actions and the alleged injury; and (3) the alleged injury is redressable through a favorable decision. *See* 🚩 *id.* at 560–61; *Otwell v. Ala. Power Co.*, 747 F.3d 1275, 1279–80 (11th Cir. 2014). Each element of standing must exist, though Defendants' challenge relates only to the third prong, redressability.

The FTC has suffered a cognizable Article III injury. "Congress may confer standing on federal agencies to bring enforcement actions under its statutes." *SEC v. Rogers*, 283 F. App'x 242, 243 (11th Cir. 2008); *see also Dir.*, 🚩 *Office of Workers' Comp. Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 133 (1995) ("[Supreme Court precedent] certainly establish[es] that Congress *could* have conferred standing upon the Director without infringing Article III of the Constitution[.]"). Here, Congress has conferred standing on the FTC to sue when invoking 🚩 § 53(b). *Cf. FTC v. CyberSpy Software, LLC*, No. 6:08-cv-1872-Orl-31GJK, 2009 WL 455417, at *1 (M.D. Fla. Feb. 23, 2009) (holding that a standing challenge against the FTC "fails as a matter of law, as Congress has conferred standing on the FTC to pursue" claims raised under 🚩 § 53(a) ).

The FTC's constitutional "injury" in this case is a product of Congress conferring authority upon the FTC to enforce the laws at issue. When one of those laws is infringed, the FTC is constitutionally injured, and its allegations need not be more particularized than that. *Cf. CFPB v.* 🚩 *Gordon*, 819 F.3d 1179, 1188–89 (9th Cir. 2016) ("Congress authorized the CFPB to bring actions in federal court to enforce certain consumer protection statutes and regulations. And with this authorization, the Executive Branch, through the CFPB, need not suffer a 'particularized injury'—it is charged under Article II to enforce federal law." (citation omitted) (citing 🚩 *Lujan*, 504 U.S. at 576–77) ).

The FTC's injury is also fairly traceable to Defendants because they are alleged to have engaged in conduct that resulted in a violation of laws over which the FTC has enforcement jurisdiction. Thus, the first two standing elements are met (Defendants do not contend otherwise).

The parties' primary dispute is over the third prong: whether the FTC's alleged injury is redressable. The Court holds that it is. The Court has the power to enjoin the Defendants under 🚩 § 53(b) and to exercise the "full range of equitable remedies," including disgorgement, available thereunder against the Defendants. *FTC v. WV Universal Mgmt.*, 877 F.3d 1234, 1239 (11th Cir. 2017) (quoting *FTC v. Gem Merch. Corp.*, 87 F.3d 446, 468 (11th Cir. 1996) ). Utilizing these remedies, the Court is capable of adequately redressing the FTC's injury.

Defendants challenge this conclusion. They argue that the FTC's failure to properly plead a 🚩 § 53(b) claim would render its claim before the Court un-redressable under Article III because, without a valid claim, the Court lacks the power to apply the remedial mechanisms identified above. Without these remedies, Defendants' argue, the Court lacks Article III subject-matter jurisdiction.

The Court rejects this argument because it impermissibly blends the fundamental issue of the Court's power to hear the case with the inquiry into whether the FTC has satisfactorily alleged the elements of its claim. Issues related to the redressability of a plaintiff's claims should not be so readily merged into the merits analysis.

**\*3** As the Supreme Court has held,

> It is firmly established ... that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts'

Appx105

Case 4:22-mc-00369   Document 32-1   Filed on 06/06/22 in TXSD   Page 121 of 144

Federal Trade Commission v. Hornbeam Special Situations, LLC, Not Reported in Fed....

2018 WL 6521516

statutory or constitutional *power* to adjudicate the case....
"[J]urisdiction ... is not defeated ... by the possibility that
the averments might fail to state a cause of action on which
petitioners could actually recover."

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83,
89 (1998) (some alterations in original) (citations omitted)
(quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946) ). "[I]t is
also well settled that where legal rights have been invaded,
and a federal statute provides for a general right to sue for
such invasion, federal courts may use any available remedy
to make good the wrong done." *Bell*, 327 U.S. at 684.

Here, the FTC's asserted cause of action is made available
by § 53(b), and Defendants do not contend that the
FTC's averments are inarguable, that is, "so insubstantial,
implausible, foreclosed by prior decisions of [the Supreme
Court], or otherwise completely devoid of merit as not to
involve a federal controversy." *Steel Co.*, 523 U.S. at 89
(quoting *Oneida Indian Nation of N.Y. v. Cty. of Oneida*,
414 U.S. 661, 666 (1974) ). Indeed, the Court has already held
that the FTC has stated a claim under § 53(b), *see* [181]
at 28–30 (more on this *infra* ). The Defendants' alleged legal
violations are properly thought of as an invasion of the FTC's
legal province, for which Congress has provided a remedy in
federal court.

Any further dispute regarding the merits of the FTC's claims
or entitlement to the relief it seeks here is more appropriately
addressed in a motion to dismiss. *Cf. Holloway v. Pagan
River Dockside Seafood, Inc.*, 669 F.3d 448, 452 (4th Cir.
2012) ("Deficiencies in the statement of a federal cause of
action should normally be addressed by a motion under rules
challenging the sufficiency of the complaint or the evidence
pleaded to support the complaint, such as authorized by Rules
12(b)(6), 12(c), or 56.").

This prescribed analytical distinction between challenges to
the merits of a claim and the question of whether a federal
case or controversy exists serves an important purpose.
Defendants' arguments, fully born, would mean that failure to
plead the elements of a claim results, ipso facto, in a plaintiff
lacking redressability under Article III (assuming it is the only
avenue of relief sought). Such a rule would severely impair
the operation of the courts, slowing down decision making
and interfering with decisional finality.

These woe betides were avoided in *Steel Co.*, which refused
to "call the existence of a cause of action 'jurisdictional,' ...."
523 U.S. at 92. If it was otherwise, the courts would
have to evaluate jurisdiction any time the merits of a case
were suspect because "[w]ithout jurisdiction the court cannot
proceed at all in any cause." *Id.* at 94 (quoting *Ex parte
McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868) ).

Such "jurisdictionalizing" of the merits inquiry would also
jeopardize the finality of legal proceedings. If a failure to state
a claim compels failure of jurisdiction, a case dismissed for
failure to state a claim would never have a preclusive effect on
future litigation over the same issue because dismissal for lack
of subject-matter jurisdiction is "not an adjudication on the
merits that would give rise to a viable res judicata defense."
*Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1188 (11th
Cir. 2003).

**\*4** Accordingly, the Court rejects Defendants' objection to
the FTC's standing based on its failure to properly plead
a § 53(b) claim. The Court holds that Defendants have
not demonstrated that the FTC lacks standing to sue and
that its arguments go to the merits of the claim rather than
the Court's jurisdiction. Under Rule 12(g), Defendants are
precluded from bringing a successive challenge to the merits
of the FTC's claims (i.e., per Rule 12(b)(6) ), even if it is
adorned in jurisdictional garb. This would normally be the
end of the inquiry.

The Court is, however, inclined to formally reconsider
Section III.D.2 of its previous order [181], in which the
Court held that because certain aspects of § 53(b)
are unreviewable, the FTC has no pleading obligation
demonstrate entitlement to bring suit thereunder. Because
Defendants have not requested that the Court reconsider this
issue, and the FTC has not had an adequate opportunity to
defend the prior ruling in its favor, the Court will order
briefing rather than consider the issue as it was raised in
Defendants' Rule 12(b)(1) motion.

### IV. Conclusion

The Court denies Defendants' motion [183] to dismiss for
lack of subject-matter jurisdiction. In light of the Court's
inclination to reconsider its earlier ruling (as to Section
III.D.2 of its previous order [181] only), the Court orders
supplemental briefing as to the following.

Appx106

Case 4:22-mc-00369   Document 32-1   Filed on 06/06/22 in TXSD   Page 122 of 144

Federal Trade Commission v. Hornbeam Special Situations, LLC, Not Reported in Fed....

2018 WL 6521516

First, whether the Court should reconsider its previous ruling that the FTC is not required to plead and prove anything related to its "reason to believe" under § 53(b) because this section is entrusted to the FTC's discretion, particularly in light of *FTC v. Shire ViroPharma, Inc.*, No. 17-131-RGA, 2018 WL 1401329 (D. Del. Mar. 20, 2018), *appeal docketed*, No. 18-1807 (3d Cir. Apr. 12, 2018). Second, if the Court were to reconsider its decision and hold that the FTC must plead facts to support its charge under § 53(b), whether the FTC has adequately pleaded its "reason to believe" as to each of the Defendants (including what deference, if any, the FTC's allegations are entitled to). Finally, the briefing should address what impact this would have on the case and remaining claims and Defendants, including any statute-of-limitations issues that would arise if the FTC was wholly or partly incapable of bringing its suit under § 53(b).

Defendants should submit a brief of no more than twenty pages by July 23, 2018. The FTC shall submit a response of no more than twenty pages by July 30. No replies will be permitted, unless the Court orders otherwise.

IT IS SO ORDERED this 10th day of July, 2018.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6521516

---

## Footnotes

1    Patricia Brandmeier Robinson, Executrix of the Estate of Jerry L. Robinson; Earl G. Robinson; James McCarter; Mark Ward; eDebitPay, LLC; Dale Paul Cleveland; William R. Wilson; iStream Financial Services, Inc.; Kris Axberg; Richard Joachim; and Chet Andrews.

2    Page references refer to page numbers in the CM/ECF PDF document reader, rather than the page numbers on the copies of the documents themselves.

3    In their briefs, the parties' arguments run past each other as they have each characterized Defendants' theories differently. The FTC primarily argued against what it perceived to be Defendants' argument that § 53(b) entails jurisdictional thresholds that must be satisfied by independent factual averments in order to establish federal jurisdiction over claims thereunder. Defendants have, however, disavowed such an argument in their replies, stating that their jurisdictional challenge is based solely on a lack of the FTC's standing on redressability grounds. *See* [189] at 13–14 n.7. This posture renders inapposite their argument that *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252 (11th Cir. 2009), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 556 U.S. 449, 453 n.2 (2012), requires that the FTC plead sufficient facts to establish jurisdiction.

The issue in *Sinaltrainal* was decided in the context of the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, which, unlike § 53(b), contains jurisdictional prerequisites that require discreet factual pleading. *See id.* at 1262, 1262 n.11. Because Defendants do not contend that § 53(b)—or any other federal statute at issue here—is similarly jurisdictional, they cannot argue that the FTC's failure to plead the elements of § 53(b) defeat jurisdiction under *Sinaltrainal.* Nor do Defendants challenge the Court's jurisdiction under 28 U.S.C. § 1331, which the Court holds is satisfied by the FTC's allegation of federal claims under § 53(b). *Lobo v. Celebrity Cruises, Inc.*, 704 F.3d 882, 891 (11th Cir. 2013).

**Federal Trade Commission v. Hornbeam Special Situations, LLC, Not Reported in Fed....**

2018 WL 6521516

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Appx108

2016 WL 9244671
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

UNITED STATES of America, Plaintiff,

v.

COMMERCIAL RECOVERY SYSTEMS, INC.,
Timothy L. Ford, individually and as an officer of
Commercial Recovery Systems, Inc., and David
J. Devany, individually and as a former officer of
Commercial Recovery Systems, Inc. Defendants.

Case No. 4:15–CV–36
|
Signed 04/18/2016

**Attorneys and Law Firms**

Monica Christine Groat, Heide L. Herrmann, United States
Dept. of Justice, Consumer Protection Branch, Washington,
DC, for Plaintiff.

Timothy L. Ford, Heath, TX, pro se.

Emil Lippe, Jr., Law Offices of Lippe & Associates, Dallas,
TX, for Defendants.

## ORDER FOR PERMANENT INJUNCTION AGAINST
## DEFENDANTS COMMERCIAL RECOVERY
## SYSTEMS, INC. AND TIMOTHY L. FORD, ONLY

AMOS L. MAZZANT, UNITED STATES DISTRICT
JUDGE

**\*1** Plaintiff, the United States of America, acting upon
notification and authorization to the Attorney General
by the Federal Trade Commission ("Commission"), filed
its Complaint for Injunctive Relief and Civil Penalties
("Complaint"), for a permanent injunction, civil penalties,
and other equitable relief in this matter, pursuant to Sections
13(b) and 16(a)(1) of the Federal Trade Commission Act
("FTC Act"), 15 U.S.C. §§ 53(b) and 56(a)(1).
Defendants have been served with the summons and the
Complaint and have filed answers with the Court. (Dkt. #7).

The Court granted summary judgment against defendants
Commercial Recovery Systems, Inc. ("CRS") and Timothy L.
Ford ("Ford") in favor of Plaintiff on April 7, 2016 (Dkt. #69),

and found CRS and Ford liable for violations of Section 5 of
the FTC Act, 15 U.S.C. § 45(a), and multiple provisions
of the Fair Debt Collection Practices Act ("FDCPA"), 15
U.S.C. §§ 1692–1692*l*, (Dkt. #69 at 15). The Court found
that Plaintiff is entitled to a permanent injunction sought
against Defendants CRS and Ford and reserved for trial
the determination of civil penalties as to Defendant Ford
personally. The Court now makes the following findings and
enters this Order for Permanent Injunction ("Order"):

## FINDINGS

1. This Court has subject matter jurisdiction of this case
and personal jurisdiction over Defendants pursuant to 28
U.S.C. §§ 1331, 1337(a), 1345, and 1355, and under 15
U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), 56(a), and
1692*l*(a).

2. Venue is proper in this district under 28 U.S.C. §§
1391(b)(1)–(2), (c)(1)–(2), and (d), and 1395(a), and
15 U.S.C. § 53(b).

3. The activities of Defendants are in or affecting commerce
as "commerce" is defined in Section 4 of the FTC Act, 15
U.S.C. § 44.

4. Defendants CRS and Ford are "debt collectors" as defined
in Section 803(6) of the FDCPA, 15 U.S.C. § 1692a(6).

5. Plaintiff's Complaint alleges that Defendants CRS and
Ford participated in deceptive acts or practices in violation
of Section 5 of the FTC Act, 15 U.S.C. § 45, and in
violation of Section 807 of the FDCPA, 15 U.S.C. § 1692e,
in connection with their debt collection activities.

6. The Complaint states a claim upon which relief may be
granted against Defendant CRS under Sections 5(a), 13(b),
and 16(a)(1) of the FTC Act, 15 U.S.C. §§ 45(a), 53(b)
and 56(a), and under Sections 807 and 814(a) of the
FDCPA, 15 U.S.C. §§ 1692e and 1692*l*(a).

United States v. Commercial Recovery Systems, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 9244671

7. The Complaint states a claim upon which relief may be granted against Defendant Ford under Sections 5(a), 5(m)(1)(A), 13(b), and 16(a)(1) of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b) and 56(a), and under Sections 807 and 814(a) of the FDCPA, 15 U.S.C. §§ 1692e and 1692*l*(a).

8. By Order dated April 7, 2016, the Court granted Plaintiff's Motion for Summary Judgment as to Defendants CRS and Ford. The Court found Defendant CRS violated Section 5 of the FTC Act, 15 U.S.C. § 45(a), and multiple provisions of the FDCPA, 15 U.S.C. §§ 1692–1692*l*, including Sections 807(2), 807(3), 807(4), and 807(5) of the FDCPA, 15 U.S.C. § § 1692e(2), 1692e(3), 1692e(4), and 1692e(5), and, therefore, Defendants are liable for injunctive relief under Section 5 of the FTC Act. (Dkt #69 at 10–12). The Court found Defendant Ford, President and owner of CRS, "by virtue of his management positions and his day-to-day involvement in the company's operations" also subject to injunctive relief and found him liable for civil penalties for FDCPA violations by CRS. (Dkt. #69 at 14–15).

**\*2** 9. Plaintiff has authority under Sections 5(a), 5(m)(1)(A), 13(b), and 16(a), of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), and 56(a), and Sections 807 and 814(a) of the FDCPA, 15 U.S.C. §§ 1692e and 1692*l*(a), to seek, and the Court has the legal authority and equitable power to award, the civil penalty and injunctive relief requested.

10. There is no genuine issue as to any material fact concerning the liability of Defendants CRS and Ford for injunctive relief for deceptive acts and practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), and for violations of the FDCPA, 15 U.S.C. §§ 1692–1692*l*, as alleged in the Complaint.

11. As no material facts are in dispute, Plaintiff is entitled to judgment as a matter of law pursuant to Rule 56(c) of the Federal Rules of Civil Procedure against Defendants CRS and Ford.

12. There is a reasonable likelihood that Defendants CRS and Ford will continue to engage in the same or similar activities alleged in the Complaint unless permanently enjoined from those activities.

13. Entry of this Order for Permanent Injunction as to Defendants CRS and Ford is in the public interest.

14. Defendants CRS and Ford have no claims under the Equal Access to Justice Act, 28 U.S.C. § 2412.

### DEFINITIONS

For the purpose of this Order, the following definitions apply:

A. "**Debt**" means any obligation or alleged obligation to pay money arising out of a transaction, whether or not such obligation has been reduced to judgment.

B. "**Debt collection activities**" means any activity the principal purpose of which is to collect or attempt to collect, directly or indirectly, debts owed, or asserted to be owed, or due.

C. "**Debt collector**" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. The term also includes any creditor who, in the process of collecting its own debts, uses any name other than its own which would indicate that a third person is collecting or attempting to collect such debts. The term also includes any person to the extent such person receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt.

D. "**Defendants**" means both the Individual Defendant and the Corporate Defendant, individually, collectively, or in any combination.

1. "**Corporate Defendant**" means Commercial Recovery Systems, Inc., and its successors and assigns.

2. "**Individual Defendant**" means Timothy L. Ford.

Appx110

Case 4:22-mc-00369   Document 32-1   Filed on 06/06/22 in TXSD   Page 126 of 144

United States v. Commercial Recovery Systems, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 9244671

## ORDER

### I. BAN ON DEBT COLLECTION ACTIVITIES

IT IS THEREFORE ORDERED that Defendants, whether directly or through an intermediary, are permanently restrained and enjoined from:

A. Participating in debt collection activities; and

B. Advertising, marketing, promoting, offering for sale, selling, or buying any consumer or commercial debt or any consumer information relating to a debt.

### II. PROHIBITION AGAINST DECEPTIVE CLAIMS, INCLUDING FALSE AND/ OR UNSUBSTANTIATED CLAIMS

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the sale of any product or service, are permanently restrained and enjoined from:

 **\*3**  A. Making any misrepresentation, or assisting others in making any representation, expressly or by implication:

1. that any person is affiliated with, endorsed or approved by, or otherwise connected to any other person, government entity, or other public or commercial entity, including an attorney's office, law firm, or court system;

2. the nature, expertise, position, or job title of any person who provides any product or service;

3. any other fact material to consumers concerning a product or service, including: the total costs, material restrictions, limitations, conditions, or material aspect of its performance, efficacy, nature, or central characteristics.

B. Making any representation or assisting others in making any representation, expressly or by implication, about the benefits, performance, or efficacy of any product or service, unless the representation is non-misleading, and, at the time such representation is made, Defendants possess and rely upon competent and reliable evidence that is sufficient in quality and quantity based on standards generally accepted in the relevant fields, when considered in light of the entire body of relevant and reliable evidence, to substantiate that the representation is true.

### III. CONSUMER INFORMATION

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from directly or indirectly:

A. Disclosing, using, or benefitting from consumer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a consumer's account (including a credit card, bank account, or other financial account), that any Defendant obtained prior to entry of this Order in connection with third party debt collection; and

B. Failing to destroy such consumer information in all forms in their possession, custody, or control within 30 days after entry of this Order.

*Provided, however*, that consumer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

### IV. ORDER ACKNOWLEDGMENTS

IT IS FURTHER ORDERED that Defendants obtain acknowledgments of receipt of this Order:

A. Each Defendant, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B. For 15 years after entry of this Order, Individual Defendant, for any business that such Defendant, individually or collectively with any other Defendants, is the majority owner or controls directly or indirectly, and Corporate Defendant, must deliver a copy of this Order to: (1) all principals,

Appx111

Case 4:22-mc-00369 Document 32-1 Filed on 06/06/22 in TXSD Page 127 of 144
United States v. Commercial Recovery Systems, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 9244671

officers, directors, and LLC managers and members; (2) all employees, agents, and representatives who participate in conduct related to the subject matter of this Order in Section II; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting. Delivery must occur within 7 days of entry of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities.

 **\*4** C. From each individual or entity to which a Defendant delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

### V. COMPLIANCE REPORTING

IT IS FURTHER ORDERED that Defendants make timely submissions to the Commission:

A. One year after entry of this Order, each Defendant must submit a compliance report, sworn under penalty of perjury:

 1. Each Defendant must: (a) identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission and Plaintiff may use to communicate with Defendant; (b) identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business, including the goods and services offered, the means of advertising, marketing, and sales, and the involvement of any other Defendant (which Individual Defendant must describe if he knows or should know due to his own involvement); (d) describe in detail whether and how that Defendant is in compliance with each Section of this Order; and (e) provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

 2. Additionally, Individual Defendant must: (a) identify all telephone numbers and all physical, postal, email and Internet addresses, including all residences; (b) identify all business activities, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest; and (c) describe in detail such Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership.

B. For 15 years after entry of this Order, each Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

 1. Each Defendant must report any change in: (a) any designated point of contact; or (b) the structure of Corporate Defendant or any entity that any Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

 2. Additionally, each Individual Defendant must report any change in: (a) name, including aliases or fictitious name, or residence address; or (b) title or role in any business activity, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest, and identify the name, physical address, and any Internet address of the business or entity.

C. Each Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D. Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: ___" and supplying the date, signatory's full name, title (if applicable), and signature.

 **\*5** E. Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: *United States v. Commercial Recovery Systems, Inc., X150014.*

### VI. RECORDKEEPING

Appx112

Case 4:22-mc-00369   Document 32-1   Filed on 06/06/22 in TXSD   Page 128 of 144

United States v. Commercial Recovery Systems, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 9244671

IT IS FURTHER ORDERED that Defendants must create certain records for 15 years after entry of the Order, and retain each such record for 5 years. Specifically, Corporate Defendant and Individual Defendant for any business that such Defendant, individually or collectively with any other Defendant, is a majority owner or controls directly or indirectly, must create and retain the following records:

A. accounting records showing the revenues from all goods or services sold;

B. personnel records showing, for each person providing services, whether as an employee or otherwise, that person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C. records of all consumer complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response;

D. all records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission; and

E. a copy of each unique advertisement or other marketing material.

### VII. COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring Defendants' compliance with this Order:

A. Within 14 days of receipt of a written request from a representative of the Commission or Plaintiff, each Defendant must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying. The Commission and Plaintiff are also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69, provided that Defendants, after attempting to resolve a dispute without court action and for good cause shown, may file a motion with this Court seeking an order for one or more of the protections set forth in Rule 26(c).

B. For matters concerning this Order, the Commission and Plaintiff are authorized to communicate directly with each Defendant. Defendant must permit representatives of the Commission and Plaintiff to interview any employee or other person affiliated with any Defendant who has agreed to such an interview. The person interviewed may have counsel present.

C. The Commission and Plaintiff may use all other lawful means, including posing, through its representatives as consumers, suppliers, or other individuals or entities, to Defendants or any individual or entity affiliated with Defendants, without the necessity of identification or prior notice. Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b–1.

D. Upon written request from a representative of the Commission or Plaintiff, any consumer reporting agency must furnish consumer reports concerning Individual Defendant, pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. § 1681b(a)(1).

### VIII. RETENTION OF JURISDICTION

**\*6** IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

### All Citations

Not Reported in Fed. Supp., 2016 WL 9244671

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:22-mc-00369   Document 32-1   Filed on 06/06/22 in TXSD   Page 129 of 144

Wilson v. City of Mission, Texas, Not Reported in Fed. Supp. (2020)

2020 1 W20L3693

2020 WL 2079359
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, McAllen Division.

Steven J. WILSON, Plaintiffs,
v.
CITY OF MISSION, TEXAS and
Teodoro Rodriguez, Jr., Defendants.

Civil Action No. 7:18-cv-00399
|
Signed 04/29/2020
|
Entered 04/30/2020

**Attorneys and Law Firms**

Omar Ochoa, Omar Ochoa Law Firm PC, Jose Manuel Martinez, Attorney at Law, Victor Rodriguez, Jr., Victor Rodriguez Law Firm, McAllen, TX, for Plaintiffs.

Roberto Deodoro Guerra, Ysmael Fonseca, Guerra, Leeds, Sabo & Hernandez, PLLC, McAllen, TX, Heather Scott, Guerra, Leeds, Sabo & Hernandez, PLLC, Brownsville, TX, for Defendants.

## OPINION AND ORDER

Micaela Alvarez, United States District Judge

 **\*1** The Court now considers "Plaintiff's Opposed Motion for Leave to File Second Amended Complaint" [1] and Defendants' response. [2] After considering the motion, record, and relevant authorities, the Court **GRANTS** Plaintiff's motion to amend except to the extent described herein.

## I. BACKGROUND AND PROCEDURAL HISTORY

This case is a civil rights lawsuit seeking recovery for allegedly excessive force used by Mission Police Department officers when they shot an unarmed man in his bedroom on January 9, 2017. [3] The operative complaint, Plaintiff's First Amended Complaint, brings claims against Mission, Texas police officer Teodoro Rodriguez, Jr. under 42 U.S.C. § 1983 and against the City of Mission under the Texas Tort Claims Act. [4]

Plaintiff Steven Wilson is disabled by schizoaffective disorder. [5] On January 9, 2017, Plaintiff "suffered a mental health episode" and the Mission Police Department received calls that Plaintiff "was running naked through the neighborhood." [6] Police officers arrived at Plaintiff's home and found Plaintiff in his locked bedroom lying in his bed. [7] Defendant police officer Rodriguez fired his shotgun at Plaintiff through a window that looked into Plaintiff's bedroom. [8] The shotgun blast severely injured Plaintiff, but Plaintiff survived with permanent injuries after being taken to the hospital. [9] The use of live shotgun ammunition was allegedly a mistake, as Defendant Rodriguez meant to use a nonlethal "beanbag round." [10]

Plaintiff's instant motion now informs the Court that Plaintiff's belief that Defendant Officer Rodriguez shot Plaintiff was error. [11] Plaintiff brought his original complaint in December 2018 [12] and filed his amended complaint in April 2019. [13] Plaintiff represents that "[d]iscovery in this case did not begin until June 2019." [14] Plaintiff learned no later than September 30, 2019, that Officer Jaime Solis was actually the shooter, [15] and Plaintiff moved to amend in December 2019. [16] It turns out that Officer Rodriguez was allegedly the "supervisor in charge of the scene and negligently loaded the wrong type of ammunition in the weapon Officer Solis used." [17] Plaintiff seeks leave to amend to account for new facts, assert supervisor liability against Officer Rodriguez, and amend the Texas Tort Claims Act "claim against the City of Mission to account for Officer Rodriguez's and Officer Solis's respective conduct." [18] Plaintiff relies on the "relation-back doctrine under Rule 15(c)" to account for adding claims and a defendant beyond the statute of limitations. [19]

Defendants oppose Plaintiff's motion for leave to amend. Defendants' central argument is that "[e]ven through his proposed second amended complaint, however, Plaintiff fails to state a claim upon which relief can be granted against the Defendants. Plaintiff has proposed to amend his complaint in an effort to survive otherwise certain dismissal, but such amendments are cosmetic and futile." [20] Defendants also argue that Plaintiff's supervisory claim against Defendant Rodriguez [21] and claims under the Texas Tort Claims Act cannot be brought. [22] The motion is ripe for decision.

Wilson v. City of Mission, Texas, Not Reported in Fed. Supp. (2020)

2020 1 W20L3693

## II. DISCUSSION

### a. Legal Standards

**\*2**  After the deadline for amending a pleading once as a matter of course,[23] "a party may amend its pleading only with the opposing party's written consent or the court's leave."[24] Plaintiffs' First Amended Complaint was filed on April 30, 2019,[25] so the motion for leave to amend in December 2019 is after the 21-day deadline[26] and therefore requires the Court's leave. "Leave to amend is in no way automatic, but the district court must possess a substantial reason to deny a party's request for leave to amend."[27] In determining whether to allow leave to amend a pleading, courts examine whether there is (1) undue delay; (2) bad faith or dilatory motive; (3) repeated failure to cure deficiencies by previous amendments; (4) undue prejudice to the opposing party; and (5) futility of the amendment.[28] As to the fifth factor, the Fifth Circuit has held that that courts "need not indulge in futile gestures. Where a complaint, as amended, would be subject to dismissal, leave to amend need not be granted."[29] Absent such factors, the Court should freely grant the requested leave.[30] Nonetheless, the decision whether to grant leave to amend lies within the Court's sound discretion.[31] "At some point a court must decide that a plaintiff has had a fair opportunity to make his case; if, after that time, a cause of action has not been established," this Court will dismiss the suit.[32]

To determine whether a proposed amended complaint is futile, the Court applies the Federal Rule of Civil Procedure 12(b)(6) standard.[33] Under Rule 12(b)(6), to avoid dismissal, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "[34] The Court accepts all well-pleaded facts as true (even if doubtful or suspect[35]) and views those facts in the light most favorable to the plaintiff, but will not strain to find inferences favorable to the plaintiff.[36] A plaintiff need not plead detailed factual allegations, but must plead more than " 'naked assertion[s] devoid of 'further factual enhancement' " or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" to survive a motion to dismiss.[37] Courts first disregard any conclusory allegations as not entitled to the assumption of truth,[38]

and then undertake the "context-specific" task, drawing on judicial experience and common sense, of determining whether the remaining well-pled allegations give rise to entitlement to relief.[39] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[40] Courts have "jettisoned the [earlier] minimum notice pleading requirement"[41] and the complaint must plead facts that "nudge" the claims "across the line from conceivable to plausible."[42] However, the standard is only "to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success."[43] The Court is limited to assessing only the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which the Court may take judicial notice.[44] Because the focus is on the pleadings, "if, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."[45]

### b. Analysis of Relation-Back of Proposed Amendment

**\*3**  The Court first turns to whether Plaintiff's proposed new claims against police officer Jaime Solis are time-barred by the statute of limitations or are permitted by the relation-back doctrine, because there is no need to examine Plaintiff's allegations against Officer Solis if they cannot be asserted at all. Plaintiff acknowledges that he "seeks to add claims and a defendant beyond the applicable 2-year statute of limitations"[46] so Plaintiff therefore "relies on the relation-back doctrine under Rule 15(c)."[47] Plaintiff argues that he has made an error of misidentification, but the relation-back doctrine permits amendment where the parties are closely related or where notice may be imputed through shared counsel.[48] Plaintiff also argues that the allegations arise out of the same occurrence, Officer Solis will not be prejudiced by the amendment, the nature of claims will not change and the Court will not need to modify the case management schedule, and Officer Solis knew he may be sued because of the shooting.[49] Defendants respond that the proposed amendment is not a mistake or misidentification, that shared counsel does not cure the issue, and that effectively substituting Officer Solis for Officer Rodriguez is impermissible.[50]

Case 4:22-mc-00369  Document 32-1  Filed on 06/06/22 in TXSD  Page 131 of 144
Wilson v. City of Mission, Texas, Not Reported in Fed. Supp. (2020)
2020 1 W20L3693

The relation-back doctrine permits an amended complaint to substitute in place of the original complaint, and thus cure any potential statute of limitations issues, when the doctrine as embodied in Federal Rule of Civil Procedure 15(c) and elaborated upon by the courts is satisfied. [51] Rule 15(c)(1) provides in full:

> An amendment to a pleading relates back to the date of the original pleading when:
>
> (A) the law that provides the applicable statute of limitations allows relation back;
>
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
>
> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

The Fifth Circuit has already held in the context of a 42 U.S.C. § 1983 action that Rule 15(c)(1)(A) is inapplicable. [52] Therefore, "the addition of a new defendant does not relate back to the original complaint unless what is now Rule 15(c)(1)(C) applies." [53] Under that subsection, "Plaintiffs have the burden to demonstrate that an amended complaint relates back under Rule 15(c)." [54] Thus, Plaintiff must satisfy the three elements of the rule: (1) same transaction, (2) notice, and (3) mistake. [55] In other words, under Rule 15(c), the party Plaintiff seeks to bring in by amendment, Officer Solis, must have been involved in the same occurrence as Officer Rodriguez and must have received notice within 90 days [56] of the action and knew or should have known that the case would have been brought against Officer Solis but for Plaintiff's mistake concerning the identity of the officer that shot Plaintiff. [57] The relation-back "rule 'is meant to allow an amendment changing the name of a party to relate back to the original complaint only if the change is the result of an error,

such as a misnomer or misidentification.' " [58] The inquiry thus turns on "what the prospective defendant reasonably should have understood about the plaintiff's intent in filing the original complaint." [59]

**\*4** Defendants do not dispute that the proposed amendment satisfies the first element, Rule 15(c)(1)(B). [60] Plaintiff's proposed amendment arises from the same occurrence and merely seeks to substitute Officer Solis for Officer Rodriguez in the same set of allegations. [61]

Defendants also do not appear to dispute the second element, notice, under Rule 15(c)(1)(C)(i). [62] The notice element in this context may be satisfied by actual awareness of the issues in the complaint, [63] or by an "identity of interest between the original defendant and the defendant sought to be added or substituted," which means "the parties are so closely related in their business operations or other activities that the institution of an action against one serves to provide notice of the litigation to the other. In this regard, notice may be imputed to the new party through shared counsel." [64] Officer Solis testified that he was aware of the shooting issue and knew that he may be sued within approximately 60 days after the incident. [65] Defendants do not object to this testimony. [66] Further, Plaintiff argues that "Officer Solis will not be prejudiced because the same counsel that have been representing the City of Mission and Officer Rodriguez will be representing him," [67] and Defendants do not object. [68] Indeed, the same attorneys represented Defendant City of Mission and Defendant Rodriguez, in addition to a police officer now dismissed from this proceeding and "Unknown Mission Police Officers," at an earlier stage of this case. [69] Furthermore, all police officers were served at the same address, [70] which supports the inference of adequate notice to Officer Solis. [71] Lastly, Officers Rodriguez and Solis share an identity of interest as police officers with the same city police department, which further supports an inference of adequate notice. [72] There is no obvious reason that Officer Solis has not received adequate notice or will be prejudiced by joinder, and Defendants point to none. Officer Solis will be entitled to raise all appropriate defenses.

Defendants dispute that Plaintiffs can satisfy the third element, mistake, under Rule 15(c)(1)(C)(ii). [73] Defendants argue that "failing to identify individual defendants cannot

Wilson v. City of Mission, Texas, Not Reported in Fed. Supp. (2020)

2020 1 W20L3693

be characterized as a mistake." [74] The Fifth Circuit held in *Jacobsen v. Osborne* that "[a] failure to name the correct defendant due to a lack of knowledge of the proper party is not a mistake and will not allow a plaintiff to avail itself of the relation back doctrine." [75] However, the Supreme Court has abrogated this holding. [76] The relevant passage is as follows:

> **\*5** By focusing on [Plaintiff] Krupski's knowledge, the Court of Appeals chose the wrong starting point. The question under Rule 15(c)(1)(C)(ii) is not whether Krupski knew or should have known the identity of [Defendant] Costa Crociere as the proper defendant, but whether Costa Crociere knew or should have known that it would have been named as a defendant but for an error. Rule 15(c)(1)(C)(ii) asks what the prospective *defendant* knew or should have known during the Rule 4(m) period, not what the *plaintiff* knew or should have known at the time of filing her original complaint. Information in the plaintiff's possession is relevant only if it bears on the defendant's understanding of whether the plaintiff made a mistake regarding the proper party's identity. For purposes of that inquiry, **it would be error to conflate knowledge of a party's existence with the absence of mistake**. [77]

With this holding, the Supreme Court resolved a circuit split and repudiated, among other cases, Second and Seventh Circuit precedent holding that a plaintiff's knowledge or lack of knowledge is dispositive of the Rule 15(c)(1)(C)(ii) "mistake" inquiry. [78] Those Second and Seventh Circuit precedents are the cases the *Jacobsen* Court relied upon to reach its holding that failure to name the correct defendant because of a lack of knowledge is not a permissible mistake. [79]

Accordingly, the *Jacobsen* analysis that Defendants urge is not the appropriate inquiry. Instead, the Supreme Court articulated the considerations that must guide this Court's decision:

> We agree that making a deliberate choice to sue one party instead of another while fully understanding the factual and legal differences between the two parties is the antithesis of making a mistake concerning the proper party's identity. We disagree, however, with respondent's position that any time a plaintiff is aware of the existence of two parties and chooses to sue the wrong one, the proper defendant could reasonably believe that the plaintiff made no mistake. The reasonableness of the mistake is not itself at issue. As noted, a plaintiff might know that the prospective defendant exists but nonetheless harbor a misunderstanding about his status or role in the events giving rise to the claim at issue, and she may mistakenly choose to sue a different defendant based on that misimpression. That kind of deliberate but mistaken choice does not foreclose a finding that Rule 15(c)(1)(C)(ii) has been satisfied. [80]

In light of these considerations, the Court must ascertain whether Plaintiff (1) deliberately chose to sue Officer Rodriguez and not other parties, thus foreclosing a relation-back amendment under the "mistake" element, or (2) mistakenly chose to sue Officer Rodriguez based on a misimpression of Officer Rodriguez's role in the events giving rise to Plaintiff's claim. If Officer Solis "legitimately believed that the limitations period had passed without any attempt to sue him," then he would have "a strong interest in repose" that Rule 15(c) would protect by denying a relation-back amendment. [81]

**\*6** Defendants recognize the possibility of a relation-back amendment and admit that, "[h]ad Plaintiff misnamed Officer Solis as Officer Rodriguez, or the other way around, the proposed amendment would squarely fit into the law

Appx117

Wilson v. City of Mission, Texas, Not Reported in Fed. Supp. (2020)

2020 1 W20L3693

enunciated by Rule 15(c)." [82] Defendants argue, "[h]owever, [that] where Plaintiff failed to timely bring a claim against the correct defendant or lacked the ability to identify the correct Defendant, and used the good name of Officer Rodriguez to essentially serve as 'John Doe,' Rule 15(c) provides no remedy." [83] Defendants correctly recognize that the use of "Unknown Defendants" or "John Does" in a complaint cannot serve as placeholders for Plaintiff to later substitute in real Defendants identified through discovery after the statute of limitations has passed. [84] Suing a "John Doe" is an intentional choice that forecloses a finding of mistake. [85] However, although Plaintiff originally brought claims against "Unknown Mission Police Officers," Plaintiff dismissed the unknown Defendants in his first motion for leave to file an amended complaint. [86] Here, Plaintiff does not seek to maintain claims against Officer Rodriguez and also substitute in Officer Solis where a "John Doe" once stood, but instead Plaintiff seeks to correct the mistaken belief that Officer Rodriguez shot Plaintiff. [87] Although Plaintiff cannot sue "unknown officers" and "use these 'John Doe' claims to now substitute in [Officer Solis] after the limitations period," [88] Plaintiff here deliberately but mistakenly chose to sue Officer Rodriguez based on the misimpression that Officer Rodriguez was the shooter. [89]

As the Fifth Circuit has recognized, the purpose of Rule 15 is not to "[squelch] a legitimate legal claim...by a party mistakenly identifying the party to be sued." [90] The Court is to "take a 'sensible approach to reading a complaint so that suits may be maintained regardless of technical pleading errors' " and consider Rule 15(c)'s purpose to "help, not hinder, persons who have a legal right to bring their problems before the courts." [91] As the Supreme Court stated, Rule 15 is biased toward resolution of disputes on their merits because "repose would be a windfall for a prospective defendant who understood, or who should have understood, that he escaped suit during the limitations period only because the plaintiff misunderstood a crucial fact about his identity." [92] Here, Officer Solis testified that, in the words of Rule 15(c)(1)(C)(ii), he "knew or should have known that the action would have been brought against [him], but for a mistake concerning the proper party's identity:"

> Q Okay. So about [two] months after the incident is when you learned that it was a breach round instead of a bean bag round [that was fired at Plaintiff]? A [by Officer Jaime Solis] Yes.

Q And at that point, you were concerned about a lawsuit? A Yes.

Q And you thought you might be involved in a lawsuit? A Correct. [93]

Thus, Officer Solis has no strong interest in repose. Officer Solis knew or should have known that a lawsuit bringing claims against Plaintiff's shooter should have named him but for a mistake of identity because the original complaint and amended complaint made clear that Plaintiff intended to sue the shooter. [94] Where a complaint makes a "mistake concerning the proper party's identity" and incorrectly alleges that a Defendant performed the actions or role alleged, amendment should be permitted to substitute in the correct Defendant. [95] In light of Rule 15's bias to resolving issues on the merits, Officer Solis's awareness of the issues and diminished interest in repose, and Plaintiff's claims against Officer Rodriguez based on Plaintiff's "misunderstanding about his status or role in the events giving rise to the claim at issue," [96] the Court holds that Plaintiff may amend his complaint to bring allegations and claims for relief against Officer Solis and that such amendment will relate-back to the date of the original pleading under Federal Rule of Civil Procedure 15(c) and therefore will not be barred by the statute of limitations. The Court will consider the proposed amended complaint to the extent it relates to Officer Solis.

### c. Analysis of Proposed Amended Complaint

**\*7** Plaintiff argues that the amended complaint merely represents an attempt to conform his pleading to the discovery, and that the five warning factors militating against amendment are not present. [97] Defendants respond that Plaintiff's proposed amendment would be futile and fail to state a claim, and that other warning factors are present. [98]

### 1. Supervisory Liability Claim as to Defendant Rodriguez

Defendants first oppose Plaintiff's attempt to bring a supervisory liability claim under 42 U.S.C. § 1983 against Defendant Rodriguez. [99] Defendants argue that Plaintiff alleges neither the personal involvement of Defendant Rodriguez in the alleged deprivation of Plaintiff's constitutional right to be free of excessive force nor a causal

Wilson v. City of Mission, Texas, Not Reported in Fed. Supp. (2020)

2020 1 W20L3693

connection between Defendant Rodriguez's conduct and the allegedly wrongful actions or any deliberate indifference to the same. [100] Plaintiff argues that Defendant Rodriguez gave a weapon to Officer Solis and gave a direct order to apprehend Plaintiff, which evinces deliberate indifference to Plaintiff's constitutional rights. [101]

"A supervisor cannot be held liable under 🔖 section 1983 on the basis of *respondeat superior*." [102] "A supervisory official may be held liable...only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." [103] To establish a claim under the first possibility, "the misconduct of the subordinate must be affirmatively linked to the action or inaction of the supervisor." [104] Furthermore, "[i]n order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates." [105] " 'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." [106] "Deliberate indifference describes a state of mind more blameworthy than negligence...[but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." [107] "The 'deliberate indifferent' requirement permits courts to separate omissions that 'amount to an intentional choice' from those that are merely 'unintentionally negligent oversight[s].' " [108] Deliberate indifference can manifest in a failure to train, [109] but Plaintiff is not bringing a failure-to-train claim against Defendant Rodriguez. [110]

**\*8** Plaintiff alleges in the proposed amended complaint that City of Mission police officers responded to calls about Plaintiff's mental health episode and entered Plaintiff's home, then determined that Plaintiff was in his bedroom. [111] "For several hours, officers attempted to make contact with [Plaintiff] Steven [Wilson], but were met with continued silence." [112] Hours into this scene, Defendant Rodriguez arrived at the home and took control of the scene as the commanding officer. [113] Officer Rodriguez determined that Plaintiff needed to be extracted from his bedroom, so

Officer Rodriguez left the home and went to the Mission police department to obtain "less-than-lethal" weaponry to extract Plaintiff. [114] While at the police station, Officer Rodriguez loaded a shotgun with a "breaching round," which is deadly if fired at a person. [115] Officer Rodriguez then returned to Plaintiff's home and "gave the 'less-than-lethal' shotgun loaded with a 'breaching round' to Officer Solis." [116] Officer Rodriguez then ordered other police officers to break an exterior window into Plaintiff's bedroom. [117] Officer Rodriguez used the broken exterior window to see that Plaintiff was lying unarmed in bed and was not responsive to communication, and "Officer Rodriguez then ordered Officer Solis and other officers to breach the door to Steven's bedroom and to extract Steven from the room." [118] In another part of the proposed amendment, Plaintiff alleges that Officer Rodriguez's ordered Officer Solis "to apprehend Steven and gain Steven's compliance by whatever means necessary, including the use of deadly force." [119] After the order, "Officer Solis entered Steven's bedroom" and allegedly shot Plaintiff without provocation with the shotgun that Officer Rodriguez had loaded and given to Officer Solis to use. [120] Plaintiff argues that Officer Rodriguez gave his subordinate, Officer Solis, "a direct order to apprehend Plaintiff using whatever means necessary, including deadly force," and that such are the grounds for supervisory liability under 🔖 42 U.S.C. § 1983. [121] Defendants point out that Plaintiff's allegations do not involve a direct order to shoot Plaintiff, and no causal connection exists between Defendant Rodriguez ordering officers to breach the door and extract Plaintiff and the alleged excessive force, and Plaintiff has not alleged that Defendant Rodriguez disregarded a known or obvious consequence of his alleged action. [122]

On the facts alleged here, the Court agrees with Plaintiff. Plaintiff's proposed amended complaint alleges that Officer Rodriguez knew Plaintiff was alone, unarmed, lying in his bed, and not responsive to attempted communication. [123] Plaintiff alleges "[t]here was no emergent situation that threatened life or bodily harm of any person, either police officer or civilian. Steven did nothing to provoke or intimidate" the officers. [124] Despite these circumstances, Officer Rodriguez ordered Officer Solis "to apprehend Steven and gain Steven's compliance by whatever means necessary, including the use of deadly force." [125] Taking all of Plaintiff's allegations as true and drawing all reasonable inferences in Plaintiff's favor, irrespective of whether Plaintiff will

Case 4:22-mc-00369 Document 32-1 Filed on 06/06/22 in TXSD Page 135 of 144

Wilson v. City of Mission, Texas, Not Reported in Fed. Supp. (2020)

2020 1 W20L3693

ultimately be able to prove his claims, the Court finds that Officer Rodriguez's specific reference to use "deadly force," taken together with the otherwise unprovoked circumstances, evinces Officer Rodriguez's order's deliberate indifference to Plaintiff's constitutional rights. Officer Rodriguez handing Officer Solis a shotgun, then ordering Officer Solis to contemplate the use of deadly force to gain compliance by whatever means necessary is sufficient to affirmatively link Officer Solis's alleged misconduct in using the shotgun with Officer Rodriguez's order. Therefore, the proposed amended complaint would not be futile. The Court **GRANTS** Plaintiff's motion for leave to file an amended complaint to the extent that Plaintiff sets forth allegations and claims under 42 U.S.C. § 1983 against Defendant Teodoro Rodriguez for supervisory liability.

### 2. Texas Tort Claims Act Claims

Defendants argue that all of Plaintiff's claims under the Texas Tort Claims Act in the proposed amended complaint are futile. [126] Defendants first argue that Plaintiff brings an intentional tort claim, but the Defendant City of Mission enjoys sovereign immunity that forecloses an intentional tort claim against the city. [127] Furthermore, Defendants argue that Defendant City of Mission is entitled to receive notice of a claim not later than 6 months after the incident giving rise to the claim, and because Plaintiff failed to tender the requisite notice, the claim is jurisdictionally barred. [128]

With respect to notice, section 101.101 of the Texas Tort Claims Act entitles a governmental unit to receive notice not later than 6 months after the incident that may give rise to a Texas Tort Claims Act claim. [129] The notice must describe: "(1) the damage or injury claimed; (2) the time and place of the incident; and (3) the incident." [130] Failure to give the required notice precludes a waiver of sovereign immunity and will jurisdictionally bar claims against a governmental unit, such as a city or municipality. [131] Actual notice is sufficient "when the governmental unit has knowledge of the injury, its alleged or possible fault producing or contributing to the injury, and the identity of the person injured," but "[m]ere notice that an incident has occurred is not enough to establish actual notice." [132]

*9 Plaintiff makes no argument that he has satisfied the notice requirement of the Texas Tort Claims Act. [133]

Plaintiff's original complaint was filed on December 18, 2018, complaining of an incident on January 9, 2017, [134] so the complaint cannot satisfy the 6-month notice requirement. Plaintiff's original complaint alleges that "[h]eretofore and on or about January 09, 2017 Defendants acquired actual notice of the injuries and potential claims of the Plaintiff pursuant to the law in these matters," [135] but the allegation is conclusory and not entitled to the presumption of truth [136] because it states no facts of how Defendants acquired notice. The operative First Amended Complaint alleges "[t]he City had knowledge of Steven's injuries, knew that Officer Rodriguez's conduct caused the injuries, and knew the identity of the Officer and the type of equipment involved. Thus, written notice from Steven was not required." [137] The proposed amended complaint is substantially identical. [138] However, the allegation is also conclusory and will be disregarded for the same reason. The Court has not been presented with sufficient information to determine that the notice requirement of section 101.101 has been fulfilled. Furthermore, the Court finds that the mere fact of the shooting itself is insufficient to satisfy the notice requirement. If such were the case, the notice requirement would be nullified in all such cases.

Accordingly, the Court agrees with Defendants that Plaintiff's claim against Defendant City of Mission is barred by official immunity. [139] The Court **DENIES** Plaintiff's motion for leave to amend to the extent any proposed amendment would attempt to assert claims against the City of Mission. The Court has no occasion to reach the arguments with respect to waiver of sovereign immunity under the Texas Tort Claims Act in connection with negligent or intentional acts and makes no determination.

### 3. Undue Delay

Defendants' brief contains a subsection under the Texas Tort Claims Act entitled "Undue Delay," wherein Defendants argue that Plaintiff's entire motion for leave to file an amended complaint should be denied for reasons of delay. [140] Undue delay is one of the warning factors that militates against permitting Plaintiff to file an amended complaint. [141] Defendants contend that "Plaintiff's second amended complaint would constitute an undue delay, and Defendants should not burdened in the context of a set of amendments that could and should have been asserted

Wilson v. City of Mission, Texas, Not Reported in Fed. Supp. (2020)

2020 1 W20L3693

initially." [142] Plaintiff asserts that his proposed amendment has not been unduly delayed because "Plaintiff did not become aware that Officer Solis was the shooter until he was able to conduct discovery in this case, including Officer Solis's deposition." [143] Plaintiff chose to wait until discovery had been substantially completed to move for leave to amend his complaint, [144] and "[s]ince written discovery has been substantially completed, Plaintiff does not anticipate amending the claims further." [145] Defendants respond that Plaintiff "certainly knew of all relevant facts and theories supporting his proposed amendments since the inception of the cause of action, as the events giving rise to his claim occurred on January 9, 2017, and his Original Complaint was filed on December 18, 2018." [146]

"Liberality in pleading does not bestow on a litigant the privilege of neglecting her case for a long period of time." [147] In considering whether the proposed amendment arrives after "undue delay," the Court "may properly consider (1) an unexplained delay following an original complaint, and (2) whether the facts underlying the amended complaint were known to the party when the original complaint was filed." [148]

Here, Plaintiff represents that discovery did not begin in this case until June 2019. [149] Plaintiff deposed Officer Solis in September 2019 [150] and waited until discovery was substantially complete to move to amend in December 2019. [151] This case contrasts starkly with the precedent Defendants urge the Court to apply. In that case, the plaintiff "sought leave to add both a fact of which it had been aware since before it filed its original complaint and a cause of action based on the identical, known facts that underlie its original complaint" which the plaintiff knew about some 24 months before filing its original complaint. [152] The Fifth Circuit affirmed the lower court's "discretionary determination that allowing [plaintiff] to amend its complaint would not further the purposes of Rule 15, but to the contrary would serve only to reward [plaintiff] for its unreasonable delay." [153]

**\*10** In this case, Plaintiff learned no later than September 30, 2019, that Officer Jaime Solis was actually the shooter, [154] and Plaintiff moved to amend in December 2019 based on new information. [155] Plaintiff also represents that, even as late as April 2019, "he and...counsel mistakenly believed Officer Rodriguez shot Plaintiff....Plaintiff did not have the

means necessary to learn that Officer Rodriguez was not the shooter." [156]

The Court is unpersuaded that Plaintiff acted with undue delay. Plaintiff moved within 6 months since the beginning of discovery to amend his complaint to account for new facts that Plaintiff did *not* know at the inception of this case. Unlike the precedent in the *Southmark* case that Defendants urge, Plaintiff was not aware of all relevant facts at the time of filing the original complaint. Furthermore, the Court is disinclined to punish Plaintiff for waiting until the substantial close of discovery, when Plaintiff anticipates no further amendment, [157] to move for leave to amend because the Court does not favor repeated amendments.

Even if the Court were to find undue delay, Defendants do not contend that any of the other warning factors militating against leave to amend are present. [158] As earlier discussed, Rule 15 is biased toward resolving claims on their merits. [159] Accordingly, even if the Court found undue delay, the Court would not necessarily deny leave to amend given its examination of the other warning factors. Because Defendants do not urge rejection of Plaintiff's motion for leave to amend based on the other four warning factors, except as already discussed, the Court has no occasion to consider them and makes no determination.

*4. Dismissal on Other Grounds*

As noted above, Defendants assert that "Plaintiff's claims under the Texas Tort Claims Act are also futile." [160] Defendants pray "that this Court deny Plaintiff's Opposed Motion for Leave to File Second Amended Complaint in its entirety." [161] However, Defendants make no argument as to the futility of any other claims beyond those already discussed, or any argument as to why Plaintiff's other claims should be dismissed or denied from a proposed amendment. Federal courts are "not merely a repository into which an appellant may 'dump the burden of argument and research,' nor is it the obligation of this court to act as an advocate." [162] This Court is entitled to have issues clearly defined; arguments asserted without citation to authority or left undeveloped are waived. [163] "Judges are not like pigs, hunting for truffles buried in briefs." [164] Accordingly, Plaintiff's motion for leave to amend will be **GRANTED** to the extent that Defendants fail to develop argument in

Wilson v. City of Mission, Texas, Not Reported in Fed. Supp. (2020)

2020 1 W20L3693

opposition, which will be taken as a representation of no opposition. [165]

### III. CONCLUSION

**\*11**  For all of the foregoing reasons, the Court **GRANTS** Plaintiff's motion for leave to amend except to the extent any proposed amendment would attempt to assert claims against the City of Mission. The Court instructs Plaintiff to file a Second Amended Complaint on this Court's docket consistent with this opinion and order no later than **May 8, 2020**.

IT IS SO ORDERED.

DONE at McAllen, Texas, this 29th day of April 2020.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 2079359

## Footnotes

| | |
|---|---|
| 1 | Dkt. No. 29. |
| 2 | Dkt. No. 30. |
| 3 | *See* Dkt. No. 21. |
| 4 | Dkt. No. 22 at 1, ¶ 1. (The facts set out herein are as alleged by Plaintiff) |
| 5 | *Id.* ¶ 2. |
| 6 | *Id.* at 2, ¶ 9. |
| 7 | *Id.* at 2–3, ¶ 11. |
| 8 | *Id.* at 3, ¶ 13. |
| 9 | *Id.* ¶¶ 14–16. |
| 10 | *Id.* at 5, ¶¶ 21–22. |
| 11 | Dkt. No. 29 at 1, ¶ 2. |
| 12 | Dkt. No. 1. |
| 13 | Dkt. No. 22. |
| 14 | Dkt. No. 29 at 1, ¶ 3. |
| 15 | *See* Dkt. No. 29-2. |
| 16 | Dkt. No. 29. |
| 17 | *Id.* at 2, ¶ 3. |
| 18 | *Id.* at 2, ¶ 4. |
| 19 | *Id.* ¶ 5. |

2020 1 W20L3693

20    Dkt. No. 30 at 2, ¶ 1.

21    *Id.* at 3, ¶ 5.

22    *Id.* at 9, ¶ 13.

23    *See* FED. R. CIV. P. 15(a)(1).

24    FED. R. CIV. P. 15(a)(2).

25    Dkt. No. 22.

26    Dkt. No. 29.

27    *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014) (quotation omitted).

28    *SGK Props., L.L.C. v. U.S. Bank Nat'l Ass'n*, 881 F.3d 933, 944 (5th Cir.) (quoting *Smith v. EMC Corp.*, 393 F.3d

      590, 595 (5th Cir. 2004)), *cert. denied*, 139 S. Ct. 274 (2018).

29    *United States ex rel. Jackson v. Univ. of N. Tex.*, 673 F. App'x 384, 388 (5th Cir. 2016) (quoting *DeLoach v. Woodley*, 405 F.2d 496, 496–97 (5th Cir. 1968) (per curiam)).

30    *Foman v. Davis*, 371 U.S. 178, 182 (1962).

31    *Smith*, 393 F.3d at 595 (quoting *Quintanilla v. Tex. Television, Inc.*, 139 F.3d 494, 499 (5th Cir. 1998)).

32    *Gentilello v. Rege*, 627 F.3d 540, 546 (5th Cir. 2010) (quoting *Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986)).

33    *Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 873 (5th Cir. 2000).

34    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

35    *Twombly*, 550 U.S. at 555–56.

36    *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008).

37    *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see also id.* at 679 (holding that a complaint that "do[es] not permit the court to infer more than the mere possibility of misconduct" does not suffice to state a claim).

38    *Mustapha v. HSBC Bank USA, NA*, No. 4:11-CV-0428, 2011 WL 5509464, at *2 (S.D. Tex. Nov. 10, 2011) (Hanks, J.) ("[A] court is not required to accept conclusory legal allegations cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged.").

Wilson v. City of Mission, Texas, Not Reported in Fed. Supp. (2020)

2020 1 W20L3693

39    *Iqbal*, 556 U.S. at 678–79; *see also* *Fernandez-Montez v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss").

40    *Iqbal*, 556 U.S. at 678.

41    *St. Germain v. Howard*, 556 F.3d 261, 263 n.2 (5th Cir. 2009).

42    *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570).

43    *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010))

44    *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008).

45    FED. R. CIV. P. 12(d).

46    *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.003 (West 2020).

47    Dkt. No. 29 at 2, ¶ 5.

48    *Id.* at 3, ¶ 7.

49    *Id.* at 7–8, ¶¶ 18–20.

50    Dkt. No. 30 at 6–9, ¶¶ 8–12.

51    *See* *Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 926 F. Supp. 2d 935, 946 (S.D. Tex. 2013) (Harmon, J.) (citing *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538 (2010)).

52    *See* *Balle v. Nueces Cty.*, 952 F.3d 552, 557 (5th Cir. 2017).

53    *Ultraflo Corp.*, 926 F. Supp. 2d at 946 (citing *Braud v. Transp. Serv. Co. of Ill.*, 445 F.3d 801, 806 (5th Cir. 2006)).

54    *Al-Dahir v. FBI*, 454 F. App'x 238, 242 (5th Cir. 2011).

55    *See* *Jacobsen v. Osborne*, 133 F.3d 315, 320 (5th Cir. 1998).

56    *See* FED. R. CIV. P. 4(m).

57    *Al-Dahir*, 454 F. App'x at 242.

58    *Balle v. Nueces Cty.*, 952 F.3d 552, 557 (5th Cir. 2017) (quoting *Jacobsen*, 133 F.3d at 320).

59    *Id.* (quoting *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 554 (2010)).

60    *See* Dkt. No. 30 at 5–7, ¶¶ 7–10.

Case 4:22-mc-00369   Document 32-1   Filed on 06/06/22 in TXSD   Page 140 of 144

Wilson v. City of Mission, Texas, Not Reported in Fed. Supp. (2020)

2020 1 W20L3693

61      *See* Dkt. No. 29 at 2, ¶¶ 3–4.

62      *See* Dkt. No. 30 at 7–9, ¶¶ 10–12.

63      🚩 *Sanders-Burns v. City of Plano*, 594 F.3d 366, 378 (5th Cir. 2010).

64      🚩 *Jacobsen v. Osborne*, 133 F.3d 315, 320 (5th Cir. 1998) (internal quotation marks and citations omitted).

65      Dkt. No. 29-2 at 40, 159:7–160:8.

66      *See* Dkt. No. 30 at 6–7, ¶ 9. Defendants argue that, even if shared counsel is present, the "mistake" element remains. *Id.* Although Federal Rule of Civil Procedure 12(d) requires the Court to convert a motion to dismiss into a motion for summary judgment if the Court considers matters outside the pleadings, Rule 15 has no such requirement.

67      Dkt. No. 29 at 7, ¶ 19.

68      *See* Dkt. No. 30 at 6–7, ¶¶ 7–10.

69      *See* Dkt. No. 7 at 21–22.

70      Dkt. No. 4.

71      *See Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 926 F. Supp. 2d 935, 955 (S.D. Tex. 2013) (citing 🚩 *Norton v. Int'l Harvester Co.*, 627 F.2d 18, 21 (7th Cir. 1980) & 🚩 *Sanders-Burns v. City of Plano*, 594 F.3d 366, 378 (5th Cir. 2010)).

72      *See Quinn v. Guerrero*, 863 F.3d 353, 363 (5th Cir. 2017) (noting the existence of a "shared identity of interest between the officers and the City").

73      *See* Dkt. No. 30 at 5–9, ¶¶ 7–12.

74      *Id.* at 7, ¶ 10 (quoting 🚩 *Jacobsen v. Osborne*, 133 F.3d 315, 321 (5th Cir. 1998) (quoting 🚩 *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 470 (2nd Cir. 1995))).

75      *Ultraflo Corp.*, 926 F. Supp. 2d at 947 (citing 🚩 *Jacobsen*, 133 F.3d at 321).

76      3 EDWARD SHERMAN & MARY P. SQUIERS, MOORE'S FEDERAL PRACTICE – CIVIL § 15.19[3][d] nn.42–44 and accompanying text (Supp. March 2020), *cited with approval in* 🚩 *Sanders-Burns v. City of Plano*, 594 F.3d 366, 377, 379 (5th Cir. 2010).

77      🚩 *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 548 (2010) (bold emphasis added).

78      SHERMAN & SQUIERS, *supra* note 76, § 15.19[3][d] n.42.

79      🚩 *Jacobsen v. Osborne*, 133 F.3d 315, 321 (5th Cir. 1998) (quoting 🚩 *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 470 (2d Cir. 1995) & 🚩 *Worthington v. Wilson*, 8 F.3d 1253, 1257 (7th Cir. 1993)).

80      🚩 *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 549 (2010).

Case 4:22-mc-00369   Document 32-1   Filed on 06/06/22 in TXSD   Page 141 of 144
Wilson v. City of Mission, Texas, Not Reported in Fed. Supp. (2020)
2020 1 W20L3693

81   *Id.*

82   Dkt. No. 30 at 9, ¶ 12.

83   *Id.*

84   *See* ⚑ *Whitt v. Stephens Cty.*, 529 F.3d 278, 283 (5th Cir. 2008) ("[A]n amendment to substitute a named party for a John Doe does not relate back under rule 15(c)."); *accord* ⚑ *Balle v. Nueces Cty.*, 952 F.3d 552, 557 (5th Cir. 2017); *Winzer v. Kaufman Cty.*, 916 F.3d 464, 471 (5th Cir. 2019) ("Thus, to the extent Appellants sued 'unknown officers,' they cannot use these 'John Doe' claims to now substitute in Cuellar and Huddleston after the limitations period.").

85   ⚑ *Heglund v. Aitkin Cty.*, 871 F.3d 572, 580 (8th Cir. 2017) ("The [John Doe] device accurately conveyed that the [plaintiffs] did not know [the proposed new defendant's] identity. The statement was not the result of a misunderstanding or misconception; it was an intentional misidentification, not an unintentional error, inadvertent wrong action, or 'mistake.' "); ⚑ *Smith v. City of Akron*, 476 F. App'x 67, 69 (6th Cir. 2012) ("The Rule allows relation back for the mistaken identification of defendants, not for defendants to be named later through 'John Doe,' 'Unknown Defendants' or other missing appellations.").

86   *See* Dkt. No. 20.

87   Dkt. No. 29 at 1, ¶ 2.

88   *Winzer*, 916 F.3d at 471 (citing ⚑ *Whitt*, 529 F.3d at 282–83).

89   Dkt. No. 29 at 1–2, ¶¶ 2–4.

90   ⚑ *Sanders-Burns v. City of Plano*, 594 F.3d 366, 379 (5th Cir. 2010) (quoting SHERMAN & SQUIERS, *supra* note 76, § 15.19[3][d]).

91   *Id.* at 380 (quoting ⚑ *Hill v. Shelander*, 924 F.2d 1370, 1373–75 (7th Cir. 1991)).

92   ⚑ *Krupski*, 560 U.S. at 550; *see also id.* ("Because a plaintiff's knowledge of the existence of a party does not foreclose the possibility that she has made a mistake of identity about which that party should have been aware, such knowledge does not support that party's interest in repose.").

93   Dkt. No. 29-2 at 40, 159:18–160:2.

94   *See* Dkt. No. 1 at 4–5, ¶¶ 12, 20; Dkt. No. 22 at 3–4, ¶¶ 12, 17.

95   *See* ⚑ *Krupski*, 560 U.S. at 554–55.

96   *Id.* at 550.

97   Dkt. No. 29 at 4–10, ¶¶ 8–26.

98   Dkt. No. 30 at 4–5, ¶¶ 5–6 & 9–12, ¶¶ 13–19.

99   *Id.* at 3, ¶ 5.

2020 1 W20L3693

100   *Id.* at 5, ¶ 6.

101   Dkt. No. 29 at 6, ¶ 16.

102   🚩 *Southard v. Tex. Bd. of Crim. Justice*, 114 F.3d 539, 550 (5th Cir. 1997) (citations omitted).

103   2 (quoting 🚩⚠ *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)).

104   🚩 *Southard v. Tex. Bd. of Crim. Justice*, 114 F.3d 539, 550 (5th Cir. 1997).

105   *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (alterations and emphasis in original) (quoting 🚩⚠ *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 435 (5th Cir. 2008))

106   🚩 *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997).

107   🚩 *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

108   🚩 *Gonzalez v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 756 (5th Cir. 1993) (alterations in original) (quoting 🚩 *Rhyne v. Henderson Cty.*, 973 F.2d 386, 392 (5th Cir. 1992)).

109   *See Porter*, 659 F.3d at 446.

110   *See* Dkt. No. 29 at 6, ¶¶ 15–16 & Pl.'s Second Am. Compl., Dkt. No. 29-1, ¶¶ 14, 26.

111   Dkt. No. 29-1 at 2–3, ¶¶ 10–12.

112   *Id.* at 3, ¶ 12.

113   *Id.* ¶ 13.

114   *Id.*

115   *Id.*

116   *Id.* ¶ 14.

117   *Id.*

118   *Id.* at 3–4, ¶¶ 14–15.

119   *Id.* at 5, ¶ 20.

120   *Id.* at 3–4, ¶¶ 14–15.

121   Dkt. No. 29 at 6, ¶ 16.

122   Dkt. No. 30 at 5, ¶ 6.

123   Dkt. No. 29-1 at 3, ¶ 14.

124   *Id.* at 5, ¶ 19.

2020 1 W20L3693

125    *Id.* ¶ 20.

126    Dkt. No. 30 at 9, ¶ 13.

127    Dkt. No. 30 at 10, ¶¶ 13–14.

128    *Id.* at 11, ¶ 15.

129    TEX. CIV. PRAC. & REM. CODE ANN. § 101.101 (West 2020).

130    *Id.* § 101.101(a).

131    ⚑ *Putthoff v. Ancrum*, 934 S.W.2d 164, 174 (Tex. App.—Fort Worth 1996, writ denied).

132    *Id.* at 173.

133    *See* Dkt. No. 29.

134    Dkt. No. 1 at 3, ¶ 7.

135    *Id.* at 7, ¶ 33.

136    *See supra* notes 38–39 and accompanying text.

137    Dkt. No. 22 at 5, ¶ 24.

138    Dkt. No. 29-1 at 7, ¶ 28.

139    *See* ⚑ *Putthoff v. Ancrum*, 934 S.W.2d 164, 174 (Tex. App.—Fort Worth 1996, writ denied).

140    Dkt. No. 30 at 11–12, ¶¶ 16–19.

141    *See supra* note 28 and accompanying text.

142    Dkt. No. 30 at 12, ¶ 18.

143    Dkt. No. 29 at 9, ¶ 23.

144    *Id.*

145    *Id.* at 4, ¶ 9.

146    Dkt. No. 30 at 12, ¶ 18.

147    ⚑ *In re Southmark Corp.*, 88 F.3d 311, 315–16 (5th Cir. 1996) (quoting ⚑ *Daves v. Payless Cashways, Inc.*, 661 F.2d 1022, 1025 (5th Cir. 1981)).

148    *Id.* at 316 (quotations and footnotes omitted).

149    Dkt. No. 29 at 1, ¶ 3.

150    *See* Dkt. No. 29-2.

151    Dkt. No. 29 at 4, ¶ 9.

Wilson v. City of Mission, Texas, Not Reported in Fed. Supp. (2020)

2020 1 W20L3693

152   *In re of Southmark Corp.*, 88 F.3d 311, 316 (5th Cir. 1996).

153   *Id.*

154   *See* Dkt. No. 29-2.

155   Dkt. No. 29.

156   *Id.* at 1, ¶ 2.

157   *Id.* at 4, ¶ 9.

158   *See* Dkt. No. 30.

159   *See supra* notes 90–92 and accompanying text.

160   Dkt. No. 30 at 9, ¶ 13.

161   Dkt. No. 30 at 12.

162   *See* *U.S. Bank v. Lindsey*, 920 N.E.2d 515, 535 (Ill. App. Ct. 1st Dist. 2009) (quoting *Obert v. Saville*, 624 N.E.2d 928, 931 (Ill. App. Ct. 2d Dist. 1993))

163   *In re FM Forrest, Inc.*, 587 B.R. 891, 933 (Bankr. S.D. Tex. 2018) (quoting *Perez v. Astrue*, No. 2:09-1504, 2009 WL 4796738, at *4 (D.N.J. Dec. 9, 2009)).

164   *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

165   LR7.4 ("Failure to respond to a motion will be taken as a representation of no opposition.").

---

**End of Document**     © 2022 Thomson Reuters. No claim to original U.S. Government Works.